# United States Bankruptcy Court

# District of Massachusetts

|  |  |
|---|---|
| In re: | Chapter 11 |
| | Case No. 05-40809 |
| ACCESS CARDIOSYSTEMS, INC., | |
| Debtor | |
| ACCESS CARDIOSYSTEMS, INC., | Adversary Proceeding |
| NORTH AMERICAN | No. 05-4076 |
| ENTERPRISES, INC., JOHN | |
| MORIARTY AND ASSOCIATES, | |
| JOHN J. MORIARTY, RICHARD F. | |
| CONNOLLY, JR., AND JOSEPH R. | |
| ZIMMELL, | |
| Plaintiffs, | |
| OFFICIAL COMMITTEE OF | |
| UNSECURED CREDITORS OF | |
| ACCESS CARDIOSYSTEMS, INC., | |
| Plaintiffs-Intervenors, | |
| v. | |
| RANDALL FINCKE, | |
| Defendant | |

## <u>MEMORANDUM OF DECISION</u>

Before this Court are "Plaintiffs' Motion for Partial Summary Judgment" (the "Plaintiffs' Summary Judgment Motion") and "Defendant Randall Fincke's Motion for Partial Summary Judgment" ("Fincke's Summary Judgment Motion"). Resolution of each motion

1

requires this Court to determine whether the Plaintiffs are entitled to a declaration that Access Cardiosystems, Incorporated owns the rights under a patent application filed in the name of the defendant, Randall Fincke ("Fincke"), as inventor. Additionally, this Court must determine whether summary judgment in favor of Fincke is appropriate as to the Plaintiffs' claims for common-law and securities fraud.

I.    FACTS AND TRAVEL OF THE CASE

A.    **Introduction**

Access Cardiosystems, Incorporated ("Access" or the "Debtor") filed a voluntary petition seeking relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[1] on February 8, 2005. Access develops and markets a portable automated external defibrillator (the "AED" or the "Access AED"), and continues to operate its business as a debtor in possession. See 11 U.S.C. § 1107.

The present controversy stems from a pre-petition suit filed in the Massachusetts Superior Court by the Debtor and various of the Debtor's individual investors (together, the "Plaintiffs")[2] against Fincke,[3] one of Access's founders and stockholders and a former

---

[1] See 11 U.S.C. §§ 101, et. seq.

[2] The Official Committee of Unsecured Creditors (the "Committee") has intervened in the present case. However, the Committee's role has been minor relative to the summary judgment motions. At oral argument, the Committee merely stated that it supported the Plaintiffs' position, having intervened only to protect the rights of unsecured creditors in the event of a settlement.

[3] On March 25, 2005, Fincke initiated an adversary proceeding within the Debtor's main bankruptcy case by filing a "Notice of Removal Pursuant to Federal Rule of Bankruptcy Procedure 9027" (the "Notice of Removal"), effectively transferring the Superior Court case to this Court. The Plaintiffs have not objected to the removal, and this Court therefore has jurisdiction of the controversy pursuant to 28 U.S.C. § 1452. See also Fed. R. Bankr. P. 9027.

2

Access director and officer.  In the Complaint,[4] the Plaintiffs seek, *inter alia*, a declaratory judgment that Access owns the intellectual property associated with the Access AED and, accordingly, seek an order requiring Fincke, the named inventor in Non-Provisional Patent Application Number 10/232,645 ("the 645 Application"), to assign to Access all rights in the pending patent application, related intellectual property and any ensuing patent.

A detailed examination of Access's history and the development and implementation of the AED technology is necessary to resolve the contested ownership of the intellectual property.  Although both parties have attempted to raise the specter of dispute regarding possibly relevant facts, a review of the record demonstrates that the material facts are essentially undisputed.[5]

B.    **The Formation of Access**

1.    *Intellectual Property Development and Pre-Incorporation Activities*

The development of the technology underlying the Access AED began in March of 2000, prior to Access's incorporation, when Fincke "started developing . . . new defibrillation technology."  In conjunction with his burgeoning idea, Fincke approached Gregory Baletsa regarding the formation of a corporation to exploit the technology.  Fincke

---

[4] After removal of the action, the Plaintiffs moved to amend the complaint, which motion was allowed without objection on July 26, 2005.  Thereafter, the Plaintiffs again moved to amend the complaint to identify and add as parties the corporate entities through which the individual investors made investments in Access.  No additional claims or factual allegations were asserted in the second amended complaint and no objection to the motion was filed.  Accordingly, this Court allowed the motion on October 20, 2005.  Although Fincke has not filed an answer to the second amended complaint (hereafter, the "Complaint"), the failure to do so is immaterial, as his previously filed answer to the first amended complaint addresses all relevant allegations and claims made by the Plaintiffs.

[5] The following recitation of facts are those material only to the dispute over intellectual property ownership.  As will be discussed later, the facts relevant to the fraud claims are omitted here to maintain clarity in the present discussion.

3

asked Baletsa to begin the steps necessary to prepare for the incorporation of a business to produce, market and sell the end product, while Fincke would concentrate his efforts on developing the appropriate technology. Baletsa agreed, advanced $50,000 of his own funds as initial financing, and in return for his work on the administrative tasks, was to receive a percentage share of stock in the corporation.

In addition to Fincke and Baletsa, other individuals also began working on the AED technology in the spring of 2000.[6] Baletsa contacted Keith Bowers ("Bowers"), an electrical engineer, to recruit his assistance with the new technology. Baletsa and Bowers met on March 13, 2000 to discuss Bowers' possible involvement in the company. At that meeting, Baletsa told Bowers that Baletsa was the president of a new company being formed to develop and market defibrillator technology. Baletsa further explained that he and Fincke were trying to avoid venture capital investment and would compensate Bowers for his work through stock options in the to-be-formed corporation. Bowers accepted Baletsa's offer and began work as a "consultant" to Access in late March or early April of 2000.

During the same time frame, Baletsa and Fincke also approached Alan Adamsky, another electrical engineer. Fincke maintains that Adamsky was not working for Access prior to incorporation, and that, initially, Fincke merely asked Adamsky certain questions regarding a charging circuit for the AED. But Adamsky testified at his deposition that he began work as a "consultant" to Access in March of 2000 before the company's incorporation. It is not disputed, however, that Adamsky was brought into the endeavor in

---

[6] Although there has been some dispute over whether the contributions certain individuals made to the development of the AED render them "co-inventors" of the technology, the Plaintiffs have conceded, for the limited purpose of the summary judgment motions, that Fincke is the sole inventor of the technology described in the '645 Application.

4

some capacity prior to Access's formal incorporation.  Like Bowers, Adamsky was to be initially compensated with stock options in the company.[7]

David Barash, Access's Medical Director, and Jonathan Epstein, an AED trainer, were also brought on prior to Access's incorporation.[8]  It was agreed that they, too, would be compensated with stock options in Access.  It is clear from the parties' testimony at deposition that those to be initially compensated with stock options would receive cash for their services when monies became available.  Cash payments were eventually made, all of which were paid by Access, and not by Fincke personally.

In his response to the Plaintiffs' Request for Admissions ("RFA's"), Fincke stated that no "formal or informal structure" was in place prior to the incorporation of Access.  The evidence, however, conclusively shows otherwise.  In addition to the hiring of various consultants to assist in technological and administrative development, other evidence of a more formal business venture appear in the record.  For instance, by May of 2000, a checking account had been opened and a Workers Compensation and Employers Liability Insurance Policy had been obtained – both in the name of the unincorporated business.  And, by June of 2000, when the AED technology had progressed to the point of apparent viability, Fincke and Baletsa met with Randy LaCasse, a patent engineer, to discuss the

_____

[7] In April of 2001, Adamsky's increased hours led to an agreement that he would be paid in cash (rather than in stock) for his services – but Adamsky later left the Debtor's employ when certain payments were not forthcoming.

[8] There is some conflict in Fincke's answers to the Plaintiffs' Requests for Admission regarding when Barash actually became involved.  In one response, Fincke denies that he sought Barash's assistance prior to incorporation.  In a separate answer, however, he admits that "prior to the incorporation of Acelex, Fincke contacted Barash to provide clinical input on the use of AED products."

filing of a provisional patent application.  LaCasse was hired on behalf of Access to do preliminary work that would eventually lead to the filing of that application.

### 2.    *The Incorporation of Access*

On July 5, 2000, Access was formally organized as a Massachusetts corporation under the name "Acelex Corporation" (hereafter, also referred to as "Access").[9] The Articles of Organization state that the purpose of the corporation is to "engage in the business of designing, manufacturing, distributing and selling emergency defibrillation equipment . . . ." Fincke and Baletsa were named as the company's only directors and officers; Fincke was listed as Vice President and Treasurer, and Baletsa was listed as President.

When Access was first incorporated, Fincke and Baletsa were the only stockholders, with Fincke holding approximately 85 percent of the issued shares. A Stockholders Agreement executed by Fincke and Baletsa on June 7, 2000 contains several restrictions on the voluntary transfer of Access stock, including rights of first refusal by Access should any stockholder wish to transfer his shares.  An Amendment to Stockholders Agreement executed January 18, 2001 incorporated the terms of the original agreement, but reflected the addition of Barash as an Access stockholder.  By virtue of the amended agreement, Fincke held approximately 85 percent of issued shares, Baletsa held approximately 11.5 percent, and Barash held approximately 3.5 percent.[10]

---

[9] Thereafter, a separate "Acelex Corporation" was formed in Delaware.  The Massachusetts corporation was merged with the Delaware corporation in January 2001.   At some point, the corporate name of the merged entity was changed from "Acelex Corporation" to "Access Cardiosystems, Incorporated." Acelex and Access will jointly be referred to as "Access" for the remainder of this memorandum.

[10] According to a letter to investors dated October 18, 2002 (the "Investor Letter"), Access had an authorized capitalization of 29,000,000 shares of common stock.  By this time, in addition to the shares held by Fincke, Baletsa and Barash, an additional 3,887,283 shares had been issued

Although Baletsa was initially listed as the company President, it is clear from the record that Fincke generally controlled Access from conception through incorporation and beyond. Fincke testified at deposition that Baletsa did not adequately perform his duties as President, leaving Fincke to control and direct a majority of the company's administrative activities. Following Baletsa's resignation in January of 2001, Fincke took over the role as President. Fincke remained the majority stockholder and sole director until April of 2003. Even after he no longer retained a majority of stock ownership in Access, Fincke continued to function as President and CEO until November 2003.

C.    **Patent Applications**

An initial provisional patent application (the "First Provisional Application") for a "Defibrillator AED Unit" was filed on August 31, 2001 in the United States Patent and Trademark Office. Fincke was named as sole inventor. LaCasse was hired by Access to prepare and file the application, and all associated costs were paid for by Access. Access subsequently hired new patent counsel, Mark Pandiscio ("Pandiscio"). Pandiscio filed a second provisional patent application (the "Second Provisional Application") related to the AED technology in May of 2002.[11]

In order to retain August 31, 2001 as the priority date for the claims listed in the First Provisional Application, it was necessary to file a non-provisional application covering the

---

to contractors and employees as part of their stock option plans, which shares would "vest over periods of time set forth in the individual options." The total number of shares reserved for issuance pursuant to the stock option plans was 4,300,000. An additional 2,300,000 shares were reserved for issuance to investors if certain promissory notes were converted.

[11] In Pandiscio's affidavit, he states that the Second Provisional Application was filed because he "observed . . . that there had been significant further advances in the technology to be patented."

disclosed invention within one year. Non-provisional Patent Application Number 10/232,645 ( the "'645 Application") was timely filed, though at the last possible moment, on August 30, 2002. The '645 Patent Application lists the invention as an "Automated External Defibrillator (AED) System," with Fincke as the sole inventor. In an affidavit submitted in conjunction with the summary judgment motions, Pandiscio states that he listed Fincke as the sole inventor on both the Second Provisional Application and the '645 Application because he was instructed to do so by Fincke.

Also on August 30, 2002, Pandiscio filed with the United States Patent and Trademark Office an International Patent, Application Number PCT/US2002/02817 (the "PCT Application"), covering the AED technology. The complete application was not attached to the parties' pleadings, but the abstract of the invention on the cover page of the PCT Application is identical to the abstract on the '645 Application. Further, Fincke stated at deposition that he "believe[d] the content [of the PCT Application and the '645 Application] is the same content."

Unlike a patent application in the United States, an international patent application may be filed in the name of a company and may be applied for by someone other than the inventor. On the PCT Application covering the AED technology, Fincke is named as the inventor, but Access is designated as the "Applicant." Pandiscio states that Access was named as the Applicant on the PCT Application because he believed that Access "owned" the invention disclosed in the application. According to Pandiscio, he "understood the owner of the technology to be The Company. As a matter of common practice, where it is possible to do so, a non-U.S. patent application is filed in the name of the company that

8

owns the patent."[12]   In conjunction with the filing of the PCT Application, Fincke executed

a Power of Attorney, signed by Fincke as President of Access, giving Pandiscio authority

to act on Access's behalf with regard to the filing and prosecution of the PCT Application.

All parties agree that no assignment of rights under the '645 Application has been

executed between Fincke and Access. What is obviously in dispute is whether the parties

intended that such an assignment would eventually be executed and/or whether Fincke

had an obligation to assign rights in the '645 Application independent of any express or

implied understanding between the parties.   Fincke vehemently denies that he ever

intended to assign his rights in the '645 Application and any ensuing patent to Access,

while various individuals associated with company say they believed otherwise.

Pandiscio admits that Fincke never explicitly told him that he would sign an

assignment of rights in the '645 Application.  However, Pandiscio believed, at the time  the

'645 Application was filed, that an assignment would be executed at a later date.  Although

Pandiscio's normal practice was to file an assignment in conjunction with the filing of a

patent application, he testified at deposition that "we didn't have time to execute the formal

papers in order to keep the filing date and that we would provide the formal papers later;

and those formal papers would . . . [include] the assignment."  It is unclear why he did not

press for execution of that assignment following the filing of the '645 Application.

---

[12] Fincke attempts to raise a question of fact by pointing to another statement by Pandiscio
wherein Pandiscio admits that he does not know what the effect of naming Access as the Applicant
would be in countries where, like the United States, patent laws allow patents to issue only in the
name of the inventor. However, the precise effect of the PCT Application from country to country
is irrelevant. What *is* relevant is the fact that Access was listed as Applicant and not Fincke,
because it evidences that Fincke either believed or intended that Access would have ownership
of the intellectual property rights associated with the PCT Application.

9

In spite of the fact that Fincke, as the named inventor on the '645 Application, was the *de facto* owner of the invention disclosed in the '645 Application and any patent to be issued, no licensing agreement was ever entered into between Fincke and Access regarding Access's use of the intellectual property. In fact, no steps were taken to secure, in writing or otherwise, Access's rights to use the technology described in the '645 Application. By the same token, Fincke never affirmatively stated to any relevant parties that he considered himself to hold equitable, as well as legal rights, to the '645 Application and any patent to be issued, nor did he take any steps to assign his rights under the '645 Application in exchange for additional consideration from Access. In fact, according Fincke, the subject of assignment of patent rights simply "did not come up."

Pandiscio's fees, as well as all other costs associated with the patent filings, were paid for by Access. In addition, those payments were reflected on Access's corporate tax returns, and not on Fincke's personal tax returns. Fincke has not reimbursed Access for any of the payments made to secure patent rights in the intellectual property.

D.   **Development, Manufacturing, Marketing and Distribution of the Access AED**

By the fall of 2002, Access had progressed from a purely developmental phase, and had begun manufacturing the Access AED. The Debtor had received FDA approval and was actively marketing the product. In a promotional brochure (the "Access Brochure") partly authored by Fincke, Access is described as "entirely focused on developing breakthrough solutions." The Access Brochure also refers to "our technology" and "patents pending." At this point, however, Access was less focused on the development

of new technology, and was concentrating its efforts on building a quality product,
marketing the product and generating sales that would produce revenues for the company.

A Business Plan dated October 18, 2002 (the "Business Plan") outlined the
company's planned trajectory, from technological development to product sales. The
Business Plan was authored in part, reviewed and approved by Fincke prior to its
distribution.[13] The following are relevant excerpts from the Business Plan:

1.    *Introduction*: Describes Access as a "medical technology company that
      designs, manufactures and markets a . . . proprietary line of . . . AED's . . .,"
      and refers to "Access Product Technology," "the core technology in the
      product," and the "proprietary waveform."

2.    *Business Summary*: Refers to the "AccessAED," stating that the "AccessAED
      has unique Biphasic WaveControl Technology," which is "a unique capability
      for the Access AED that is not possible with any of the other competitors";
      states that Access "intends . . . to develop defibrillation solutions . . ." and
      refers to "its improved technology."

3.    *Product Overview*: Describes the "AccessAED" as "the only device that offers
      escalating defibrillation energy . . ."

4.    *Sales and Marketing*: Says that "AccessAED product features . . . will create
      a significant competitive advantage," and describes marketing and
      promotional strategies offering European distributors limited exclusivity in
      their core markets and calls for plans to further the establishment of brand
      identity.

5.    *Competition*: Provides an overview of competitors' products and outlines their
      benefits and drawbacks in comparison to the Access AED.  Nowhere
      discusses whether Fincke, as the "owner" of the intellectual property, may or
      may not develop a competing product.

6.    *Technology Overview*: States that the "Corporate goal is to create an AED
      with clinical superiority . . . accomplished with the difibrillation therapy
      waveform," and refers to the "proprietary product design."  The section also

_____

[13] Fincke disputes the degree to which he is responsible for the contents of the Business
Plan. He claims that Access's corporate counsel, Michael Elefante ("Elefante"), drafted the "Risk
Factors" section and that other parties provided input regarding individual sections of the Business
Plan. This dispute is not legally relevant however, as will be discussed below.

references the patent application filed in August of 2001 covering various technologies employed in the Access AED.

7.   *Risk Factors*: Lists various risks that may be associated with investing in Access, including the existence of various competitors and the possibility of patent infringement claims.   Nowhere is it stated that Access has no ownership rights in the pending patents covering the technology or that Access has no license agreement regarding use of the technology underlying the Access AED.

E.   **The Funding of Access**

After the initial $50,000 contributed by Baletsa was depleted, Fincke began to lend his personal funds to Access.  Fincke loaned $325,000 to Access between January of 2001 and June of 2001, of which only $43,465.38 remains outstanding.  By the fall of 2002, it was clear that additional funding would be required to keep Access afloat until revenues from AED sales were realized, and Fincke began to solicit funds from outside investors. He first approached two of his longstanding close friends, John Moriarty ("Moriarty") and Richard Connolly ("Connolly").  Both loaned funds to Access in 2001.[14]  In 2002, James Radley ("Radley") and Joseph Zimmel ("Zimmel"), friends of Moriarty and Connolly, loaned additional funds to Access[15] (together, the "Investors").  The following is a summary of loans made by the Investors from July of 2001 through December of 2002, taken from the Loan/Equity Investment Summary (the "Investment Summary") attached to Fincke's Summary Judgment Motion.

| July 2001: | Moriarty | $1,000,000 |
| November 2001: | Connolly | $500,000 |

---

[14] Moriarty invested in Access through John Moriarty & Associates, a company for which he serves as a principal.

[15] Radley's investments were made through North American Enterprises, Inc., a corporation owned and controlled by Radley.

12

| December 2001: | Moriarty | $500,000 |
| April 2002: | Moriarty | $300,000 |
| | Connolly | $300,000 |
| May 2002: | Moriarty | $250,000 |
| | Connolly | $75,000[16] |
| June 2002: | Moriarty | $300,000 |
| August 2002: | Radley | $2,000,000 |
| December 2002: | Zimmel | $500,000 |

Accordingly, the total amount loaned to Access by the Investors in 2001 and 2002 was $5,725,000.

By the spring of 2003, Access needed additional cash resources. Fincke approached the Investors regarding additional funding, but the Investors were reluctant to extend additional loans to Access on the same terms. The Investors were concerned that the company's balance sheet, as well as corporate governance issues, would make it difficult for Access to obtain long term financing from other sources. According to Radley, the Investors were concerned with Access's heavy debt load, and felt that

> for [Access] to be able to move forward it needed a cleaner balance sheet. . . . [The Investors] didn't feel that continuing to load the company with debt was going to solve the problems and give [them] the future flexibility the company was obviously going to need in order to continue forward. . . . [Fincke] needed Access to act like a real company with a cleaned up balance sheet and a real board with five directors of which we could point [sic] three and he would appoint two.

A March 25, 2003 letter from Radley to Fincke summarized the Investors' concerns regarding the company's debt burden, and proposed new terms for additional financing.

---

[16] According to the Investment Summary, this $75,000 was repaid to Connolly in August of 2002, but the repayment was not recorded in the general ledger.

According to that proposal, the Investors would take equity positions in Access and a "formal corporate governance structure" would be implemented. Fincke initially rejected the Investors' proposal, but finally acquiesced in order to obtain the additional funds needed to keep Access afloat. A Closing Agenda for the deal, dated April 25, 2003, summarizes the transactions[17] as follows:

a.   Radley's initial $2 million loan plus accrued interest would be converted to equity, and Radley would purchase an additional $500,000 of Access stock.

b.   Moriarty would purchase $250,000 in Access stock.

c.   Connolly's initial investment would be converted to equity, and he would purchase an additional $500,000 of Access stock.

d.   Zimmel would purchase $500,000 in Access stock.

Subsequent to the April 2003 Transaction, the Investors continued to loan additional amounts to Access to keep it in operation. According to the Complaint, the Investors had contributed at least $11.7 million as of June of 2004, through convertible promissory notes, including an additional $5,975,000 in cash availability for Access.[18]

F.    **Changes in Corporate Structure and the Proposed Employment Agreement**

In addition to the influx of additional funds, the April 2003 Transaction brought changes in Access's corporate structure and governance. Fincke no longer held a majority of shares in the corporation. A Board of Directors (the "Board" or the "Access Board") was formed, and Radley, Moriarty and Zimmel were elected as members. Pursuant to the

---

[17] This series of transactions, including the conversion of the Investors' debt to equity and the Investors' purchase of additional Access shares, will be referred to as the "April 2003 Transaction."

[18] The Investors have continued to finance Access's operations throughout the Chapter 11 case.

14

terms of the transaction, Fincke also became a member of the Board and, although he had the option of doing so, did not appoint an additional Board member.

At a meeting of the Access Board on May 23, 2003 (the "May 2003 Board Meeting"), Moriarty suggested that, in light of Fincke's new position as minority shareholder, an employment agreement should be drafted to protect Fincke's position in the company. Radley was appointed to negotiate the employment agreement with Fincke, and Attorney Elefante was to send a draft agreement to Radley. Radley eventually received two draft agreements from Elefante, but no formal agreement was ever entered into between Fincke and Access. According to Radley, "it just sort of fell by the wayside." Likewise, there is no indication that Fincke pushed the issue over the ensuing months.

Although intellectual property issues were not raised at the May 2003 Board Meeting, the draft agreements sent to Radley by Elefante included language regarding ownership of intellectual property developed by Fincke in connection with Access's business. Elefante's cover letter accompanying the first draft, dated June 6, 2003, stated:

> The draft is intended to provoke your thoughts about what an appropriate contact [sic] with Randall would be. The draft follows the form of a fairly typical employment agreement with a senior person like Randall. . . .
>
> The genesis of the suggestion that there be an employment agreement was my sense that both Randall and the company needed an employment agreement to reflect the changed circumstances. From Randall's point of view, it seemed to me he legitimately ought to have some assurance that he will continue to be an employee of the company or will be adequately compensated if he no longer is. From the company's point of view, it seemed to me important that we document the fact that [the] company owns the intellectual property Randall has produced for Access. The company also ought to be protected against the possibility that Randall will leave the company and compete against it.

15

The second draft agreement was essentially identical to the first, and was accompanied by a cover letter from Elefante to Radley dated November 14, 2003, which stated:

> From the Company's point of view the greatest benefit of the agreement are the confidential information and non-compete provisions. The provisions nail down the company's rights to the intellectual property generated by Randall and protect it from competition. The non-compete is very strong from the company's point of view. Getting Randall's agreement to these provisions would be valuable to the company and worth a trade in job security for Randall.

The proposed employment agreements contained standard terms of employment, including compensation, termination of employment, severance benefits and non-compete provisions. Both also contained a section titled "Confidential Information; Assignment of Inventions." Neither of the proposed agreements, however, referred specifically to the '645 Application, the PCT Application or to any existing intellectual property used by Access or the assignment of any interest in that property.[19] And while Fincke would be

---

[19] The following are the relevant terms of the "Assignment of Inventions" portion of the proposed employment agreements:

> . . .
>
> b) *Inventions.* Inventions means discoveries, improvements and ideas (whether or not shown or described in writing or reduced to practice) and works of authorship, whether or not patentable or copyrightable, (1) which relate to the business of the Company, or (2) which relate to the Company's actual or demonstrably anticipated research or development, or (3) which result from any worked [sic] performed by the Executive for the Company, (4) for which equipment, supplies, facility or trade secret information of the Company is used, or (5) which is developed on any Company time.
>
> c) With respect to Inventions made, authored or conceived by Executive, either solely or jointly with others during his employment, whether or not during normal working hours or whether or not at the Company's premises, Executive will:
>
> (i) Keep accurate, complete and timely records of such Inventions, which records shall be Company property and be retained on the Company's premises.
>
> (ii) Promptly and fully disclose and describe such Inventions in writing to

required to assign to Access any inventions "made, authored or conceived by [Fincke]

either soley or jointly with others during his employment," he was not required to assign

inventions (1) developed entirely on his own time and unrelated to the business of Access

or its actual or anticipated research or development or (2) which did not result from any

work performed by Fincke for Access.

Both drafts of the employment agreement were apparently sent only to Radley.

Elefante testified at deposition that he did not copy Fincke on either correspondence and

did not send Fincke a copy of the proposed agreements.   Radley, likewise, testified at

deposition that he never provided Fincke with a copy of the proposed agreements.   In fact,

Radley and Fincke apparently never discussed an employment agreement between Fincke

and Access.

---

the Company.
  (iii)  Assign to the Company all of his rights to such Inventions, and to
applications for letters patent and/or copyright in all countries and to
letters patent and/or copyrights granted upon such Inventions in all
countries.
  (iv)  Acknowledge and deliver promptly to the Company (without charge to
the Company but at the expense of the Company) such written
instruments and to do such other acts as may be necessary in the
opinion of the Employer to preserve property rights against forfeiture,
abandonment or loss and to obtain and maintain letters patent and/or
copyrights an [sic] to vest the entire right and title thereto in the
Company.

  d)  The above provision of this Agreement does not apply to an Invention for which
no equipment, supplies, facility or trade secret information of the Company was
used and which was developed entirely on Executive's own time, and (1) which
does not relate (a) directly to the business of the Company or (b) to the
Company's actual or demonstrably anticipated research or development, or (2)
which does not result from any work performed by the Executive for the
Company.
  . . .

17

G.    **Fincke's Employment at Access Ends**

The Investors maintain that Fincke mismanaged the company throughout his time as President and CEO, a claim which Fincke of course denies. Convinced that Fincke's leadership was not right for Access, the Board voted, on November 28, 2003, to "remove Fincke as President and Treasurer and to relieve him of his executive position (CEO), but to elect him as non-executive Chairman of the Board of Access and Chief Technical Officer." However, Fincke was to receive no cut in pay or benefits. Also at that meeting, Radley was elected as interim President, Treasurer and CEO of Access until the Board named a successor.

The parties disagree regarding the circumstances that precipitated Fincke's final departure from Access. Fincke claims he was fired and physically locked out; the Investors claim that he quit and was never denied access to the company's offices. Regardless of which version is correct, it is undisputed that Fincke officially left Access in January of 2004. Thereafter, Access attempted to repurchase all of Fincke's stock for $1.00, which according to the Plaintiffs represented the total book value of the shares at that time.[20]

H.    **Fincke Asserts Ownership of the Intellectual Property**

On February 20, 2004, Pandiscio received a telephone call from Fincke. During the course of their conversation, Fincke indicated that he believed Pandiscio did not and had never represented Access, but was retained as Fincke's personal representative with regard to the intellectual property matters. Fincke also informed Pandiscio that Fincke did

_____

[20] Access argues that its rights regarding the repurchase of Fincke's shares are controlled by the terms of a Stock Purchase Agreement. Fincke disputes the valuation of his stock and Access's right to repurchase his shares. Fincke has asked this Court to opine relative to whether Access is entitled to purchase his outstanding shares for this amount. This particular dispute, however, is not directly implicated by summary judgment motions presently before this Court.

not intend to assign his rights in the intellectual property to Access. Thereafter, on March 3, 2004, Fincke emailed a letter to Pandiscio to the same effect. In that letter, Fincke again asserted that he "always" considered Pandiscio and Pandiscio's firm to be his "personal counsel in connection with the prosecution of [the '645 Patent Application]." Fincke further stated that "at no time did [Fincke] authorize or instruct [Pandiscio] to act for Access Cardiosystems, Inc. ("*Access*") in these matters, nor did [he] give any authorization or instruction to transfer to Access . . . [his] rights relating to this technology or to any patents and patent applications relating to it." Fincke also instructed Pandiscio not to represent Access in connection with the '645 Application, to refrain from communicating with Access directors, officers or investors without Fincke's explicit permission and instruction and to send all materials and work product related to the '645 Application to Fincke personally.

Pandiscio explained to Fincke at the time of the telephone call that he disagreed with Fincke's characterization of Pandiscio's representation. On March 4, 2004, in response to Fincke's written communication, Pandiscio sent a letter to Fincke's counsel at that time, Jack McElhinney ("McElhinney"), and Access's corporate counsel, Michael Batson ("Batson"). In that letter, Pandiscio expressed his understanding that he represented Access, and not Fincke personally, regarding intellectual property matters. Pandiscio recited several grounds for this belief, including: (1) Pandiscio was introduced to Access by John Rice, an Access employee; (2) Pandiscio understood that communications were to be directed to Access through interactions with Fincke and other Access employees; (3) Pandiscio sent all bills to and was paid only by Access; and (4) prior to the February telephone call, there was no indication that he represented anyone other

19

than Access or that Fincke personally, and not Access, owned the intellectual property. Therefore, Pandiscio declined to comply with Fincke's demands.

On June 14, 2004, Fincke's new counsel, Ieuan G. Mahony ("Mahony"), sent a letter directly to Access's new president, John Geisel ("Geisel"). In that letter, Mahony asserted Fincke's ownership of the intellectual property used by Access, demanded that Access "cease and desist using proprietary and confidential know-how that Fincke disclosed to Access for purposes of manufacturing and distributing products covered by the claims of the '645 Patent," and threatened to "notify Access's distributers and customers of their exposure to infringement claims upon issuance of the Patent, and their exposure to misappropriation claims now," should Access not comply with Fincke's demands.

Access responded on July 6, 2004 by filing the first version of the complaint now pending before this Court.

### I.      The Complaint and Counterclaims

The Complaint contains seven counts. Counts I and III seek a declaratory judgment and constructive trust to be imposed in favor of Access regarding the ownership of the '645 Application, any ensuing patent and the intellectual property associated with the Access AED. Count II alleges that Fincke breached his fiduciary duties to Access and the Investors. Counts IV and V allege negligent misrepresentation and actual fraud by Fincke on Access and the Investors. Counts VI and VII seek damages for securities fraud under Massachusetts and Federal securities laws.

Fincke answered the Complaint by generally denying the Plaintiffs' claims, and filed several counterclaims against Access and the Investors. Counterclaims I, II and III allege breach of contract and promissory estoppel claims against the Investors and Access

20

arising from their failure to provide Fincke with a "promised" employment agreement. Counterclaim IV alleges breach of fiduciary duties by the Investors.  Counterclaim VI[21] asserts a claim of wrongful discharge against Access. Counterclaim VII seeks a declaratory judgment regarding (1) the parties' rights and obligations under the Stockholder Agreement and (2) ownership of the '645 Application and inventions disclosed therein.

The Plaintiffs now seek summary judgment on Count I of the Complaint.  There, they ask for a declaration that Access owns all right and title to the inventions disclosed in the '645 Application, any ensuing patent and the intellectual property related to Access's defibrillator technology.  They ask this Court to order Fincke to assign all rights in the pending patent application to Access.[22]

Fincke moves for summary judgment on four Counts of the Complaint: (a) Count II for Fincke's alleged breach of fiduciary duty; (b) Count IV regarding Fincke's alleged fraud against Access and the Investor Group; and (c) Counts VI and VII alleging securities fraud. Inasmuch as Count II of the Complaint addresses Fincke's alleged breach of fiduciary duties as grounds for requiring Fincke to assign all rights in the intellectual property to Access, it is essentially duplicative of Count I.  Thus, the parties' summary judgment motions relative to the ownership of the '645 Application will be treated as cross-motions.[23]

---

[21] Due to a typographical error in Fincke's filed Answer and Counterclaims, there is no Counterclaim V.

[22] Fincke filed a timely opposition to the Plaintiff's Summary Judgment Motion.

[23] The Plaintiffs timely filed oppositions to Fincke's Summary Judgment Motion.

II.    POSITIONS OF THE PARTIES

    A.    **Counts I and II: Declaratory Judgment and Breach of Fiduciary Duty**

        1.    *Plaintiffs*

The Plaintiffs essentially argue that Fincke's fiduciary duties as a director and officer of Access oblige him to assign the rights to the intellectual property underlying the Access AED, as embodied in the '645 Application, to Access. The Plaintiffs support their position by citing to cases from other jurisdictions in which courts have held that a named inventor on patent applications and/or ensuing patents was obligated to assign to the company the rights in the intellectual property based on the inventor's fiduciary obligations to the company.

Several theories are embedded in the Plaintiffs' fiduciary duty argument. First, because a fiduciary may not engage in self-dealing or usurp a corporate opportunity, they argue that Fincke cannot now personally benefit from the millions of dollars invested in Access to develop the AED technology by retaining rights to the claims described in the '645 Application. Second, the Plaintiffs contend that Access's sole purpose from its formation was to exploit the intellectual property at issue here. As such, Fincke cannot deprive the company of its only asset in direct contravention of the fiduciary duties he once held toward Access.  In addition, the Plaintiffs argue that Fincke developed the intellectual property as an "alter ego" of Access, that Access paid all costs of filing and prosecuting the '645 Application, that Access paid all consultants and other employees hired to exploit the intellectual property and that Fincke, through the Business Plan and other company documents, held out the intellectual property as belonging to Access. As such, he cannot now equitably claim that he, and not Access, owns the rights to the '645 Application.

2.    *Fincke*

Fincke raises three major arguments in his summary judgment motion and in response to the Plaintiffs' motion. First, he argues that all the inventive elements contained in the '645 Application were conceived of prior to the incorporation of Access. Therefore, Access never had a claim of ownership with regard to the intellectual property. On this basis, Fincke says his claim of ownership does not and never has conflicted with Access's property interests, and he did not usurp a corporate opportunity. He brought the asset into the company, and can take it with him freely upon departure.

Second, Fincke argues that the Investors and other individuals involved with Access have always known that he owned the rights under the '645 Application and that he had not executed an assignment of those rights. He points out that the Business Plan and other documents never explicitly state that Access, and not Fincke individually, owns the intellectual property underlying the Access AED. Furthermore, he says that the Investors' knowledge as to ownership is belied by their admission that they expected Fincke *would* execute an assignment "at the appropriate time." Therefore, the Investors could not have believed that Access *did* own rights to the intellectual property.

Finally, Fincke maintains that he has no obligation to assign the intellectual property rights in the defibrillator technology because Access never finalized and executed the employment agreement. The protections to be afforded by that agreement were, he argues, a necessary condition to his assignment of the '645 Application. Because Access failed to hold its end of the bargain, Fincke argues, he has no obligation to execute an assignment to Access.

B.   **Counts IV, VI and VII: Fraud Claims**

In Counts IV, VI and VII of the Complaint, the Plaintiffs allege that Fincke made

various misrepresentations and failed to disclose material facts to the Investors regarding

Access's achievements, profitability, revenue projection, order rates, average sales price,

financial run rates and product stability and that Fincke misrepresented or failed to state

material facts regarding problems with key distributors and customers, problems with

product shipments and the existence of contingent liabilities to third parties and potential

lawsuits. These false representations and failures to disclose, they allege, were made in

an effort to induce the Investors to fund Access. Thus, they seek damages for fraud under

Massachusetts law and for securities fraud under both the Massachusetts Uniform

Securities Act, M.G.L. c. 110A § 410(a)(2), and the federal Securities Exchange Act,

Section 10(b) and 17 C.F.R. § 240.10b-5.

Fincke has moved for summary judgment on these three Counts, arguing that all

material facts and risks were fully disclosed in the October 2002 Offering Memorandum,

that the figures used in the March 2003 Company Overview were without error and that all

projections were clearly labeled as such. Thus, he argues, the securities fraud claims must

fail because all material facts were fully disclosed and the Plaintiffs cannot have "justifiably

relied" on mere projections. In addition, Fincke argues that after April 2003, the Board was

apprised weekly or biweekly of Access's financial condition, which information precludes

the fraud claim to the extent it alleges that Fincke misrepresented Access's financial

condition.

The Plaintiffs oppose summary judgment on the three fraud claims, noting many

disputes of material fact. They point to various disputes regarding the extent to which

24

Fincke failed to disclose material facts in violation of both Massachusetts and federal laws.

The Plaintiffs also argue that the Plaintiffs' reasonable reliance is a question of fact,

precluding summary judgment on all three counts.

III.    <u>DISCUSSION</u>

A.    **Summary Judgment Standard**

Summary judgment may be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). The First Circuit has held that

> A "genuine" issue is one "that properly can be resolved only by a finder of
> fact because [it] may reasonably be resolved in favor of either party." Put
> another way, a "genuine" issue exists if there is "sufficient evidence
> supporting the claimed factual dispute" to require a choice between "the
> parties' differing versions of the truth at trial." A "material" issue is one that
> "affect[s] the outcome of the suit," that is, an issue which, perforce, "need[s]
> to be resolved before the related legal issues can be decided." <u>Garside v.
> Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990) (citing and quoting, <em>inter
> alia</em>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91
> L.E.2d 265 (1986), and <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250,
> 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

<u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994). Whether the

factual issues disputed by the parties are material to the outcome of the case "is

determined by the substantive law governing the issues." <u>Great Lakes Press Corp. v.

Froom</u>, 695 F.Supp. 1440, 1445 (W.D.N.Y. 1987).

"A party opposing summary judgment must 'present definite, competent evidence

to rebut the motion.'" <u>Maldonado</u>, 23 F.3d at 581 (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950

F.2d 816, 822 (1st Cir. 1991), <u>cert. denied</u>, 504 U.S. 985 (1992)). Evidence sufficient to

rebut a motion for summary judgment must be significantly probative, id., and not merely "conjectural or problematic." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Thus, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Id.

### B.   Counts IV, VI and VII: Fraud Claims

Common-law and securities fraud claims often require the resolution of disputed factual issues, see, e.g., Basic v. Levinson, 485 U.S. 224 (1988); Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002); Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017 (Mass. 2004); see also Wright & Miller, "Summary Judgment in Particular Actions and on Particular Issues: Actions Involving State of Mind," 10B Fed. Prac. & Proc. Civ. 3d § 2730, and this case is no exception. Numerous factual disputes are presented[24] regarding the existence, nature, extent and materiality of Fincke's false or misleading representations or omissions. Since each of these disputed areas is essential to resolve the common-law fraud and securities fraud claims, Fincke's Summary Judgment Motion with regard to Counts IV, VI and VII is DENIED.

### C. Counts I and II: Ownership of the '645 Application and Intellectual Property

### 1.   Inventorship v. Ownership

Under federal law, the named inventor on a patent application is presumed to be the legal owner of the property rights embodied in the patent application and any ensuing

---

[24] For purposes of the present memorandum, the myriad factual allegations and supporting exhibits presented by the parties relative to the fraud claims have not been described in detail. To do so would have been to undertake an onerous, distracting and unnecessary recitation of factual minutiae.

patents, see Univ. Patents, Inc. v. Kligman, 762 F.Supp. 1212, 1218-19 (E.D. Pa. 1991) (citing D. Chisum, Patents, § 22.02(1990)), and Fincke is correct in his assertion that, under federal law, he is the presumed owner of the inventions disclosed in the '645 Application. See Stonecraft, LLC v. Slagter (In re Stonecraft, LLC), 322 B.R. 623, 630 (S.D. Miss. 2005).[25]

It is of paramount importance, however, that a company cannot apply for a United States patent in its own name. Edwards v. Gramling Eng'g Corp., 588 A.2d 793, 798 (Md. App. 1991) (citing S.A. Deller, Deller's Walker on Patents § 439 at 59 (2d ed. 1972)); 3 E. Lipcomb III, Lipcomb's Walker on Patents § 9:43 at 75 (3d ed. 1985)).   Under federal patent laws, only the inventor may apply for a patent. Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 fn.23 (Fed. Cir. 1993); 35 U.S.C. §§101, 102(f). But patents are freely assignable, allowing named inventors to transfer ownership of intellectual property from themselves to a corporate entity. 35 U.S.C. § 261 ("patents shall have the attributes of personal property . . . [and] [a]pplications for patent, patents, or any interest therein, shall be assignable. . . ."). In the absence of an executed assignment, equitable principles may oblige a named inventor to transfer ownership of his or her rights in a patent or patent application to another entity. Edwards v. Gramling, 588 A.2d at 798; Kennedy v. Wright, 676 F.Supp. 888, 892 (D. Ill. 1988) (citing Grip Nut Co. v. Sharp, 150 F.2d 192 (7th Cir. 1945), cert. denied, 326 U.S. 742 (1945)). Thus, what is at issue in this case is the equitable ownership of the intellectual property, because it is undisputed that the legal ownership technically rests in Fincke as the named inventor.

---

[25] Although the Plaintiffs have previously maintained that Fincke is not the sole inventor of the claims contained in the '645 Application, the Plaintiffs have conceded Fincke's sole inventorship for the purposes of the present summary judgment motions.

27

Inventorship and ownership present different legal questions and are governed by distinct areas of law. Beach Aircraft, 990 F.2d at 1248; Great Lakes Press Corp. v. Froom, 695 F.Supp. 1440, 1445 (W.D.N.Y. 1987). Inventorship is a question of federal patent law. Froom, 695 F.Supp. at 1445. Ownership is a question of state law,[26] although laws as to ownership rights in patents are essentially uniform across the jurisdictions. Id.; see also Kennedy v. Wright, 676 F.Supp. at 891.

### 2.    Employers' Rights to Employee Inventions

An employer's right to ownership of an employee's inventions varies depending on the circumstances. "The general rule is that an inventor owns the patent rights to an invention even though the invention was conceived and/or reduced to practice while the inventor was employed." Stonecraft, LLC v. Slagter (In re Stonecraft, LLC), 322 B.R. 623, 630 (Bankr. S.D. Miss. 2005); see also Solomons v. United States, 137 U.S. 342, 346 (1890); Cahill v. Regan, 157 N.E.2d 505, 508 (N.Y. 1959). If, however, an employee is hired to work in an inventive capacity, then the employer is entitled to the rights in the invention. Stonecraft, 322 B.R. at 630; see also Solomons, 137 U.S. at 346; Great Lakes Press Corp. v. Froom, 695 F.Supp. 1440, 1445-46 (W.D.N.Y. 1987) (quoting United States v. Dubilier Condenser Corp., 289 U.S. 178, 187 (1933)). Furthermore, if the employer and employee have executed an employment contract requiring the employee to assign rights in his or her inventions to the employer, the employer owns the employee's inventions. See Stonecraft, 322 B.R. at 630.

Finally, where the relationship is not a "true employee-employer relationship," Stonecraft, 322 B.R. at 631, but one in which the inventor stands in a fiduciary relation to

---

[26] The parties conceded at oral argument that Massachusetts is the governing state law.

the company, the fiduciary "may be under an obligation, in the absence of agreements to

the contrary, to assign any patents resulting from the invention to the organization." Id.

(quoting Van Slyke & Friedman, Employer's Right to Inventions and Patent of its Officers,

Directors and Employees, 18 AIPLA Q.J. 127, 147 (1990)).

      3.    *Fincke's Fiduciary Duties to Access*

      a.    <u>Fiduciary Duties of Promoters</u>

    "Those who undertake to form a new corporation, to procure for it the rights and

capital by which it is to carry out the purposes set forth in its charter, and to establish it as

able to do its business, are its promoters." Hays v. The Georgian, Inc., 181 N.E. 765, 768

(Mass. 1932). A promoter is one who "participates in the formation of a corporation or

some other joint business venture, and takes steps to put it in a position to transact the

business for which it is intended." Café la France, Inc. v. Schneider Sec., Inc., 281

F.Supp.2d 361, 373 (D.R.I. 2003) (citing Black's Law Dictionary 712 (6th Ed. 1990)).

    A promoter stands in a fiduciary relationship to the company which he or she

promotes, Old Dominion Copper Mining and Smelting Co. v. Bigelow, 74 N.E. 653, 655

(Mass. 1905), and is "charged with the duties imposed by good faith" when dealing with

the corporation, Hays, 181 N.E. at 768. When promoters engage in self-dealing vis-à-vis

the corporation, "they will not be permitted to benefit by any secret profit which they may

receive at the expense of the corporation or of its members." Gladstone v. Bennett, 153

A.2d 577, 582 (Del. 1959); see also Whaler Motor Inn, Inc. v. Parsons, 363 N.E.2d 493,

497 (Mass. 1977); Hays, 181 N.E. at 768; Keith v. Radway, 108 N.E. 498, 499 (Mass.

1915). In order to retain the benefit of transactions with the corporation, a promoter must

disclose in full the particulars of any transaction for prior approval or, at the very least,

obtain subsequent ratification by an independent board. <u>Whaler Motor Inn</u>, 363 N.E.2d at 497.[27]

Beginning in March of 2000, prior to formal incorporation, Fincke clearly acted as a promoter for Access.  Fincke did not develop the intellectual property in isolation. Instead, the development of the intellectual property was part of a cooperative effort between Fincke and Baletsa – while Baletsa handled the pre-incorporation administrative activities, Fincke worked on developing the intellectual property that would form the basis for the corporation's product. Fincke and Baletsa recruited others to assist in Access's development prior to incorporation, offering stock options in the corporation as compensation for their services.  A checking account was opened and an insurance policy was taken out on behalf of "Acelex."  Thus, although Fincke argues that there was no "venture" in place prior to the incorporation of Access, it is clear that he, Baletsa, and others were all working toward making Access a viable business operation.  His activities in this regard were essential promotive activities.

     b.    <u>Fiduciary Duties of Corporate Directors and Officers</u>

Under Massachusetts law, corporate directors and officers owe their corporations fiduciary duties of care and loyalty. <u>Demoulas v. Demoulas Super Markets, Inc.</u>, 677 N.E.2d 159, 179 (Mass. 1997); <u>Spiegal v. Beacon Participations, Inc.</u> 8 N.E.2d 895, 905 (Mass. 1937).  The duty of care requires corporate fiduciaries to act with the "strictest good faith in caring for and managing the corporation's property," <u>Beaudette v. Graham</u>, 165

---

[27] As the Massachusetts Supreme Judicial Court has noted, however, "the problems of the common law liability of promoters as fiduciaries have been largely dormant since the enactment of Federal securities legislation in the 1930's. <u>See</u> W.L. Cary, <u>Corporations</u> 1042 (4th ed. 1969)." <u>Whaler Motor Inn</u>, 363 N.E.2d at 497.

N.E. 671, 673 (Mass. 1929), and to "exercise reasonable intelligence in conducting the affairs of the corporation." Ellis v. Varney, 17 Mass. L. Rep. 394 (Mass. Sup. 2004).

The duty of loyalty prohibits fiduciaries from "promoting their own interests in a manner injurious to the corporation." Ellis v. Varney, 17 Mass. L. Rep. 394. "Their paramount duty is to the corporation and their personal pecuniary interests are subordinate to this paramount duty." Beaudette, 165 N.E. at 673. Corporate fiduciaries must act "solely in the interest of the corporation," Gilbert Mfg. Co. v. Goldfine, 59 N.E.2d 461, 463 (Mass. 1945), and "cannot be permitted to serve two masters whose interests are antagonistic." Demoulas, 677 N.E.2d at 179 (quoting Spiegal, 8 N.E.2d at 904).

In keeping with the duty of loyalty, corporate fiduciaries are prohibited from engaging in self-dealing and from pursuing corporate opportunities, except under limited circumstances. Although self-dealing and the usurpation of corporate opportunities are distinguishable activities, "the requirements that determine the propriety of pursuing corporate opportunities and engaging in self-dealing transactions are similar." Demoulas, 677 N.E.2d at 179. Thus, the Massachusetts Supreme Judicial Court (the "SJC") has referred to both as the "corporate opportunity doctrine," id., and this Court will do the same.

In Demoulas v. Demoulas Super Markets, Inc., the SJC discussed the contours of the corporate opportunity doctrine and a fiduciary's concomitant obligations. Because the discussion in Demoulas so clearly describes Massachusetts law on the corporate opportunity doctrine, it is worth quoting at length.

> "[T]he true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, 'taking advantage of an opportunity [for his personal profit] when the interests of the corporation justly call for protection. This calls for the application of ethical standards of what is fair and equitable . .

31

. [in a] particular sets of facts.'" *Durfee*, 323 Mass. at 199, quoting Ballantine, Corporations 204-205 (rev. ed. 1946). This "fundamental fairness test places the burden on the fiduciary who acquires a corporate (or partnership) opportunity, or who engages in self-dealing, 'to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership.'" *Meehan v. Shaghnessy*, 404 Mass. 419, 535 N.E.2d 1255 (1989). *See Starr v. Fordham*, 420 Mass. 178, 183, 648 N.E.2d 1261 (1995).

. . . A director or officer is not entirely barred from pursuing a corporate opportunity, but a person holding either position cannot do so unless the opportunity is first offered to the corporation and rejected by it. In this aspect, *the corporate opportunity doctrine may be considered to be a rule of disclosure. In re Tufts Elecs., Inc.*, 746 F.2d 915, 917 (1st Cir. 1984), *citing Durfee*, 323 Mass. at 200. To satisfy the principle of fairness to the corporation and to meet his duty of loyalty, *the fiduciary must fully disclose to the corporation, all material facts* concerning the opportunity. . . . Similarly, to satisfy the duty of loyalty, a fiduciary wishing to engage in a self-dealing transaction must disclose the details of the transaction and the conflict of interest to the corporate decisionmakers.

. . . [W]here a corporate opportunity or self-dealing transaction is disclosed to the corporation, but the decision on it is made by self-interested directors, *the burden is on those who benefit from the venture to prove that the decision was fair to the corporation.* . . .

In short, to meet a fiduciary's duty of loyalty, a director or officer who wishes to take advantage of a corporate opportunity or engage in self-dealing must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation. Otherwise, the officer or director acts in violation of his fiduciary duties, and whatever gain or advantage that he acquires may be held for the benefit of the corporation so as to deny him any benefit or profit.

Demoulas, 677 N.E.2d at 180-82 (citations omitted) (emphasis added); see also Martin v. Kagan (In re: Tufts Elec., Inc.), 746 F.2d 915, 917 (1st Cir. 1984) ("the corporate opportunity doctrine is a rule of disclosure"); Durfee v. Durfee & Canning, Inc., 80 N.E.2d 522 (1948).

c.    Analysis

As a promoter of Access, as Vice President and Treasurer of Access from its incorporation through January of 2001, and as President, Treasurer and CEO until

32

November 2003, Fincke owed fiduciary duties of care and loyalty to the company at all times relevant to this litigation. Even accepting as true Fincke's representation that, from the inception of Access in March 2000, he has always considered himself, and not Access, the rightful owner of the intellectual property, his actions constituted clear violations of his fiduciary duties to the corporation. The intellectual property, the '645 Application and any ensuing patent are essential corporate opportunities that Fincke has attempted to divert for his own gain.

Fincke has argued that all inventive components of the claims disclosed in the '645 Application were conceived of prior to Access's incorporation. Thus, his argument goes, he brought the asset to the company, there was never an independent "opportunity" for the corporation to exploit, and therefore no opportunity for Fincke to usurp. But Fincke's fiduciary duties toward Access began prior to incorporation, during the development of the intellectual property. The intellectual property clearly represented an essential opportunity for the corporation, since Access's sole purpose was to exploit the resulting inventions. "Corporate opportunity" is a broad concept that includes "property in which the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or . . . *where the officers' interference will, in some degree, prevent or hinder the corporation in effecting the purpose of its creation.*" Wartski v. Bedford, 926 F.2d 11, 18 (1st Cir. 1991) (emphasis added) (quoting Lincoln Stores v. Grant, 34 N.E.2d 704, 707 (Mass. 1941)). A corporate opportunity also includes "property which is necessary for the business of a corporation . . . in order to protect and develop its business interests." Wartski, 926 F.2d at 18 (quoting Black v. Parker Mfg. Co., 106 N.E.2d 544, 549 (Mass. 1952)). The inventions disclosed in the '645 Application are the cornerstone of the Access

33

corporation. Without it, there would be no Access AED, the development of which has been the sole focus of the corporation for the majority of its operation.

While asserting control over the intellectual property, Fincke did not take proper steps to protect the corporation from his own self-interest. See Demoulas, 677 N.E.2d 159. Fincke never affirmatively disclosed to anyone else involved in the corporation that he intended to assert complete ownership of the intellectual property – which ownership would give him the right to leave Access and utilize the property for his own profit to the detriment of Access (as he now intends to do). The corporate opportunity doctrine requires this type of disclosure before a fiduciary may take advantage of so essential an aspect of a corporation's business. Id. at 180-181. Nor can Fincke demonstrate that his assertion of ownership is fundamentally fair to the corporation. Id. at 181. Because the Access AED is essential to the corporation's viability, its lack of ownership rights over the intellectual property would be devastating to its operation. After Access's expenditure of millions of dollars to develop, market and manufacture the Access AED, the loss of rights to the intellectual property underlying the product would be fundamentally unfair to the company.

Fincke also breached his duty of care and wasted corporate assets by failing to protect the company's interest in the intellectual property. See Henderson v. Axiam, Inc., 1999 Mass. Super. LEXIS 580, *158 (Mass. Super. 1999). If Fincke's intention to retain ownership rights over the intellectual property from the outset was, as he argues, legitimate, he had an absolute duty as Access's sole director and officer to secure for Access the appropriate rights in the intellectual property to allow it to manufacture the Access AED. Id. This he did not do. Fincke never attempted to negotiate a licensing agreement with Access, nor did he ever offer to sell his interest in the '645 Application to

the company.    Instead, he allowed enormous sums of money to be invested in the

corporation without the fundamental intellectual property protections the company would

need to protect itself from competition and claims of patent infringement.  Fincke's failure

to obtain appropriate intellectual property protections for Access constitutes a breach of

his duty of care toward the corporation. Moreover, allowing the expenditure of corporate

assets on the product's development in the absence of those protections constitutes a

waste of corporate assets.

Fincke also breached his duties of care and loyalty by wasting corporate assets and

engaging in self-interested transactions when he diverted Access funds to pay for all costs

and fees associated with the filing and prosecution of the patent applications.  It was

fundamentally unfair to have Access pay for patent protection when the corporation itself

had no mechanism by which it could legitimately exploit the invention.  If Fincke intended

to retain the intellectual property, his use of corporate funds to pay for the filing and

prosecution of the First and Second Provisional Applications, as well as the non-provisional

'645 Application, constitutes a breach of his fiduciary duties toward Access and corporate

waste.

Because he has taken advantage of an essential corporate opportunity and has

breached various fiduciary duties toward Access, the only appropriate remedy is to require

Fincke to assign to Access his rights in the '645 Application, any ensuing patent, and any

other intellectual property associated with Access's business. Under Massachusetts law,

when a fiduciary attempts to personally gain by diverting a corporate opportunity, "whatever

gain or advantage that he acquires may be held for the benefit of the corporation so as to

deny him any benefit or profit." Demoulas, 677 N.E.2d at 180-82.

4.     *"Alter Egos" and "Implied Contracts"*

The analysis above relies, at its core, on an acceptance of Fincke's current representation that he always considered himself the sole owner of the property and never intended to transfer or assign that interest to Access.   Under a far more plausible interpretation of the evidence, one could conclude that Fincke did not initially view the intellectual property as his personal property, but as property of the corporation which he directly controlled, and it was not until he left Access that he truly attempted to assert ownership over the intellectual property.

In addition to, or in conjunction with, fiduciary duty theories, courts faced with facts similar to these have required the assignment of patent rights where the named inventor acts as an "alter ego" for a corporation while developing and securing patent rights for an invention.   The principles underlying the "alter ego" theory are essentially agency and contract principles.   Agency principles may compel an assignment of patent rights when it is clear that the inventor acted on behalf of the company with regard to the inventions. See, e.g., Stonecraft, LLC v. Slagter (In re Stonecraft, LLC), 322 B.R. 623 (Bankr. S.D. Miss. 2005); Kennedy v. Wright, 676 F.Supp. 888 (C.D. Ill. 1988), aff'd, 867 F.2d 616 (Fed. Cir. 1989); Dowse v. Fed. Rubber Co., 254 F. 308 (N.D. Ill. 1918).   "When one legal entity is but an instrumentality or alter ego of another by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets." Kennedy v. Wright, 676 F.Supp. at 893 (quoting In re Eufaula Enter., Inc., 565 F.2d 1157 (10th Cir. 1977)).

In addition, the inventor's actions may clearly evidence an implied understanding that rights in inventions belong to the company, see, e.g., E.F. Drew & Co. v. Reinhard,

36

170 F.2d 679 (2d Cir. 1948); <u>Great Lakes Press Corp. v. Froom</u>, 695 F.Supp. 1440

(W.D.N.Y. 1987); <u>Lacy v. Rotating Prod. Sys., Inc.</u>, 961 P.2d 1144 (Colo. App. 1998).  No

express contract is required:

> "For the employer to be entitled to a patent it is not necessary that the
> contract should specifically so provide." It "is a question to be decided upon
> all the facts of the individual case." In short, such a contract may be implied
> from the relations of the parties.

<u>E.F. Drew</u>, 170 F.2d at 682 (2d Cir. 1948) (Learned Hand, J.) (<u>quoting</u> Restatement of

Agency § 397, cmt. (a)).

Because in many ways the "alter ego" and "implied contract" theories are but

opposites sides of the same coin, the circumstances in which courts have required

assignment based on either, or both, of the theories significantly overlap. For instance,

dispositive facts include:

1.    The inventor directly controlled some or all of the company's management
      and day-to-day activities. <u>Dowse</u>, 254 F. at 314-15; <u>Stonecraft</u>, 322 B.R. at
      632; <u>Froom</u>, 695 F.Supp. at 1447; <u>Kennedy v. Wright</u>, 676 F.Supp. at 893;
      <u>Lacy</u>, 961 P.2d at 1145-46.

2.    The invention relates to an essential aspect of the company's business.
      <u>Dowse</u>, 254 F. at 316; <u>Froom</u>, 695 F.Supp. at 1447; <u>Kennedy v. Wright</u>, 676
      F.Supp. at 893; <u>Lacy</u>, 961 P.2d at 1145-46.

3.    The inventor did not affirmatively assert ownership until leaving the company.
      <u>Dowse</u>, 254 F. at 315; <u>Stonecraft</u>, 322 B.R. at 633.

4.    Written documents or the inventor's statements implied corporate ownership
      of the inventions/intellectual property. <u>Dowse</u>, 254 F. at 314; <u>E.F. Drew</u>, 170
      F.2d at 682-83; <u>Stonecraft</u>, 322 B.R. at 635; <u>Froom</u>, 695 F.Supp. at 1448;
      <u>Kennedy v. Wright</u>, 676 F.Supp. at 890-91; <u>Lacy</u>, 961 P.2d at 1146.

5.    Patent counsel was retained on behalf of the corporation and not the
      inventor personally. <u>Dowse</u>, 254 F. at 314; <u>Stonecraft</u>, 322 B.R. at 633, 634-
      35; <u>Froom</u>, 695 F.Supp. at 1443.

6.      The company paid for filing and prosecution of patent applications relating
to the invention. <u>Dowse</u>, 254 F. at 315; <u>Stonecraft</u>, 322 B.R. at 633; <u>Froom</u>,
695 F.Supp. at 1443; <u>Kennedy v. Wright</u>, 676 F.Supp. at 890-91; <u>Lacy</u>, 961
P.2d at 1146.

Each of these factors is present in this case.  Fincke exercised direct control of

Access from its inception through April of 2003, and retained substantial control over the

company's affairs until his departure in January of 2004.  As company president and CEO,

he hired patent counsel to prosecute the patent applications, and all costs associated

therewith were paid by Access.  These costs were reflected on Access's tax filings, and not

on Fincke's personal tax filings.  In addition, Fincke, acting as company President,

authorized the filing of the PCT Application in the name of Access, and not himself

personally.

Moreover, company documents authored in part and reviewed by Fincke clearly

implied that Access owned the rights to the intellectual property underlying the Access AED

– including references to "Access Product Technology," and repeated references to the

development of inventive technologies as a fundamental corporate goal.  At the time these

documents were disseminated, Access's sole product, the Access AED, was derived from

the intellectual property disclosed in the '645 Application.

With the exception of Fincke's post-February 2004 assertions, all of the relevant

evidence supports the conclusion that Fincke did not view the intellectual property as his

personal asset during his involvement with the company.  Instead, he acted on behalf of

Access in obtaining protection for the company's intellectual property.  He treated the

intellectual property as a corporate asset, to be protected through corporate funds.  His

actions are entirely consistent with the Plaintiffs' assertion that, although there was no

38

formal agreement, Fincke acted at all material times as though the property belonged to the company.

Because (1) the evidence demonstrates that Fincke acted on behalf of Access, as Access's agent, with regard to intellectual property matters, including the filing and prosecution of the '645 Application and (2) Fincke treated the intellectual property as a corporate asset, represented to others that it was a corporate asset and used corporate funds to protect and develop the asset, Access is entitled to ownership of the '645 Application, any ensuing patent, and the intellectual property related to the Access AED.

5.    *The Employment Agreement*

In addition to generally denying his fiduciary or implied contract obligations to assign his rights in the '645 Application to Access, Fincke argues that the company's failure to finalize and execute the "promised" employment agreement, initially discussed at the May 2003 Board Meeting, releases him of any obligation to assign rights Access in the intellectual property. This argument, however, is unavailing.

Fincke's obligation to assign the '645 Application to the company arises from Fincke's fiduciary duties toward Access and from his role as Access's agent in filing the patent applications and representing the intellectual property as owned by Access. These fiduciary duties and attendant obligations arose prior to the May 2003 Board Meeting. Furthermore, they are independent of Fincke's rights or claims vis-a-vis the proposed employment agreement. Although Fincke's wrongful discharge and breach of fiduciary duty claims against the Plaintiffs may be asserted, as they are here, as separate claims, they may not be raised to defeat his fiduciary obligations to Access under Massachusetts law.

Additionally, despite Fincke's expansive description of the circumstances surrounding the employment agreement, there is absolutely no evidence that *anyone*, including Fincke, believed the employment agreement represented a trade in job security for Fincke's assignment of the '645 Application. First, no mention of intellectual property was made at the May 2003 Board Meeting, and the subject was not raised until Elefante sent the draft agreements to Radley. But Fincke was not copied on this correspondence, and apparently never received a copy of the draft agreements. And even if Fincke had seen either the draft agreements or Elefante's cover letters, nothing in the language of either implies that the employment agreement was intended to secure Fincke's employment protections in return for assignment of the '645 Application. The cover letters do not reference an understanding that Fincke had retained rights in the intellectual property. Instead, Elefante refers to the importance of *documenting* Access's ownership – which concerns have born fruit in the present adversary proceeding.

Furthermore, there is no draft agreement, contract or other document in evidence that demonstrates an understanding that any intellectual property matters covered by the draft agreements would include an assignment of the '645 Application. In fact, the agreements as they were drafted were entirely forward-looking and referred to "inventions" in the generic sense. There is no mention of the '645 Application, and no draft assignment was included.

In sum, Fincke's arguments suggesting the existence of an understanding between himself and Access, through the Board of Directors, that an agreement would be executed to assign rights to Access in the '645 Application in exchange for protective employment provisions, teeter on the line between embellishment and outright hyperbole. More

40

important, Fincke's fiduciary duties to Access and his treatment of the intellectual property as if it already belonged to Access supercede any alleged "quid pro quo" understanding. Fincke's assertions regarding wrongful discharge, breach of contract and breach of fiduciary duties based upon the failure of Access to provide him with a protective employment agreement may be raised elsewhere, but cannot stand as a defense to his duties to assign the rights in the '645 Application.

IV.     <u>CONCLUSION</u>

For all the foregoing reasons, the Plaintiffs' Summary Judgment Motion on Count I of the complaint is GRANTED. Fincke's Summary Judgment Motion on Counts II, IV, VI and VII is DENIED.  Separate orders in conformity with this memorandum shall issue consistent herewith.

DATED: March 31, 2006                    By the Court,

_____

Henry J. Boroff
United States Bankruptcy Judge