# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 05-40809-HJB |
| ACCESS CARDIOSYSTEMS, INC., | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| ACCESS CARDIOSYSTEMS, INC., | ) | Adversary Proceeding |
| NORTH AMERICAN | ) | No. 05-4076-HJB |
| ENTERPRISES, INC., JOHN | ) | |
| MORIARTY AND ASSOCIATES, | ) | |
| JOHN J. MORIARTY, RICHARD F. | ) | |
| CONNOLLY, JR., AND JOSEPH R. | ) | |
| ZIMMELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| ACCESS CARDIOSYSTEMS, INC., | ) | |
| | ) | |
| Plaintiffs-Intervenors,[1] | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RANDALL FINCKE, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

---

[1] The Official Committee of Unsecured Creditors (the "Committee") was granted leave to intervene in the present case, but that intervention was predicated on its desire to protect the interests of unsecured creditors in the event of a settlement.  As no settlement has yet been proposed, the Committee has remained largely inactive in this adversary proceeding and has raised no independent substantive issue.

**MEMORANDUM OF DECISION**

Before the Court, after trial on the question of liability only,[2] is the "Third Amended

Complaint" (the "Complaint") filed by Access Cardiosystems, Inc. ("Access"), four of its

individual investors (the "Investors"), and the corporate entities through which several of

those investments were made (together, the "Plaintiffs") against Randall Fincke, former

Access shareholder, officer, and director.   The Plaintiffs accuse Fincke of breach of

fiduciary duty, fraud, negligent misrepresentation, and securities fraud under

Massachusetts securities laws.  Fincke responds with counterclaims against the Plaintiffs

for breach of fiduciary duty, breach of contract, promissory estoppel, and declaratory

judgment.  The following constitute the Court's findings of fact and conclusions of law on

liability under these claims, pursuant to Federal Rule of Bankruptcy Procedure 7052.


I.     FACTS AND TRAVEL OF THE CASE

Access Cardiosystems, Inc. filed a voluntary petition seeking relief under Chapter

11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[3] on

February 8, 2005.  From 2000 to 2004, Access developed, marketed, and sold a portable

automated external defibrillator (the "Access AED" or "AED").   The present controversy

stems from a pre-petition suit filed in the Massachusetts Superior Court by Access and the

Investors against Fincke, one of Access's founders, former stockholder, and former Access

---

[2] For the sake of economy, the parties agreed to try the issues relating to liability first, and then, only if necessary, issues relating to the calculation of damages.

[3] See 11 U.S.C. §§ 101 et seq. (2008).

2

director and officer.[4]   The allegations underlying the Plaintiffs' claims and Fincke's counterclaims require a step back, nine years from the time of this writing, to the year 2000, beginning with the actions of Randall Fincke.

Fincke describes himself as driven by a mission to expand market access to automated electronic defibrillation technology.[5]   Trial Tr. day 1, 43.   His work experience certainly lends credence to this claim.   By the year 2000, Fincke had worked with several medical device companies on various AED products and was the named inventor on twelve patents in the defibrillator field.[6]   And, in the early part of that year, Fincke was focused on the development of a new AED product.   Simultaneous with his burgeoning idea, however, Fincke was embroiled in litigation brought by his former employer, Zoll Medical ("Zoll").   Zoll alleged that Fincke, in conjunction with Cadent Medical (a company founded by Fincke after leaving Zoll; "Cadent"), had misused[7] Zoll's intellectual property and violated a noncompetition agreement.

---

[4] Fincke initiated this adversary proceeding within Access's main bankruptcy case by filing a "Notice of Removal Pursuant to Federal Rule of Bankruptcy Procedure 9027," effectively transferring the Superior Court case to this Court.   Plaintiffs did not object to the removal, and this Court therefore has jurisdiction of the controversy under 28 U.S.C. § 1452.   See also Fed. R. Bankr. P. 9027.

[5] A defibrillator is a "device designed to deliver a therapeutic electric shock to the heart in order to stop chaotic fibrillation and restore the normal heart rhythm."   Gen. Stip. ¶ 7.

[6] Fincke is also the named inventor on the patent embodying the technology at the heart of the Access AED ("Access Intellectual Property" or "Intellectual Property").   Ruling on the parties' motions for partial summary judgment, this Court previously ordered him to assign his rights in the Intellectual Property to Access.   See Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 340 B.R. 127 (Bankr. D. Mass. 2006) ("Access I").

[7] The parties' pleadings and witness testimony regarding the Zoll litigation were ambiguous as to the exact nature of the claims raised against Fincke and Cadent.   The characterization of the suit as one for "misuse" of intellectual property was the only description provided.

Although the litigation was a highly contentious affair, Fincke continued to work on developing the new AED, individually and not through Cadent.  In early 2000, Gregory Baletsa agreed to assist Fincke in forming a business framework to develop the new product and invested $50,000 of his own funds as the initial capital for the venture.[8]  Other individuals – including Kyle Bowers, an electrical engineer, and David Barash, a former emergency room physician – were recruited to assist in developing the technology.  They, like Fincke and Baletsa, understood that compensation for much of their initial work would come later, in the form of stock in the to-be-formed corporation that would produce, market, and sell the final product.

In June 2000, the litigation between Zoll, Cadent, and Fincke finally came to an end.  The Plaintiffs allege that Fincke represented to one or more of them that the judgment was a "vindication," as Zoll had not prevailed on a majority of the counts against him.  Zoll *did* prevail on other counts, however, and a $650,000 judgment was issued against Fincke personally, later paid by Cadent.  The litigation having ended, Cadent was sold to an unrelated third party (Cardiac Sciences), and Fincke was free to pursue his new endeavor.

On July 5, 2000, Fincke and Baletsa incorporated their new business under the name "Acelex," later changing the name to Access Cardiosystems, Inc.[9]  Baletsa was

---

[8] The exact date of this investment is not noted on Defendant's Exhibit 1, which contains a summary of loans and equity investments in Access (the "Investment Summary").  This exhibit was prepared by Jay Bounty, Access's former chief financial officer, and the Court found at trial that Fincke had adopted the document by offering it.  According to the Investment Summary, Baletsa's initial investment was $49,000, but the parties agree that $50,000 is the correct figure.

[9] Access was originally incorporated in Massachusetts as "Acelex."  Subsequently, a separate "Acelex" corporation was incorporated in Delaware.  In January 2001, the Delaware and Massachusetts entities merged and the name of the merged entity was later changed.  Because these distinctions are not relevant to the issues presently before the Court, the Court will continue to refer to both the earlier entities and the current corporate form by the name "Access."

initially named as the company's president, with Fincke acting as the vice president and treasurer.  In conjunction with the incorporation of Access, Baletsa and Fincke executed a stockholders agreement (the "Stockholders Agreement"), which contained various restrictions on the transfer of stock and allowed Access to buy back stock in the event a stockholder's employment was terminated.  At that time, Baletsa and Fincke were the only officers, directors, and stockholders in Access – Fincke held approximately 85% of the outstanding shares.[10]  Baletsa eventually left his position as president of Access in April 2001.[11]  Fincke remained Access's sole director, president, and treasurer until early 2003.

Access's initial funding in early 2000 was not sufficient to sustain the company.  Between January and June 2001, Fincke advanced an additional $325,000 of his own money to fund Access's operations.[12]  According to Michael Elefante, Access's corporate counsel,[13] he and Jack Carucci, Access's original accountant, discussed whether these funds should be considered debt or equity in the new company.  Ultimately, it was decided that $2,000 of Fincke's investments would be characterized as an investment in the company's stock and the remaining amount characterized as loans to Access.  Trial Tr. day 8, 37.  Beginning in August 2001, and continuing through September 2003, Fincke

---

[10] In January 2001, the Stockholders Agreement was amended to include Barash. Fincke maintained his 85% majority stock ownership, with Baletsa and Barash holding the remaining 11.5% and 3.5%, respectively.  Because the amended agreement incorporates the terms of the original, terms that will be discussed later in more detail, the original and the amended agreements will simply be referred to as the "Stockholders Agreement."

[11] Following his resignation, Baletsa's shares of Access stock were reduced from 1,999,419 to 100,000 shares.  He has not been repaid any portion of his initial $50,000 investment.

[12] $25,000 of this amount represents a recharacterization of amounts purportedly owed to Fincke on account of company expenses that had been charged to Fincke's personal credit cards.

[13] Elefante was a personal attorney for John Moriarty (one of the Investors) as well.

withdrew sums of money from Access. These payments were reflected on Access's books and records as payments on his loan account. By the time of trial, a substantial portion of Fincke's loans to Access had been repaid; only $43,465 of Fincke's $325,000 investment remained outstanding.

Fincke did not keep his work at Access a secret. He discussed the new company and the Access AED with various friends, some of whom expressed interest in making investments in Access to ensure its success. Plaintiffs John J. Moriarty and Richard F. Connolly, Jr. were particularly interested in Fincke's plans for the company, and they became the first outside investors to fund Access's operations.

Moriarty's and Fincke's families had long been close friends, even sharing a ski lodge together for some time. Moriarty characterized his conversations with Fincke regarding Access as "discussion[s] . . . in [the] driveway" – informal discussions about the progress of the company. Trial Tr. day 6, 85. Moriarty had been aware of the Zoll litigation and knew it had concluded; when told that Fincke had won 14 out of 17 counts, he "mistakenly took that as a victory." Trial Tr. day 6, 84. Moriarty testified that before he advanced any funds to Access, he first asked whether there were any "problems like the last time" (presumably referring to the Cadent litigation). Trial Tr. day 6, 84-85. Having received assurances that there were not, Moriarty wrote a personal check to Access for approximately $50,000 sometime between March and June 2001.[14]

---

[14] There is no record of this $50,000 on the Investment Summary or in Access's books and records, and Jay Bounty testified that he was unaware of any investments made by Moriarty other than what was recorded there. Moriarty was also unable to locate a record of the check in his personal files. At trial, however, Moriarty insisted that he had loaned funds to Access prior to his larger investment in July 2001, and Fincke similarly recalled Moriarty loaning a "small amount" between March and June 2001. The Court finds the testimony on this issue credible and that Moriarty did provide approximately $50,000 to Access between March and June 2001.

On July 13, 2001, Moriarty made a second investment[15] of $1,000,000 in Access.[16] According to Moriarty, he relied on several representations by Fincke in making this second investment, namely: the approval for sale of the Access AED in Europe,[17] orders from and good distribution network in Europe, and Fincke's purported plan to use a contract manufacturer to build the product.  Trial Tr. day 8, 88-89.  And Moriarty made an additional $500,000 investment in Access in December 2001.[18]

Fincke also discussed Access and its progress with Connolly during 2001.  Connolly was aware of Moriarty's investments in Access, Trial Tr. day 9, 8, and expressed an interest in helping the company by providing an additional investment.  Fincke responded positively.  According to Connolly, Fincke also told him that he did not need a lot of money, just enough to "get him over the . . . existing hump . . . ."  Trial Tr. day 9, 8.  Further, Fincke allegedly said the Access AED was mature, stable, and very well received in Europe and

---

[15]  The Court here and elsewhere uses the term "investment" quite liberally and without characterizing the advance as debt or equity except where otherwise indicated.  According to a summary of outstanding promissory notes (the "Note Summary"), the March 2001 loan from Moriarty is documented by a convertible promissory note in the amount of $1,000,000.  Other pre-2003 advances by the Investors were similarly made under promissory notes convertible to stock at the lender's option.  But the record indicates that not all advances were made in that fashion. Pl.'s Ex. 110.

[16]  Moriarty made this and subsequent investments through John Moriarty and Associates ("JMA").  Unless a distinction is required, Moriarty will be referred to as the "investor" regarding both his and JMA's loans.

[17]  However, Access did not receive approval for sale of the Access AED in Europe until spring 2002.  Thus, either Fincke erroneously told Moriarty that Access had received approval prior to actually having received it, or Moriarty was mistaken as to what information was given during that time frame.  Because none of the parties raised an issue of misrepresentation on this particular matter, and because there was no basis in Fincke's testimony, other witness testimony or the exhibits to support a contrary finding, the Court concludes that Moriarty was likely mistaken in remembering being told that the device was approved for sale in Europe in summer 2001.

[18]  The Note Summary characterizes this loan as documented by a convertible promissory note.

told Connolly that he had developed a sales force to cover the European market. Connolly testified that Fincke also explained that product manufacturing would be outsourced to a company in Concord, Massachusetts. Trial Tr. day 9, 16. Like Moriarty, Connolly was aware of the Zoll litigation, but not privy to the details. Trial Tr. day 9, 8-9. Following his discussions with Fincke, Connolly invested $500,000 in Access in November 2001.[19]

By the turn of the year, the Access AED had advanced considerably. A provisional Patent Application in the United States had been filed to cover the Access AED technology; Access had completed its ISO 9000 certification[20] and was awaiting approval to market and sell its products in Europe; and the European market was responding positively to the Access AED even before formal approval. In February 2002, Access began signing distribution agreements (the "Distribution Agreements") with various European distributors (the "European Distributors") and continued working to verify and validate the manufacturing process for the AED. Trial Tr. day 5, 96. In April 2002, Moriarty and Connolly each invested an additional $300,000 in Access,[21] and the Access AED received European approval for marketing and sales shortly thereafter.

---

[19] The Note Summary characterizes this loan as documented by a convertible promissory note.

[20] According to their website, ISO (International Organization for Standardization) is a non-governmental organization – "a federation of the national standards bodies of 157 countries" – that "identifies what International Standards are required by business, government and society, develops them in partnership with the sectors that will put them to use, adopts them by transparent procedures based on national input and delivers them to be implemented worldwide." ISO in Brief (2006), http://www.iso.org/iso/isoinbrief_2006-en.pdf. Fincke explained that certification under ISO 9000 standards was necessary to obtain approval of the Access AED for sale in Europe. The certification required Access to develop a system of qualifying, documented procedures that were audited on an ongoing once- or twice-yearly basis.

[21] The Note Summary characterizes both Moriarty's and Connolly's loans as documented by convertible promissory notes.

As sales in Europe began to get underway, Access was in need of additional capital to purchase raw materials needed to build the AEDs.  Both Moriarty and Connolly provided additional funds in spring 2002.[22]  And, by the early summer of that year, Access was eager to solicit further investments to help fund production needed to fill the European orders.  Connolly began speaking with his close friend, James Radley, about Access during spring 2002.  In June, Moriarty provided Access with a further investment of $300,000, and Fincke met with Radley to discuss the possibility of an even larger investment.

According to Radley, Fincke represented at their first meeting that the Access AED was a unique product and in great demand; that a good distribution system was in place in Europe with shipping having already started or about to start; and that FDA approval was soon forthcoming.  Radley also alleges that Fincke told him the product was stable and essentially "ready to go."  The need for additional funding, Fincke explained, was due in part to delays in obtaining final FDA approval.  Radley testified that Fincke told him also that the additional funding was needed just to "get over the hump" and that  $2 million would be sufficient to get the company to the point of self-sustainability.  Trial Tr. day 9, 70.  Following this meeting, Radley invested $2 million in Access.[23]  Despite Fincke's reported optimism regarding Access's financial future, Radley conceded that, at the time he made

---

[22]  Moriarty loaned an additional $250,000 and Connolly loaned an additional $75,000 to Access in May 2003.  The Note Summary characterizes the promissory notes documenting the loans as non-convertible.

[23]  This loan is memorialized by a convertible promissory note in the amount of $2 million payable to Eastern Casualty Insurance ("Eastern Casualty").  Radley's investments were made through Eastern Casualty and North American Enterprises, Inc. ("North American Enterprises"), companies owned and controlled by Radley.

the investment, he was aware that Access was having problems with working capital and that the company was not financially stable. Trial Tr. day 9, 160-161.

In July 2002, before Access obtained FDA approval to market and sell the Access AED in the United States, Fincke received a letter from John Vodopia, an attorney representing Philips Electronics ("Philips") (the "First Philips Letter"). Def.'s Ex. 24. In the letter, dated July 30, 2002, Vodopia referenced nine patents owned by Philips and claimed that "based on [Philips's] investigations," it believed the soon-to-be-released Access AED infringed on at least one of the nine patents. The letter did not detail which of the listed patents were believed to be infringed, nor did it describe which features of the Access AED Philips was referencing in support of its alleged infringement claims. Access's patent counsel, Mark Pandiscio, testified that he did not think Philips had actually seen a physical Access AED device at the time its attorney sent the First Philips Letter. Trial Tr. day 6, 17-18. The letter concluded by stating that Philips was prepared to grant licenses to Access "on reasonable terms and conditions."

According to Fincke, upon receiving the letter, he immediately forwarded it to Elefante, who then forwarded the letter to Pandiscio. Trial Tr. day 1, 91. But Elefante testified that he was not aware of this letter. Trial Tr. day 8, 38. Regardless of how it arrived at Pandiscio's office, Pandiscio did eventually receive the letter and obtained copies of the listed patents to get a sense of their volume. He then spoke with Fincke and (according to Fincke) Elefante as well, and they decided that Pandiscio would follow up with Philips. In an effort to avoid a lengthy review of the more than 200 claims included in the patents, it was agreed that Pandiscio would ask Philips to clarify the specific nature of its infringement claims. Pandiscio could not recall if Elefante participated in the discussions

10

that took place upon receipt of the letter, but did recall Fincke's involvement in the decision. Trial. Tr. day 6, 14-16.   On September 9, 2002, Pandiscio responded to Vodopia, acknowledging receipt of the First Philips Letter, requesting a clarification of the specific patents and claims alleged to be infringed, and asking for proposed licensing terms.  The letter reflects that it was copied to both Fincke and Elefante.  Def.'s Ex. 25.

Fincke testified that, in addition to deciding how best to respond to Philips's initial letter, he began reviewing the referenced patents himself.  After that review, Fincke says, he concluded that there were no serious infringement issues, with the possible exception of a decal used on the Access AED electrodes.  According to Fincke, he and Pandiscio discussed the results of Fincke's review and his decision to remove the potentially problematic decal – an issue then tasked to John Rice[24] at Access.  Trial. Tr. day 7, 77. No further response was received from Philips until the following year.

Pandiscio testified that Fincke never asked him for a formal opinion as to whether the Access AED infringed any of Philips's listed patents or any other patents.  He did recall that Rice contacted him regarding Access's concern with the decal and that Fincke told him they were considering changing the labeling to avoid any infringement issues.  According to Pandiscio, Rice asked his opinion on whether that change would solve the problem. (Pandiscio's response to Rice's inquiry was not elicited at trial.)  Trial Tr. day 6, 18. Elefante says that he was not involved in this process and gave no instruction to Fincke or others at Access regarding the re-design of the AED to avoid infringement.  Trial Tr. day 8, 35.

_____

[24]  John Rice was responsible for mechanical aspects of the AED design and also worked on regulatory and quality matters for Access.

Access received FDA approval for market and sale of the Access AED in the United States in August 2002. Pl.'s Ex. 64. On August 30, Pandiscio filed a Non-Provisional Patent Application for the Access AED (the "'645 Application") and an International Patent Application (the "PCT Application") covering the Access AED technology. Sales in Europe formally began shortly thereafter.

Almost immediately, working capital constraints at Access began taking their toll. Access was having difficulty from the start buying enough parts to fill the European orders and was struggling to pay its past-due accounts with vendors. It was evident that Access would need a substantial cash infusion to pay for the necessary raw materials. Fincke, together with Elefante and Access's management team, began to prepare an investor letter and business plan to be used in soliciting additional investments. Trial Tr. day 7, 7.

The business plan, dated October 2002 (the "Business Plan"), detailed various aspects of Access's business, past performance, and predicted performance. Pl.'s Ex. 107. While Fincke did not prepare all portions of the Business Plan, he contributed to the content and approved the Business Plan prior to its dissemination. The Business Plan was divided into several sections and included information relative to pricing, domestic and international sales, marketing, distribution, competition, regulatory status, manufacturing, and capital needs. In addition, both the Business Plan and the Investor Letter contained a section entitled "Risk Factors," prepared by Elefante and approved by Fincke, which contained twelve enumerated paragraphs. Each document also contained a section titled "Litigation." Both the Risk Factors and Litigation sections disclosed a patent-infringement

12

lawsuit brought by Cardiac Sciences,[25] but did not disclose the receipt of the First Philips Letter.

Section twelve (titled "Financial Projections") referenced financial spreadsheets attached to the Business Plan, consisting of a Projected Monthly Cash Flow and a Projected Monthly Balance Sheet, which included various assumptions and projections related to Access's performance and finances from September 2002 to December 2003.[26] The Financial Projections section also included a list of factors that could negatively affect Access's ability to achieve the projections and assumptions upon which the spreadsheets were based.

Each of the then extant investors – Connolly, Moriarty, and Radley – received a copy of the Business Plan and the financial spreadsheets.  Trial Tr. day 7, 7.  Joseph Zimmell also received copies of these materials in association with his interest in possibly making an investment in Access.  Zimmell was introduced to Access through David Barash in summer 2002, and he met with Fincke in fall 2002 to learn about the company and to do "due diligence."  Trial Tr. day 9, 40.  Zimmell testified that he and Fincke discussed general information regarding Access, including financial and "people" information, with an eye toward evaluating Access's prospects of becoming successful.  He testified that he was told

---

[25]  The nature and outcome of this litigation were not discussed in the parties' pleadings, nor were any details divulged in the admitted exhibits or witness testimony.

[26]  As part of his initial responsibilities as a financial consultant to Access, Jay Bounty created a financial forecast model (the "Financial Forecast Model") to track actual and projected company performance and working capital needs.  He was assisted in this task by Michael Grosberg.  The Financial Forecast Model consisted of a complex computer spreadsheet that relied on inputting various real data and assumptions to forecast the financial status and cash needs of the company.

Access was doing business in Europe and would soon be selling in the United States. <u>Trial Tr. day 9, 41-42</u>.

Zimmell did not review Access's books and records (a task he viewed as "absurd"), but did state that he was not denied the opportunity to review those records and was provided with all of the documents and information he requested.  <u>Trial Tr. day 9, 61</u>.  He testified to receiving an "offering memorandum"[27] and other presentation material at his meeting with Fincke and said he was  told that the memorandum was undergoing revision. <u>Trial Tr. day 9, 43</u>.  Zimmell testified that he saw the Business Plan and the Investor Letter prior to making his investment and that everything in those documents was material to his decision to invest.  He reviewed the financial projections as well as the assumptions that underlay the projections, and was afforded sufficient information from Access to review those assumptions.  <u>Trial Tr. day 9, 55</u>.  Following his meeting with Fincke, Zimmell invested $2 million in three tranches.[28]  On October 30, 2002, Zimmell made a $1,000,000 investment, followed by two additional $500,000 investments in November and December.[29]

---

[27]  Whether there was an "offering memorandum" separate from the Business Plan is unclear.  No document titled "offering memorandum" was admitted into evidence, and no detailed testimony as to its contents (if, indeed, it was a separate document) was offered.

[28] When questioned on this investment, Zimmell initially recalled investing $1.5 million. <u>Trial Tr. day 9, 44</u>.  The Investment Summary shows instead that the investment was $2 million, and, when presented with this evidence, Zimmell did not appear to be surprised.  <u>Trial Tr. day 9, 45</u>.

[29]  Although the parties stipulated that the Investors did not have equity interests in Access prior to April 2003, Zimmell's investments in October 2002 were made through purchases of Access stock.  This loan does not appear on the Note Summary, indicating that it was an equity investment, and Zimmell testified as such.  <u>Trial Tr. day 9, 43-44</u>; <u>Def.'s Ex. 18</u>.

In addition to Zimmell's investments in late 2002, Access also obtained a $500,000 working capital line of credit from Middlesex Bank, partly guaranteed by the United States Small Business Administration and personally guaranteed by Fincke. The line of credit was secured by a first priority lien on all of Access's assets. Def.'s Ex. 18; Pl.'s Ex. 12.

But notwithstanding these new cash infusions, things were still not going well. By the end of 2002, the European Distributors, some of whom had pre-paid for units, began to express frustration with Access. Some complained of late shipments, others that the units contained various problems and defects. Kyle Bowers testified to speaking with one European distributor, Arthur Dolby,[30] during October or November 2002. Dolby complained, *inter alia*, of batteries not working properly in the Access AEDs and Access's failure to provide satisfactory responses to previous complaints. Bowers said he reported the conversation to Fincke, but did not remember Fincke's reaction. Trial Tr. day 7, 131-132. By December, Kivex, another European distributor, was growing impatient with Access's alleged failure to ship units with Danish voice and text as requested. In an email sent to Fincke and other Access management personnel in late December, Jasper Nielsen at Kivex gave Access an ultimatum – either commit to a firm shipment date in 2002 or refund amounts Kivex had prepaid in February.[31] Pl.'s Obj.-to Ex. 4.

---

[30] Arthur Dolby represented a European Distributor appropriately named "Dolby." The Court will refer simply to "Dolby" when discussing the communications between Access and Arthur Dolby, as representative for his company.

[31] Nielson insisted that the refund or firm shipment date be given within one week. Two brief emails followed. The first said, simply, "3 days to go," and the second, "Dear Mr. Randall, I must say Im [sic] impressed by the[ ] silence from your side." Presumably, Nielson had not received either the requested units or the return of his deposited funds as of that date. Pl.'s Obj.-to Ex. 4.

Many of the problems with the European Distributors stemmed from Access's inability to obtain enough raw materials to build the AEDs.  Despite the investments made at the end of 2002, Access still found itself struggling to pay down past-due accounts with key vendors during the first part of 2003.  Bowers testified that Access was particularly dysfunctional from January through June 2003 owing to a large amount of debt, difficulty in obtaining parts, and design changes necessitated by changes in parts.  Trial Tr. day 7, 137, 149.  According to Bowers, Access was in "crisis mode" from the time shipments commenced.[32]  Trial. Tr. day 7, 149.  Grosberg likewise testified that Access was virtually insolvent in January 2003, unable to pay vendors and procure necessary parts and supplies, Trial Tr. day 5, 145, and Elefante testified that this "technical[ ] insolven[cy]" continued into summer 2003.  Trial Tr. day 8, 49.  Overdue accounts left unpaid eventually led to vendors refusing to provide additional parts or extend additional credit to Access.

For example, in early 2003, Access was forced to change its control board manufacturer from MSL to NuVisions on account of its failure to pay MSL.  MSL not only refused to manufacture any additional boards until Access's past-due account was paid, but eventually drafted upon a letter of credit guaranteed by Moriarty.[33]  Trial Tr. day 5, 149.  Access also began to fall into arrears on its rent.[34]

---

[32]  As Access employee Alyce Nelson stated in a January 5, 2003 email to Bob Ide, Access's main sales contact in Europe, Access was "in a cycle of missed revenue since the first order was taken, and getting beat up as a corporation from manufacturing through sales."  Access also needed to deal with "the lost revenue days in January due to the break in supply of board assemblies caused by a 30+ day delay of payments to vendors . . . ."  Pl.'s Ex. 119.

[33]  Grosberg testified to this, but did not say who had issued the letter of credit.  Trial Tr. day 5, 149.

[34]  According to Fincke, he could not recall exactly when Access was behind on the rent, and thought it could have been May or June 2003.  Trial Tr. day 4, 97.  Elefante testified that he

16

In a March 27, 2003 email, Fincke asked Moriarty to speak with Bound Tree, a domestic distributor, regarding Access's financial position. Def.'s Ex. 39. In that email, Fincke noted that Access would need $500,000 to purchase materials necessary to manufacture April units. He also referenced a forthcoming $250,000 investment from Moriarty in late March that would be used to begin the purchase of parts. Problems with vendors were highlighted by Fincke's statement that Access was "working every avenue possible with second source vendors to find additional methods to get the April material purchased and product produced with as much deferred cash expenses as possible."

Access was also facing complaints from European Distributors regarding unshipped accessories and AEDs with specific languages they had requested. Nielson sent another email in early February 2003 to Fincke and others at Access with complaints on behalf of Kivex. Pl.'s Obj.-to Ex. 5. Noting that Access was taking a "very long time to deliv[er] just a standard order, which is not very promising for the future," he requested an explanation and "promise[d]" to no longer pre-pay for orders.

Kivex was not the only distributor to voice complaints. According to Michael Grosberg, Access's controller, other European Distributors were also upset that they were not receiving full shipment of their orders and that Access failed to provide them with the proper clinical units and accessories. Trial Tr. day 5, 140. On February 14, 2003, Barry

---

recalled dealing with an eviction action by the landlord in summer 2003. Trial Tr. day 8, 49. But the Court finds particularly credible Moriarty's testimony to the effect that his $250,000 investment in late March was precipitated, at least in part, by his discovery that the rent was in arrears. Moriarty had a business relationship with Access's landlord and building owner, and was embarrassed when the landlord advised him of the rent arrears. Trial Tr. day 6, 100-101. Although the testimony and documents are far from clear on this point, it could be that, notwithstanding Moriarty's cash infusion, the rent remained in arrears for additional months subsequent to Investor cash infusions in March and April.

17

Klegerman, a sales manager and key member of Access's management team, sent an email to Fincke, Bounty, and others at Access detailing certain distributor frustrations. According to that email, three distributors – Boundtree, Criticare, and Mortara (Italy)[35] – had relayed "specific issues regarding unpredictable AED shipments, unconfirmed AED orders in our system, unavailable or backordered accessories without a firm ship date, paying upon delivery, and being an administrative nightmare to work with." In addition, Klegerman also stated that, in light of the problems they were experiencing, a recently-proposed price increase was not well received by the three distributors – each said they would stop doing business with Access entirely if the price were increased.[36] Pl.'s Ex. 103.

Grosberg further testified that, as of March 2003, business relationships with "key" European Distributors were "very stressed," primarily because of delivery problems and the

---

[35] Bound Tree was a domestic distributor, and Mortara presumably was one of the European Distributors, given the reference in the email to "Italy." No clarification was made as to whether Criticare was a domestic or foreign entity.

[36] In his email, Klegerman specifically reported that the distributors had stated:

"it's just not worth all this frustration to partner with Access, and in addition, your [sic] going to raise my transfer price forget it - We'll go back to Philips or CSI!"

" . . . your timing with this price increase is terrible."

"If we had the confidence and track record that it was easy to do business with Access, this price increase would not be that big of a deal! However, today, we do not want to go forward with the price increase even if we have:

1). A > than 30% margin.
2). A list price well below the competition. ($1695).
3). And, you have a nice product when we can actually receive one!"

Just to note, these distributor discussions are all on a collaborative level, built on trust, mutual respect, and friendship. At the end of the day, they want to see me win, and themselves win with Access!"

Pl.'s Ex. 103.

lack of Access AEDs containing requested features.  According to Grosberg, distributors were beginning to hold back payments for goods that were actually shipped, as well as ordering below their quotas and threatening to stop orders altogether or cancel their contracts.  Trial Tr. day 5, 141.

At trial, Fincke acknowledged that he was aware of the European Distributors' complaints, and he agreed that  problems with Access AEDs had been reported, including units going on and off and batteries going flat.   But Fincke contended that Access was investigating the problems and working to develop the requested features. He knew that European Distributors had difficulties getting responses to phone calls and emails and that they viewed Access as a difficult company with which to conduct business.  And Fincke conceded that certain distributors were threatening to stop ordering or filling their contract quotas unless the various issues were promptly addressed.  Trial Tr. day 1, 115-117.

To add to Access's woes, the Philips situation resurfaced early in 2003.   On February 28, Philips responded to Pandiscio's September 2002 letter via email, requesting a meeting to discuss Philips's intellectual property claims against Access (the "Second Philips Letter").  Def.'s Ex. 35.  On March 4, 2003, Pandiscio forwarded that email to both Fincke and Elefante.  Pl.'s Ex. 108*;* Def.'s Ex. 35.  On the same date, Pandiscio sent an email to Vodopia, copied to both Fincke and Elefante, thanking him for the response and assuring him that his email had been forwarded to Access.  Pl.'s Ex. 25; Def.'s Ex. 108. On March 26, 2003, Pandiscio emailed Fincke and Elefante again, noting that they needed to decide how to respond to Philip's proposal for a meeting.  Def.'s Ex. 59.

After receiving a follow-up phone call from Vodopia, Pandiscio sent another email to Fincke and Elefante on April 2.  Pl.'s Ex. 5.  He reported that Vodopia had informed him

that after reviewing the Access manual and examining the Access AED, Philips believed there were some infringement problems. Vodopia wanted meet with Access representatives to discuss Philips's claims. Again, neither Fincke nor Elefante responded, and no meeting was scheduled.

Despite the many setbacks, Access continued to work toward improving its situation. During March 2003, Access made two critical new hires. Jay Bounty, consultant to Access since summer 2002, came to work full time as Access's chief financial officer. William Nawn was also hired in March 2003 to oversee manufacturing at Access. Both individuals had extensive experience in their respective areas of expertise. But Access's cash problems overshadowed those hopeful gains, and Elefante and Fincke began negotiations with the Investors to secure additional financing for the company.

In connection with those negotiations, during the early part of March 2003, the Investors received a document titled "Access CardioSystems Company Overview" (the "Company Overview"),[37] which had been prepared, at least in part, by Bounty.[38] Def.'s Ex. 33. Fincke also contributed content to the Company Overview, and he reviewed and approved the final document. Gen. Stip. ¶¶ 57-59. The Company Overview summarized

---

[37] The Company Overview is not dated, and none of the testimony clarified when, exactly, the document was prepared or distributed. Portions of the document, however, indicate that it was drafted in early March 2003 – actual figures for sales, production, and shipments date through February 2003, while production and shipments in March are labeled "planned."

[38] Little testimony was directly elicited regarding the authorship of the Company Overview. However, Fincke introduced circumstantial evidence of Bounty's authorship by submitting a draft of the document that came from Bounty's files. Def.'s Ex. 6. Although he did not directly admit to his authorship, Bounty did testify, on being presented with the draft document, that he would compile these kinds of text documents to summarize various aspects of the company's business. Trial Tr. day 3, 71. Furthermore, his deposition testimony, read at trial, confirmed that the draft document was "one type of document [Bounty] would compile to summarize the cash flow model that the company produced." Trial Tr. day 3, 72.

various aspects of company operations, including Access's financial position as of March 2003. It outlined several "Key Accomplishments," "Issues," and "Current Initiatives to Address Issues." Included among the "accomplishments" were: (1) the hiring of Jay Bounty as CFO on a full-time basis; (2) the hiring of William Nawn as vice president of manufacturing; (3) a 1,500 unit per month order rate; and (4) "product manufacturing stability."

The identified "Issues" included, among others: (1) Access's outstanding debt of $1 million aged at over 90 days; (2) a poor credit rating that resulted in lost sales; and (3) a concern that the lack of available parts could reduce shippable units, requiring additional investments totaling $500,000 in April. Among the initiatives listed to address the issues, the Company Overview highlighted: (1) outside manufacturing of all boards and (2) a new pricing plan, including a price increase effective March 1 that was expected to raise the average selling price of the Access AEDs.

The Company Overview also contained more detail related to important company matters, including discussions regarding a revised budget and forecast, the order backlog, manufacturing, sales management, the price increase, and accounts payable and receivable. Attached to the Company Overview was a spreadsheet detailing Access's projected monthly cash requirements. Many parts of this document form the basis of the Complaint, discussed in more detail below.

On March 13, 2003, Fincke sent an email to the Investors listing several financing options to be discussed in an upcoming conference call. Pl.'s Ex. 13. In the email he stated:

There are four financing options to consider:

21

1. Raise $2 million ($1 million in March; $500K in April; $500K in May) and use positive operating cash flows to service outstanding debt (paying down the SBA loan in June and the outstanding investor loans beginning in July). This is the model we discussed this morning.

2. Raise $1 million in March and cut operating costs immediately by 25%. Scale back orders, production and shipments to 1,500 in March and April and 2,000 in May and June. Use positive operating cash flows to service outstanding debt (both investor and SBA) beginning in July.

3. Raise $3.5 million in March and use $2.3 million of this amount to service SBA and investor loans in Q2 (beginning in April).

4. Seek 3rd party equity investment from corporate partnerships.

Attached to the email were two financial spreadsheet models correlating to options 1 and 3 (the $2 million and $3.5 million investments, respectively).[39]

Following the conference call, Zimmell communicated a proposal from the Investors to Fincke and Access, offering an additional $2 million investment, contingent upon several changes to company governance and the conversion of outstanding debt to equity in Access. Trial Tr. day 9, 49. On March 25, 2003, Radley sent an email to Fincke (and copied to Elefante) summarizing that proposal. Pl.'s Exs. 67, 100, 109. He wrote:

. . . .

Basically, the proposal that was presented to you by Joe Zimmell and discussed by us today represents that we are prepared to provide up to $2,000,000 if, and as soon as, you accept the following terms of agreement.

1. We would provide immediately, as an investment in cash, $1,000,000 at a price of $.75 per share, and an additional $1,000,000 ($500,000 in April and $500,000 in May) on the same terms.

---

[39] Also attached to the email was a summary of Access's stock position, stock options, and outstanding loans.

2. We believe that the current debt level is very detrimental to the financial structure of the company and that meeting the obligations of the debt instruments will be putting a significant cash strain on the company at a time when cash is desperately needed for other operational priorities. Therefore, we would be willing to convert the company's debt obligations due to us to stock at an adjusted conversion price of $.75 per share, on a non-dilutive basis.

The conversion of this debt to equity would not only rid the company of its current debt, but could be very important in positioning the company for any one of several options down the road.

3. The company would establish a formal corporate governance structure, including but not limited to:

> A Board of Directors including members of the investment group that would meet on a regular basis.

> A Corporate Charter and set of By-Laws.

> Regular Financial Reports provided to the directors and investors at intervals to be agreed upon.

> Regular operational reports and reviews.

We are all very interested in and committed to the success of this company, and understand that there are many hurdles and challenges yet to be conquered. We believe that putting the company in a solid financial condition at this time is critical in order to allow you and others within the company to focus on the those [sic] other challenges that will move the company forward on a time table that among other things minimizes the possibility that we might not be able to take advantage of the current "window of opportunity" that exists in the market place.

We also believe that what we have proposed is fair and equitable to all parties concerned, and that its implementation would resolve a number of current problems and uncertainties.

> . . . .

On March 27, Elefante sent an email to Fincke which analyzed the impact of the March 25th proposal on Fincke's percentage ownership and discussed the effect of different company valuations. <u>Pl.'s Ex. 13</u>. He concluded the email by stating:

In reviewing the situation it seems to me that it imperitive [sic] to reach a deal with the investors, get the additional investment and go foward. There is lots of momentum, but it will be lost without enough funds to operate comfortably. In fact, the success you are having on sales makes the problem even worse in the short term.  To ramp up to meet the demand, you need even more cash.

After discussing the Investors' proposal with Fincke, Elefante responded to them by

email on March 28.  Pl.'s Exs. 14, 15; Def.'s Ex. 40.  He wrote:

Gentlemen, on behalf of Access and Randall I would like to thank you for your March 25th proposal.  After our discussion this morning, Access has the following reply:

Your governance proposals are acceptable.  Access will move promptly to increase the Board from its current single member to a larger group, including [Radley and Moriarty].

Your proposal to invest $2.0 million by purchasing common stock at $.75 per share is acceptable.  In light of the fact that it is nearly April, we propose that the first $1.5 million investment be made immediately with the balance of $500,000 in May.

We agreed that the outstanding debt to JMA will remaining [sic] outstanding as debt.  The first payment of interest and principal on the debt will be postponed to July 15, 2003.

The debt outstanding to [Radley, Connolly and Zimmell] will be amended to be convertible into common stock at the price of $.75 per share at the option of either the Company or the holder at any time after July 1, 2003.  We hope to be able to repay the debt as planned, but want to leave the option to convert.  The first payment of interest and principal on the debt will be due July 15, 2003.

Please let Randall know whether this is acceptable to you.  If it is, we will move quickly to put together the necessary corporate action to carry it out.
. . .

Shortly thereafter, on March 31, 2003, Elefante sent the Investors a form of letter

agreement incorporating what he understood to be the agreed-upon terms for the financing.

He noted, however, that Fincke had not yet had a chance to review the letter agreement

24

and specifically reserved Fincke's right to comment. <u>Pl.'s Ex. 16</u>.  More than simply "willing" to convert the outstanding debt to equity, as Radley indicated in the March 25 proposal, the Investors appear to have seen the conversion as a necessary element of the transaction.  Fincke, however, was  reluctant to relinquish his majority equity interest in Access, and Jay Bounty suggested  revised terms for conversion that were more favorable to the company.[40] <u>Pl.'s Ex. 17</u>.

Later that same day, Elefante again emailed the Investors and Fincke, setting forth Bounty's suggested revision:

> As you know from our discussion on Friday, Access would prefer to pay off the notes rather than to convert them to equity.  If operations go as per budget, the Company expects to be able to generate the cash to pay the notes and operate successfully.  Instead of having the notes convertible into stock at the option of either party, the Company proposes that it have the sole option to convert after July 1st at $.75 per share.  The note holder would acquire the option to convert if the Company defaulted on its obligation to pay the note as amended.  If the Company is able to make its obligations to the note holders, the notes would be paid as provided.  Please let me know if you agree with this modification.

<u>Pl.'s Ex. 17</u>.  Ultimately, this counterproposal was not accepted.

Discussions continued during the next week, as the parties worked toward a common understanding regarding the financing terms.  <u>See</u> <u>Pl.'s Exs. 19, 20</u>; <u>Def.'s Ex. 43</u>. Misunderstandings and the inability to reach a conclusion on final terms began to create tension between the parties.  For example, in an email from Elefante to Fincke, sent a few days later on April 11, 2003, Elefante reported:

---

[40]  Bounty testified at trial that he was not involved in negotiations surrounding the ensuing April 2003 Transaction, was not asked for assistance in the negotiations by Fincke, and did not know the specifics thereof.  <u>Trial Tr. day 2, 44</u>.  His suggestion as reported by Elefante, however, indicates that he was cognizant of some details of the negotiations.  But the record does not reflect that he participated in the negotiations beyond the referenced revision.

Randall, I spoke with a very unhappy John Moriarty this afternoon.   His message is: make a deal with your investors or face a very hostile group with a lot of leverage.

John is willing to consider changes in the terms to deal with your concerns. For example, the company might have the right to redeem some of the stock in the future at a price which got the investors a reward, but capped their return.   Another idea would be to be to give the company the right to reprice the deal if a binding offer from a third party was received within some specified period of time. . . . That would protect the company against the risk that the deal undervalues the company.   It would also strengthen the deal for the new investor. It would also provide an objective valuation. . . .

Another option might be to raise less from the investor group and get their agreement to a stock offering to a third party. . . .

I am concerned that the company and the investors agreed to a deal two weeks ago at $.75.   We later discovered that there was a misunderstanding about what was intended.   However, I think the company should let the investors know that it is willing to go forward with the deal that was agreed to and which was set forth in the documents I sent out on March 31st.  Even if the offer is rejected, I think it is important to make it.

I am very concerned that if the company walks away from the investors, it will face litigation from them and be in no position to raise money from other sources.   The rights the investors have as note holders (including the right to approve increases in the number of authorized shares) puts them in a position to frustrate your efforts to bring in other investors. . . .

Def.'s Ex. 46.   According to Moriarty, he was truly "unhappy," as reported by Elefante,

because he was continuing to hear about problems at the company after he had made an

additional capital investment.   Trial Tr. day 6, 111.   Then, on April 14, 2003, Radley sent

an email to Fincke purporting to withdraw his participation in the offer; he wrote:

On March 25, 2003 I sent you an e-mail outlining a plan for refinancing the existing debt of Access CardioSystems and the infusion of additional capital, all with the intention of improving the financial condition of the company and providing cash with which to move the company ahead on a more sound basis than has been possible until now.

It has been four weeks since that presentation with numerous conversations, including a meeting at your office on March 28th and there has been no affirmative response on your part to accept or reject that offer.

It is not reasonable to expect that an offer to make such a sizeable financial commitment should remain valid for an extended period of time. Therefore I am giving you this formal "notice of withdrawal" of my offer to participate in that proposed plan.

Apparently you have some other plan in mind, and I wish you the best of luck in putting it in place. . . .

In the meantime, I expect that you will honor the commitment you have with respect to the $2,000,000 note originally due to Eastern Casualty Insurance Company which has been assigned to North Enterprises, Inc. At the moment you are in arrears in the amount of $40,0000 in interest payments through March, and the first payment of principal plus interest is due in a few days.

Please let me know what your intentions are with regard to meeting this obligation.

Def.'s Ex. 48; Pl.'s Ex. 27. Radley testified that he wrote the letter because the Investors were becoming frustrated with Fincke's delay in accepting their proposal. Trial Tr. day 9, 78-79.

Contemporaneous with the negotiations between Access and the Investors, Bounty and Fincke were also exploring potential investment opportunities with outside investment firms. Several prospects expressed interest.[41] By mid-April, discussions with one firm, Summit Partners ("Summit"), progressed to the point where Summit provided Access with a term sheet relative to a potential investment in the company (the "Summit Term Sheet").[42] Pl.'s Ex. 69. Upon learning that Access had received the Summit Term Sheet, Elefante sent a letter to the Investors on April 18. Pl.'s Ex. 71. In the letter, he stated:

---

[41] See Pl.'s Exs. 18, 22, 23, 24, 69, 70, 71, 72, 74, 93, 102, 118; Def.'s Exs. 44, 70.

[42] At least one other company also provided Access with a term sheet, see Def.'s Ex. 54, although no final agreement was reached.

As you know, Access has had discussions with some potential venture capital investors about putting additional capital in the company. Randall received from Summit Partners this afternoon the enclosed Term Sheet concerning a potential investment of $5,000,000 by Summit in the company. The enclosed Term Sheet involves an investment of $5,000,000 at a post money valuation of $28,000,000. Summit has orally informed Randall that it is willing to make an investment of $8,000,000 on the same terms, with the extra $3,000,000 available to pay down the company's obligations to existing note holders.

The receipt of the Summit offer is good news, but certainly complicates everything. Randall wanted to be sure you knew what was going on and would very much like your thoughts about how best to respond. He is meeting with representatives of two other venture capital firms tomorrow and may receive an additional offer.

The Summit offer certainly has the potential for providing the company with the capital necessary to accelerate its progress. It also could enable Access to repay its obligations to the initial investor group. . . .

But despite initial interest from outside investors and the receipt of the Summit Term Sheet, no agreement with them was reached. The parties have asserted and intimated differing reasons for why additional progress was not made toward outside funding. Fincke alleges that the Investors essentially sabotaged the process and locked out any additional investors; the Investors assert that Fincke's mismanagement of Access would have made a successful due diligence process unlikely. The more likely reason, at least where the Summit investment is concerned, was that offered at trial by Elefante. He opined that Access was in such financial jeopardy that it simply would not have been able to stay in operation long enough to fulfill the term sheet's conditions and close the deal. Trial Tr. day 8, 54.

The additional financing from the Investors finally closed on April 25, 2003 (the "April 2003 Transaction"). Pl.'s Ex. 110. Until this time, the Investors had been primarily debt investors, with no ownership or control of the company, except in accordance with the

28

equity conversion options and Zimmell's equity investment.   Through the April 2003

Transaction, certain of the Investors' original notes were converted to stock and the

Investors purchased additional stock at $.628 per share as follows:

> Radley: $2,000,000 investment plus accrued interest converted to stock; $500,000 in new shares purchased

> Moriarty: $250,000 in new shares purchased

> Connolly: $875,000 previous investment plus interest converted to stock; additional $500,000 in new shares purchased

> Zimmell: $500,000 in new shares purchased

The total new investment under the April 2003 Transaction was $1,750,000 (exclusive of

the advance $250,000 invested by Moriarty in late March).

The April 2003 Transaction also brought changes to Access's corporate structure.

A formal Board of Directors (the "Board") was established, and the number of directors was

increased to five, with Fincke, Moriarty, Zimmell, and Radley formally voted as members

of the Board.[43]   The first Board of Directors meeting was held on April 25, 2003 (the "April

Board Meeting").   At the first and subsequent Board meetings, held approximately once a

month, the Board members were given presentations and various documents describing

company finances and operations.

In addition to the presentation and other materials, Access management personnel

also attended the Board meetings, with the exception of the meeting held in November

2003.   Management would speak to the Board on their various areas of responsibility at

---

[43]   Although Fincke was given the option of appointing an additional Board member, he never did so, leaving the Board with only four members.  Connolly was the only Investor not named to the Board.  He testified, however, that he believes he was receiving the same information as the Board members, although he was not at every Board meeting.  Trial Tr. day 9, 34.

Access and would answer questions raised by Board members.  Trial Tr. day 2, 120; day 5, 26-28, 58.  Among the documents given to the investors were "Key Performance Indicators," or "KPIs"[44] – financial spreadsheets containing various data on company performance.  The KPIs were accompanied by narrative descriptions of various aspects of company operations and finances.  The narratives contained general company information and summaries of the financial data contained in the KPIs.  Both the KPIs and the associated narratives included actual company results and projections.

The April 2003 Transaction left Fincke as a minority shareholder in Access. Afterward, Moriarty and Elefante discussed the need for Fincke to have employment protection in light of his now-minority position.  Moriarty felt that such protection was fair in light of the changed circumstances.[45]  Trial. Tr. day 6, 113, 118.  At the Board meeting held in May 2003 (the "May Board Meeting"), Moriarty raised the need for Fincke to have a protective employment agreement.  The other Board members agreed, and decided that Elefante would work with Radley to draft and negotiate the agreement.  Trial Tr. day 6, 118-119.  No deadline for concluding negotiations or executing an employment agreement was discussed, and an employment agreement was never executed. In fact, neither a draft nor a proposed employment agreement was even sent to Fincke, despite Elefante having

---

[44]  Bounty testified to compiling the KPIs on a weekly to bi-weekly basis from the time the Board was formed through fall 2003.  Trial Tr. day 2, 77-78.

[45]  Initial mention of the advisability of an employment agreement between Access and Fincke may actually have taken place prior to the closing of the April 2003 Transaction. In an email from Elefante to Moriarty dated May 19, 2003,  he referenced his "suggest[ion] a few weeks ago that it would be desirable to have an employment agreement with Randall. . . ."  The reference to "a few weeks ago," however, is far from specific and may or may not have included any time prior to the closing on April 25. Pl.'s Ex. 21.

forwarded at least two proposed drafts to Radley for his review.[46] Radley says the agreement "just sort of fell by the wayside," Trial Tr. day 9, 161, and Fincke testified that he took no steps personally to expedite the process or advance negotiations after the May Board Meeting, Trial Tr. day 7, 108.

Immediately following the influx of cash from the April 2003 Transaction, Access experienced a brief period of seeming improvement.  The ability to purchase more raw materials contributed to Access's success in manufacturing 100 units in one particular day in May, the highest manufacturing rate ever achieved at the company.  And, at the May Board Meeting, it was reported to the Board that the cash model showed the possibility of paying down old payables in full without the need for an additional cash infusion.  Pl.'s Exs. 61, 77.

June, however, produced mixed results. Access saw its highest revenue, but struggled to bring in new orders at the rate expected.  Part of the shortfall was attributable to resistance to the price increase, and Bounty reported that Access made revisions to the list prices and distributor transfer prices based on negative distributor feedback.  Def.'s Ex. 30.

Long-term problems at Access continued to fester.  Capital constraint quickly re-reared its head and the downward spiral of financial difficulties continued.  Fincke testified that the Board had directed him to use the money received from the April 2003 Transaction to purchase raw materials in lieu of immediately paying down overdue accounts payable. The manufacture of more Access AEDs was then expected to generate accounts

---

[46]  On June 6, 2003 and November 14, 2003, Elefante sent letters to Radley enclosing drafts of employment agreements, but, according to Elefante, Radley did not respond.  Nor did he forward either draft agreement to Fincke.  Trial Tr. day 8, 64-65; Pl.'s Exs. 76, 80.

receivable whose proceeds would be used to pay down outstanding debts to vendors and other creditors over time.  Trial Tr. day 1, 122.  Eventually, the focus on procuring raw materials tied up the company's capital in both inventory and accounts receivable.  Fincke testified that he foresaw this problem, expressed his concern to the Investors and the Board, and was told that the Investors were committed to financing the company's receivables in order to free up additional cash.  Trial Tr. day 1, 122-123; day 7, 24-25.

According to Grosberg, a number of contingent liabilities, of which he was previously unaware, also began to threaten Access's finances.  Trial Tr. day 5, 134.  In addition to the looming threat from Philips (to whom a response to its request for a meeting still had not been made), the company was facing ongoing and threatened lawsuits brought by ex-employees claiming promised stock options, temporary agency providers and consultants demanding overdue payment, and an eviction action brought by the landlord.  According to Elefante, Access was once again technically insolvent.  Trial Tr. day 8, 49.

Furthermore, the outstanding accounts payable continued to wreak havoc on Access's ability to obtain parts.  One manufacturer, the sole-source component manufacturer of a part necessary to build the AED control boards, decided to cease shipping parts until the invoices for prior shipments – totaling roughly $150,000 – were paid in full.  According to Grosberg, Fincke instructed a redesign of the AED rather than payment of the overdue amount, and also instructed Access employees to find the needed part in the interim through a broker market instead of through the original equipment manufacturer.  Grosberg testified that the Access employees were unable to find the part through third party vendors.  And, in discussions with other Access managers, they concluded that qualification of a comparable part would take too long.  Eventually, he

32

testified, the managers decided to pay the original manufacturer, enraging Fincke when he was informed of the payment after the fact.  Trial Tr. day 5, 137-138.

As Access continued to use the recently invested working capital to build AED units, it saw its accounts receivables grow.  In the materials sent to the Board prior to the Board meeting scheduled for June 27, 2003 (the "June Board Meeting"), Access was projecting $2.5 million "invested" in accounts receivable and inventory.  According to Bounty's email sent with those documents, the company was looking to the June Board Meeting "to discuss with the investor group ways to access some of this cash to help manage the working capital requirements of the business and insure a steady flow of material through the manufacturing group."  Def.'s Ex. 30.

At the June Board Meeting, the financial discussion focused on the cash model projections through September 2003, assuming shipment and average selling price goals were reached.  According to the presentation materials, and based on those assumptions, Access was predicting sufficient cash flow for July and August, although, as Bounty's email indicated, the company was beginning to point to a need for a working capital line of credit.

In addition to the Board's directive to put the April 2003 Transaction funds toward building product, the Board also directed Fincke to refrain from making any additional changes to the product and to "freeze" the product design.  Trial Tr. day 9, 81.  Product changes were thereafter necessitated, however, by safety concerns, lack of available parts, customer complaints, and requests for specific features.  And, in fact, a series of product changes implemented during the summer 2003 were particularly disruptive.

During that summer, Access bid on a project out of El Paso, Texas (the "El Paso Project") which required a change in the AED's algorithm.[47] Fincke's testimony suggested that the change was not unduly disruptive to the manufacturing process, Trial Tr. day 1, 129-130, but both Nawn and Bowers testified that the change required extensive testing, Trial Tr. day 5, 71; day 7, 141. In fact, according to the Plaintiffs, the product changes necessitated by the El Paso Project led to a six to eight week shutdown on the manufacturing floor.

The El Paso Project, however, was not the only factor prompting product changes during the summer of 2003. Both Bowers and Nawn testified that during the same time period, they were incorporating product features the European Distributors were insisting upon prior to taking any additional shipments. Trial Tr. day 5, 29; day 7, 142. And, according to Bowers, they were also working on a solution to some AEDs' occasional inability to detect a low battery – a very serious issue for a product not in regular use, and an issue the European Distributors had been raising for some time. Trial Tr. day 7, 130. Although shipments did not stop entirely during July, they dropped off considerably – documents produced at trial show that slightly more than 400 units shipped that month, 1,100 less than planned.[48] Pl.'s Ex. 34.

---

[47] As an accommodation to the reader of this opinion and in order to avoid embarrassment to the Court, it will not attempt to explain what that meant. However, the algorithm presumably related to the computing functions of the AED software. See Merriam-Webster Collegiate Dictionary 28 (10th ed. 1996) (an algorithm is "a procedure for solving a mathematical problem . . . in a finite number of steps that frequently involves repetition of an operation; a step-by-step procedure for solving a problem or accomplishing some end esp. by a computer").

[48] In an email from Bounty to the Investors dated August 20, 2003, the low July shipments were not attributed solely to product changes affecting manufacturing, but also to lower-than-projected orders and low cash receipts (presumably affecting the ability to obtain raw materials necessary for production and shipment). Pl.'s Ex. 34.

Meanwhile, back at Philips, its representatives tired of awaiting a response from Fincke relative to their request for a meeting to discuss the patent infringement allegations. In late June of 2003, Philips filed a complaint for patent infringement against Access (the "Philips Complaint"). Pl.'s Ex. 111. That spurred the hoped-for meeting, which Fincke attended in New York with Pandiscio and Elefante. At the meeting, Fincke requested that Philips withdraw the lawsuit while they continued their discussions, and he expressed a willingness to consider possible licensing terms. According to Pandiscio, Philips refused to withdraw the suit, at least partly because it had been filed to "get [Access's] attention." Trial Tr. day 6, 21.

On June 25, 2003, the Board was notified of the Philips Complaint by an email from Bounty. Def.'s Ex. 30. By letter dated July 16, 2003, Elefante also advised the Board of the Philips Complaint and related the events that had transpired following its filing. Def.'s Ex. 65. In the letter, Elefante informed the Board that he, Fincke, and Pandiscio had attended a meeting with Philips and stated that, although a license was one possible resolution, the license fee proposed by Philips was excessive. He also stated that Access believed a number of the infringement claims were meritless, either because the Access AED did not infringe or because the patents were invalid. Elefante noted the large expense such litigation could entail and explained that they were looking for counsel to assist with the litigation. He concluded by requesting a meeting with the Board within the week.

As Elefante noted in his letter to the Board, it was obvious that Access needed to hire litigation counsel. It was agreed that Elefante would meet with Attorney John Montgomery at the law firm of Ropes & Gray to discuss possible representation. Pl.'s Ex.

<u>32</u>.  And, by the end of July, Ropes & Gray was retained to handle the Philips litigation on Access's behalf.  <u>Def.'s Ex. 65</u>.

Fincke testified that Elefante was thereafter the "point person" for the Board at meetings with Ropes & Gray, that Fincke did not dictate the litigation strategy, that strategy discussions with Ropes & Gray were conducted with assistance from Elefante, and that he himself received information on the litigation from Elefante, as did the Board.  <u>Trial Tr. day 1, 96-97</u>.  Fincke acknowledged that he participated in meetings with Ropes & Gray, but said that Elefante was the lead in those interactions – "In general, Mike Elefante hired them, worked with them, and did the communication to the board as well as to myself." <u>Trial Tr. day 1, 185</u>.  Fincke further testified that no long-term strategy was developed during the summer of 2003.  He did recall a specific strategy meeting at Ropes & Gray, but said the only concrete decisions made regarded some preliminary product modifications Ropes & Gray suggested to avoid some of the alleged infringement claims.  <u>Trial. Tr. day 1, 101</u>.

Elefante's memory was different.  He testified that it was Fincke who gave instructions related to the course of the litigation and determined its strategy; and, according to Elefante, Fincke adopted an "aggressive posture" regarding the litigation.  <u>Trial Tr. day 8, 48</u>.  Elefante acknowledged, however, that following the filing of the Philips Complaint, he communicated with the Board relative to litigation matters on a regular basis, updating the members on the Philips issues as well as other legal issues during 2003.  <u>Trial Tr. Day 8, 49</u>.

By August 2003, events at Access were going from bad to worse.  The European Distributors were not entirely satisfied with Access, Philips had formally filed suit, the poor July performance left Access once again desperate for cash, and members of Access's

36

management team began speaking with Board members directly out of concern for the way events were unfolding at the company.  According to Elefante, Grosberg came to him in late summer 2003, questioning whether the entirety of available information was provided to Board members.  Elefante advised him to speak directly to the Board.  Trial Tr. day 9, 56.  Grosberg testified that when he acted on that advice, Fincke subsequently approached him in his office and asked him not to speak again directly to Board members, claiming that Grosberg did not have all of the available information and might say something misleading.  Grosberg testified that he received a telephone call from Fincke that evening on his home telephone repeating that request.  Trial Tr. day 5, 128-129.

Around the same time, David Barash and Gleason Gallagher[49] contacted Connolly to express their concerns over Access management issues.  Trial Tr. day 9, 11-12. Connolly related that conversation to Radley, Trial Tr. day 9, 29, who met with Barash and Gallagher in September to further discuss matters.  Trial Tr. day 9, 86.  According to Radley, at that meeting,  Barash and Gallagher told him that Fincke was withholding information from the Board.  After that, Radley began talking directly with others on the management team.  He testified to speaking  with Nawn during the fall regarding the feasibility of achieving the projected shipments and said he was told by Nawn that the projections could not be met.  Trial Tr. day 9, 86-87.  He related a conversation with Grosberg where he was told that supplier difficulties, overdue payables, and product changes requiring FDA documentation were slowing down production.  Trial Tr. day 9, 89.

---

[49]  Although it is clear that Gallagher was involved with Access, the testimony and exhibits did not clarify Gallagher's role at the company.

In an email from Bounty to the Board members sent in late August of 2003, it was made clear that additional funding was imperative to maintain operations. Pl.'s Ex. 34; Pl.'s Obj.-to Ex. 21. In his email, Bounty requested further loans from the Investors, stating that $750,000 was needed to meet the "immediate short-term cash requirement." Then, in September, sales plunged to 241 new orders and accounts payable remained at $1.3 million aged over 90 days; without additional working capital, Access was simply unable to pay vendors and acquire sufficient parts.

Meanwhile, Summit had continued to express some degree of interest in making an investment in Access. In late September, Summit made a presentation to the Board, but the Board ultimately decided not to accept its proposal. Moriarty testified that the Board made that decision because Access was not meeting projections, was having problems selling units, and continued to have problems with distributors and suppliers. After discussing the situation with Radley, the Investors decided that it might be more prudent to wait a year and propose something based on how Access was performing at that time. According to Moriarty, after the meeting with Summit, he believed that Access could not have survived a due diligence review. Trial Tr. day 6, 116.

Radley also noted in his testimony that he was personally concerned that Summit was or would be given false information by Fincke. Radley then met with Bounty and they drafted a counterproposal that included a projected valuation of Access based on Access achieving certain sales volumes. Trial Tr. day 9, 132. According to Radley, this was an internal document and no formal proposal was taken to Summit. Instead, he talked to Michael Balmuth, Access's contact at Summit, regarding a framework for his suggested proposal. Although, according to Radley, Balmuth thought the idea was reasonable,

38

Summit "[took] a pass." Trial Tr. day 9, 135. Ultimately, in September and October, the Investors provided more funds to finance Access's operations.

But even this additional capital did not solve all of Access's troubles. The company continued to deal with the European Distributors' complaints and their deteriorating business relationships.[50] Some of the European Distributors – Kivex, Dolby, and Schiller – expressed their dissatisfaction with Access during the fall of 2003 by way of nearly identical emails, each dated September 5, 2003, detailing many of these concerns. Pl.'s Ex. 35, Pl.'s Obj.-to Exs. 12, 13, 20. In those emails, they each stated:

> I have recently returned from a meeting of the . . . European Distributors . . . held to discuss the long outstanding and very problematic issues we have all experienced with Access CardioSystems and its products over the last 12 months. . . . [Kivex/Dolby/Schiller] requests that you and your Board of Directors give immediate attention to these issues and provide a written agreement to start all necessary corrective actions to clear up these discrepancies as well as to set up measures to prevent any reoccurrences and we give you 10 working days to respond.
>
> This is a prerequisite to us accepting further shipments, placing further orders and for us to continue promoting and selling Access CardioSystem's [products.] . . . [T]he correction of the listed failures and non-conformances are imperative and remains our greatest concern. This has been brought to your attention and that of your colleagues on more than one occasion . . . . [Kivex /Dolby/Shiller] want you to agree to a fair pricing policy and in return we will accept an increase of no more than a 5% price on the 1st January 2004 and will then consider an increase in line with the published US inflation figures on the 1st of January in subsequent years and not before.

---

[50] For instance, in the fall of 2003, there was apparently a 400-unit shipment of Access AEDs to a German distributor who later refused to pay for the units. Based on prior experience and communications with the distributor, Grosberg and Rice testified that they advised Fincke not to ship because they expected the units would not be paid for. Trial Tr. day 5, 108, 142. Fincke, allegedly relying on different input from his newly-hired European manager Stephen Dodd, made the decision to ship the units anyway. Trial Tr. day 3, 164. Full payment for these units has apparently never been received. Trial Tr. day 9, 111.

We wish to end this period of uncertainty that has existed in relation to pricing and most routine business matters.  Your staff must improve its customer awareness and learn the rules of business administration and provide the common courtesy of a prompt reply to any communication.

We would like to continue working with Access CardioSystems, in good faith, to our common benefit.  [H]owever should a positive reply not be forthcoming within the 10 working days requested we will have no alternative but to seek a solution through the legal process.

We ask that you copy these concerns to your fellow shareholders and have sent a copy to your legal council requesting the same and asking for acknowledgment of receipt from your Board and their Shareholders. . . .

Attached to each email was an appendix outlining the problems the distributors wanted addressed, from a list of technical faults to specific business changes they were seeking (including changes in communication, pricing, documentation, and time commitments for the shipment of certain accessories).[51]

Matters were finally brought to a head at the Board meeting held on November 28, 2003 (the "November Board Meeting").  Based on the other Board members' growing concern with Fincke's management, exacerbated by missed projections and the continual capital shortages, the Board formally voted to remove Fincke as president and CEO.  They offered him instead the position of chief technology officer and non-executive chairman of the board, with no reduction in his pay or benefits.  While Fincke acknowledged that there was some disagreement during the meeting as to Access's performance, he testified that he was surprised by the Board's action.  Trial. Tr. day 7, 88-89.

---

[51] Despite their threats to the contrary, the European Distributors continued to place orders and eventually acquiesced to negotiations regarding the price increase.  The European Distributors were apparently never completely satisfied, but their relationship with Access did not entirely fall apart. Although scant evidence on the matter was presented at trial, it appears that they continued to place orders through 2004.

Immediately following the November Board Meeting, Moriarty sent a fax to Elefante reporting what had transpired.  In that fax, Moriarty also advised Elefante that the Investors had agreed to loan more funds to Access on terms similar to those in the original promissory notes.  Pl.'s Ex. 81.  Elefante then drafted the minutes of the November Board Meeting to reflect the Board's decision.

Pursuant to the Board vote, Radley was officially interim President and expected to take over day-to-day operations.  But the Plaintiffs concede that Fincke continued to act as president and CEO until the end of December.  In fact, a very limited number of employees even knew that Fincke was formally no longer president and CEO of Access.  Instead, Fincke continued to run the company in the same manner as he had previously.[52]

---

[52] Radley testified that the delay in his transition to interim president was due, in part, to his desire to give Fincke time to disclose the changed circumstances himself.  Thereafter, Radley felt that it was taking too long, and he provided Fincke with a memo he suggested Fincke use to announce his change in status.  Trial Tr. day 9, 164-65.  The memo stated, in part:

> I am writing to let you know about the recent meeting I had with the company Board of Directors/ Investor group, and the result of that meeting which I consider to be very positive and exciting for the company and all it's [sic] people.
>  . . . .
> First, the investor group has agreed to provide the additional funding necessary to pay down all overdue payables and secure parts for future build kits. . . .
>
> Second, it has been obvious to me for some time that we have passed the stage where we can operate the company effectively with only one senior manager. . . . [W]e have decided to make a change in the senior management structure.
>
> Effective immediately, I will assume the positions of Chairman of the Board of Directors and Chief Technical Officer focusing on all aspects relating to product development and design. . . . [W]e have engaged [a] firm . . . to search for a Chief Operating Officer to assume responsibility for the operational aspects of the business.  Jim Radley has agreed to assist in this CEO position on an interim basis, freeing me to concentrate on the technical issues currently facing the company.

Pl.'s Obj.-to Ex. 17.

Moriarty testified that he spoke with Fincke in December 2003 and that Fincke told Moriarty he wanted to move on and did not want to serve as Access's chief technical officer. Trial Tr. day 6, 99. Elefante also testified to speaking with Fincke a number of times following the November Board Meeting. According to Elefante, Fincke at first indicated that he might be willing to move on upon some basis that was fair, but later indicated that he wanted to enter into some form of negotiation with the company. Trial Tr. day 8, 58.

In early December, a problem with the Access AED was discovered by internal testing procedures and shipment of the product ceased while Access employees searched for the cause. Bowers testified that the relevant problems were soon identified and corrected and shipments resumed. Trial Tr. day 8, 30. Then, on December 18, another problem with the Access AED was identified and a recall involving 143 units was issued; again, the company focused on determining the root cause. Soon after, while the problem remained unsolved, Fincke left for vacation from Christmas through the New Year. During that period, Bowers testified, Access personnel again believed they had resolved the problem and were able to resume shipments. Def.'s Ex. 86.

On January 5, 2004, John McElhinney, Fincke's personal attorney, sent a proposed employment agreement to the Board on behalf of Fincke. Pl.'s Ex. 47. The proposed agreement provided that Fincke would resign as an employee retroactive to January 1, 2004. McElhinney also forwarded a draft of a new stockholders agreement. The proposed agreements contemplated that Fincke would continue to be employed by Access as a consultant (at an increased rate of pay that would increase further throughout 2004); that

42

Access would reimburse him for up to $50,000 in tuition and expenses should Fincke decide to enroll in an MBA or similar type of program; and that Fincke would have a say in certain specified "Major Decisions" at Access. The proposed agreements were met with initial silence from the Board.

Also on January 5, the Board had arranged an off-site meeting for Access management scheduled through January 7. Radley testified that Fincke was invited to the meeting, but declined to attend. According to Radley, on January 7, while the meeting was ongoing, one of the management employees received a phone call from another Access employee who reported that Fincke was taking files and equipment from the company's offices. After being informed of the substance of the telephone call, Radley said, he called Access employee Maureen Demoura and instructed her to deactivate Fincke's key card, which she did. Trial Tr. day 9, 101-103. Fincke argues that this de-activation constituted a "lock-out." Trial Tr. day 7, 92. Radley disagrees, claiming that key-card access was only required to gain entry to the rear door of the building and that Fincke could still enter Access premises through the front door. Trial Tr. day 9, 166-168.

Meanwhile, upon his return from vacation, Fincke learned that AED units had resumed shipment following the December 18 recall. On January 6, 2004 (one day prior to the alleged "lock-out"), Fincke sent an email to Bounty, McElhinney, and Elefante expressing concern with the resumption of shipments and urging a review of the problem by Access management. Pl.'s Ex. 87. He sent a subsequent email to Radley on January 8, urging the immediate recall of the 100 units that had shipped while he was away. Pl.'s

43

Ex. 51. Radley wrote back on the same day, stating that Access had reviewed the situation and that everything was under control. Pl.'s Ex. 87.

On January 9, 2004, Elefante responded to McElhinney's January 5 proposed employment agreement. Pl.'s Ex. 88. In the letter to McElhinney, Elefante claimed that the Board, as well as Connolly, had met and reached several conclusions. He first asserted that Fincke had declined the chief technology officer position and had left the company. In addition, Elefante stated that the Board had done an "assessment of the business and intend[ed] to conduct an independent audit of the company," and, "after meeting with the management team and assessing the situation, they d[id] not believe that there [was] a constructive role for Randall as an employee." He also wrote that if no agreement could be reached, the Board would "take formal action to terminate Randall's employment."

Further, Elefante referenced Fincke's proposed stockholder agreement, noting that the "parties already have a Stockholders' Agreement dated July 7, 2000."[53] Elefante stated that the agreement provided for termination of a "Primary Stockholder" with or without cause and that the shareholder's stock was then required to be offered to Access at "Book Value Price." Elefante wrote that Access would refrain from exercising the option to force such a repurchase, if "an acceptable agreement [were] reached."

Finally, Elefante noted that "[t]he Board group and investors agree that in light of Randall's changed role, it may be unfair to expose him personally to the obligations of

_____

[53] Apparently, after Access received Fincke's proposed employment and revised stockholder agreements, Elefante recalled the existence of the original Stockholders Agreement and so informed the Board for the first time. Trial Tr. day 8, 59. Radley testified that he had no knowledge of the existence of the Stockholders Agreement until he received this notification from Elefante. Trial Tr. day 9, 161-162.

44

Access's lease and the Middlesex Bank loan.  If there is an agreement on separation on acceptable terms . . . the Board will undertake diligent efforts to obtain his release from such obligations and will hold him harmless from any cost or loss arising from those guarantees."  The letter concluded with a request for a response by January 16, 2004.

On January 12, 2004, Fincke again wrote to Radley with a list of possible underlying causes of the December failed tests of the AED and again urged a recall of the units shipped subsequent to the December 18 recall.  Pl.'s Ex. 52.  He also noted that it might be necessary to contact the FDA.  On the same day, Radley responded, informing Fincke that he would review the letter and give it to the manufacturing team.  The next day, January 13, Fincke sent an email to Radley, Bounty, and a representative of the FDA; attached to the email was a letter expressing his concern regarding the shipment of potentially faulty AED units and also disclosing his recent employment termination.  On January 15, Radley sent a letter to the FDA regarding the concerns raised in Fincke's January 13 letter, essentially asserting that Fincke was simply a disgruntled employee.  On January 26, 2004, Fincke sent emails to Moriarty, Radley, and the FDA to which he attached a document purporting to represent results from product testing he was independently conducting.

Also on January 26, 2004, Radley sent a letter to Fincke regarding the "Purchase of Access CardioSystems, Inc. Stock."  In that letter, he expressed Access's intention to repurchase Fincke's stock pursuant to the Stockholder's Agreement; he stated:

> Access CardioSystems, Inc. believes that your employment with the Company ended on or before January 7, 2004 as a result of your rejection of the position offered to you by the Board of Directors.  To the extent you contend, or it is determined, that your employment ended on or before

45

December 27, 2003, this letter is being sent pursuant to Section 4.01 of the Stockholders Agreement.  Because you did not make an offer pursuant to Section 4.01(a) of the Stockholders Agreement, Access CardioSystems, Inc., pursuant to Section 4.01(b) of the Stockholders Agreement hereby notifies you of its intention to purchase all the Access CardioSystems, Inc. Stock owned by you.

To the extent you contend that you were employed after December 27, 2003, Access CardioSystems, Inc. reserves its right to re-notify you of its intention to purchase all the Access CardioSystems, Inc. Stock owned by you in accordance with the Stockholders Agreement within thirty (30) days of receiving an offer from you (or after the offer is deemed to have been made under subsection (a)) to sell your shares of Stock pursuant to Section 4.01.

The purchase price of the stock being purchased from you shall be the Book Value Price ("Price") determined in accordance with Article 5 of the Agreement.  The Price shall be the price per share based upon the net book value of the Company (the "Book Value") as of the last day of the fiscal quarter ended on or most recently before your termination of employment.  The Book Value was negative $4,428,000.00 on September 30, 2003.  This yields a negative Price.  The Price that the Stockholders will pay is therefore $1.00.

Pursuant to Section 4.03 of the Stockholders Agreement, the Closing of the purchase and sale of your Access CardioSystems, Inc. Stock shall be completed at 5:00 p.m. on February 5, 2004 . . . .

Pl.'s Ex. 91.  On February 26, 2004, Radley sent a second, and substantially similar letter to Fincke, represented as a "re-notification" of Access's intent to repurchase Fincke's stock in Access for $1.00.[54]  Pl.'s Ex. 92.

Almost four months later, on June 14, 2004, Fincke, though his attorney, sent a letter to Access assert ownership of and control over Access's Intellectual Property.  Def.'s Ex.

---

[54] According to the letter, Fincke had stated on his application for unemployment benefits that his employment at Access ended some time after December 27, 2003.

46

105.  The Plaintiffs responded by filing the first complaint in this action on July 6, 2004 in the Massachusetts state court.

Access continued to ship product for a large part of 2004.  In October 2004, however, Access was forced to recall a majority of its units and the company ceased operations.  On February 8, 2005, Access filed a petition for relief in this Court under Chapter 11 of the Bankruptcy Code, and continued to operate thereafter as a Debtor-in-Possession – although the company was (and is) no longer manufacturing or selling AEDs.[55]

The present controversy was thereafter removed to this Court.  Since then, this Court has determined on the parties' motions for partial summary judgment that Access is and was the true owner of the intellectual property underlying the Access AED, and ordered Fincke to assign his interest therein to Access.  See Access I, 340 B.R. 127.  A trial was conducted to determine the question of liability on the various other claims and counterclaims made by the parties.  Thirteen witnesses testified over nine days of trial and 234 exhibits were ultimately admitted into the record.  Following trial, the parties were given the opportunity to submit proposed findings of fact and conclusions of law, which both parties have done.

---

[55]  Access's Plan of Reorganization was confirmed by this Court on May 25, 2007.

## II.   POSITIONS OF THE PARTIES

The Complaint sets forth eight claims against Fincke; five of the original counts await a ruling.[56]  Those counts are: Count II, brought by Access and the Investors: breach of fiduciary duty;[57] Count IV, brought by Access and the Investors: fraud; Count V, brought by Access and the Investors: negligent misrepresentation; Count VI, brought by the Investors: securities fraud under Mass. Gen. Laws ch. 110A, § 410(a)(2); and Count VIII: Objection to Allowance of Fincke's Alleged Claims.  In his answer to the Complaint (the "Answer"), Fincke generally denied the Plaintiff's claims and put forth several counterclaims: Counterclaim I, against Access: breach of contract; Counterclaim II, against the Investors: breach of contract; Counterclaim III, against Access and the Investors: promissory estoppel; Counterclaim IV, against the Investors: breach of fiduciary duty; Counterclaim VI,[58] against Access: wrongful discharge; and Counterclaim VII, against Access: declaratory judgment.[59]

---

[56] Count I, brought by Access, sought a declaratory judgment with regard to the ownership of Access's Intellectual Property.  Count III, brought by Access, sought the imposition of a constructive trust over the Intellectual Property in favor of Access.  Those counts were previously ruled on. See Access I, 340 B.R. 127.  Count VII, brought by the Investors, sought damages for Fincke's alleged securities fraud under federal law, § 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5.  In their post-trial brief, the Plaintiffs indicated that they were no longer asserting this claim.

[57] In addition to the fiduciary breach allegations to be discussed below, the Investors previously argued that Fincke breached his fiduciary duty toward Access by asserting an exclusive ownership interest in Access's Intellectual Property.  That particular issue has, as noted above, previously been ruled on and will not be further discussed here.  See Access I, 340 B.R. 127.

[58] Due to a typographical error in the Answer, there is no Counterclaim V.

[59] Fincke's counterclaim for declaratory judgment sought, in part, a declaratory judgment that he is the sole owner of the Access Intellectual Property, an issue, as noted above, that was earlier decided.  See Access I, 340 B.R. 127.

### A.   Counts IV, V, and VI – Fraud, Negligent Misrepresentation, and Section 410(a)(2)

The Investors' claims for common-law fraud, negligent misrepresentation and securities fraud under Mass. Gen. Laws ch. 110A, § 410(a)(2) ("§ 410(a)(2)") are predicated on Fincke's alleged misrepresentations and material omissions made in connection with their investments.   According to the Investors, Fincke misrepresented various facts that were material to their decisions to invest in Access.   In addition to Fincke's purported oral representations, the Investors claim that the Company Overview, distributed prior to the April 2003 Transaction, contained several affirmative misstatements that Fincke knew or, in the exercise of reasonable care, should have known were false and misleading.   These representations involved statements regarding product stability, profitability, order rates, and average sales price.   In addition, the Investors claim that Fincke intentionally omitted material information involving problems with key distributors and customers; problems and delays involving manufacturing and product shipments; the extent of working capital needed; and the existence of the Philips lawsuit.

The Plaintiffs also assert that Fincke's continuing misrepresentations and failures to disclose were either intentional or negligent misrepresentations upon which the Board relied in making decisions regarding Access and which prevented the Investors from effectively evaluating stated projections and adequately judging the company's financial status.   And, more generally, the Plaintiffs conclude that all of the projections presented to the Investors and the Board were misleading, either because they failed to account for

extant, and undisclosed, negative circumstances or because they were simply devoid of reason.

Fincke raises several defenses to the Plaintiff's various misrepresentation and material omission allegations.  First, he claims that all material information *was* disclosed to the Investors and the Board through either oral communications, written communications – such as the KPIs, narratives, and Board meeting presentations – or both.  And, where certain information was not initially disclosed – such as that relating to the Philips litigation and the problems with the European Distributors – disclosure was made when the matters became material.

To the extent that projections were not met, Fincke claims that the projections themselves do not give rise to a cause of action under any of the legal theories asserted by the Plaintiffs, because they were not "facts," nor were they guarantees of future events. Additionally, Fincke says that the projections and other statements regarding Access's status were reasonably based, as they were the product of consideration and deliberation between various members of the Access's management team.  As such, according to Fincke, none of the statements or projections may form the basis for liability for fraud, negligent misrepresentation, or securities fraud under § 410(a)(2).

## B.    Count II - Breach of Fiduciary Duty

The Plaintiffs' breach of fiduciary duty claims against Fincke generally fall into three categories.  First, the Plaintiffs aver that Fincke breached his fiduciary duty to Access through his alleged misrepresentations and failures to disclose to the Board Access's need for additional working capital, inability to meet projections, manufacturing problems, and

long-term difficulties with the European Distributors. The Plaintiffs contend that Fincke's behavior was self-serving in that he sought to protect his position and status at the company by deliberately hiding negative information from the Board. According to the Investors, had they known the nature and extent of the company's underlying problems, they would have taken corrective action, preventing Access's ultimate demise.

In response, Fincke says that he and the management team disclosed all material information to the Board, evidenced by the various materials sent to the Investors and presented at Board meetings, including the KPIs, narratives, and presentation materials produced during trial. As for his failure to disclose either the Philips litigation or the problems with the European Distributors, Fincke argues that when, and to the extent that, such matters became material, the Board *was* informed.

Second, the Plaintiffs argue that Fincke breached his fiduciary duties by withdrawing funds and repaying a large portion of his personal loans to Access without the knowledge or prior approval of the Board, at a time when Access was in desperate need of cash. Fincke argues that the withdrawals from Access's account were in good faith, were documented and were, he believed, solely for legitimate company expenses – i.e., salary payments and reimbursements for company expenses incurred on his personal credit cards. Thus, he argues, the payments were not in breach of his fiduciary duties to either Access or the Investors.

Finally, according to the Investors, Fincke delayed acceptance of the Investors' proposed financing terms in the spring of 2003 to the detriment of the company. To the extent that the delay in receiving the additional capital contributed to Access's inability to

manufacture AEDs that in turn would produce additional working capital, the Investors say that Fincke is to blame.  According to the Investors, Fincke's delay was fueled by his desire to remain Access's majority shareholder and his futile attempts to obtain outside investments that would allow him to do so.  Through this self-interested behavior, they argue, he placed his personal gain above the interests of Access in breach of his fiduciary duty of loyalty.

Fincke says that the delay in accepting the Investors' financing proposals during the spring of 2003 was not motivated by self-interest, although he has conceded his desire to maintain his majority stock position.  Rather, Fincke says that he, along with other management team members, were discussing and considering other financing offers during that time, which financing may have ultimately been better for the company.

Furthermore, and more generally in rebuttal to their fiduciary duty claims, Fincke argues that the Plaintiffs' allegations related to his management of the company are undercut by the fact that they allowed Fincke to retain control over Access for more than a month after they voted to remove him as president.  Fincke asserts that, as of the November Board Meeting, the Investors had full knowledge of the information and circumstances that, they claim, demonstrate multiple instances of Fincke's fiduciary violations - yet they allowed Fincke to retain control.  Therefore, according to Fincke, the Investors' actions belie the severity of the allegations being asserted in this litigation.

### C.    Count VIII – Objection to Allowance of Fincke's Claims

To the extent that Fincke is successful on any of his Counterclaims, the Plaintiffs argue that he cannot recover any amounts awarded, as he failed to file a proof of claim in

52

Access's main bankruptcy case.  Furthermore, the Plaintiffs say that his failure to seek a declaration that his Counterclaims constitute an informal proof of claim in the main case precludes any recovery.  Fincke responds by arguing that the Answer, containing Fincke's Counterclaims, constitutes an informal proof of claim.  And since the Answer was filed prior to the deadline for the filing of claims in the main case, any judgment awarded should be appropriately treated as a claim under Access's Confirmed Plan.

    **D.**    **Counterclaims**

        1.    *Counterclaims I, II ,III, IV and VII – Breach of Contract, Promissory Estoppel, Breach of Fiduciary Duty, and Wrongful Discharge*

On the basis of several legal theories, Fincke argues that the Investors and Access are liable for damages as a result of their failure to provide him with a binding employment agreement.  He insinuates that, in exchange for agreeing to relinquish majority control over Access by consummating the April 2003 Transaction, he was promised an employment agreement that would provide "protection" for him in his minority position.  If the Court were not to find adequate consideration in exchange for the promised employment agreement, Fincke alternatively argues, under a promissory estoppel theory, that he acted to his detriment in reliance on the Board's assurance that an employment agreement would be negotiated, thus leading to liability for failure to execute an agreement.  Fincke also argues that the Investors and the Board breached their fiduciary duties owed to him by retaliating against him for raising his product safety concerns.  This retaliation, according to Fincke, was evidenced both by their failure to continue amicable negotiations regarding the

employment agreement and negative statements about Fincke's management made to the press that Fincke says were untrue and damaged Access's reputation.

In addition, Fincke argues that the oral promise to execute an employment agreement altered his employment relationship, such that he no longer remained at Access as an "at-will" employee and could only be terminated for just cause. According to Fincke, he was "locked out" of the company without just cause in retaliation for his expressed concern and reports to the FDA regarding product safety issues. This conduct by Access and its Board, according to Fincke, constituted wrongful termination under Massachusetts law.

The Plaintiffs dispute the existence of a meaningful or legally binding employment contract between the parties. While they acknowledge that the Board discussed drafting and negotiating an agreement, they note that no agreement was actually reached and that, prior to leaving Access, Fincke did not assert his right to such an agreement during the months following the April 2003 Transaction. Furthermore, according to the Plaintiffs, Fincke's decision to formally leave Access was his own and, at any rate, the Board *did* have just cause for Fincke's termination. The Plaintiffs summarily deny that Fincke's alleged product safety concerns were a reason for his dismissal. In fact, according to the Plaintiffs, Fincke contrived the safety concerns for his own retaliatory motives.

### 2.    *Counterclaim VII – Declaratory Judgment*

Fincke seeks a ruling that the Stockholders Agreement is unenforceable. He argues that Access's attempt to purchase his stock for $1.00 was a retaliatory act designed to punish him for reporting safety concerns to the FDA. As evidence of this motive, Fincke

notes that the Plaintiffs first asserted Access's stock repurchase rights under the agreement following his voicing of those safety concerns and his presentation of a proposed employment agreement and revised stockholder agreement to the Board. Because, according to Fincke, the decision to exercise rights under the Stockholders Agreement was in retaliation for his reported product safety concerns and additionally motivated by a desire to avoid severance negotiations, this Court should use its equitable powers to declare the agreement unenforceable.

The Plaintiffs argue that Access's exercise of its rights under the Stockholder Agreement was lawful and legitimate and was not an effort to avoid further negotiations. Instead, the Plaintiffs say Fincke's proposed employment agreement, accompanied by the revised stockholder agreement, contained patently outrageous and unacceptable terms and conditions and was not a reasonable offer.  Furthermore, the Plaintiffs argue that equity does not lie in Fincke's favor on this point, as the Stockholder Agreement was originally drafted during the start-up phase of the company, during a time when Fincke held control over Access.  Thus, according to the Plaintiffs, there is no inequity in enforcing the agreement and holding Fincke to his own terms.

III.    DISCUSSION

   **A.    Fraud, Negligent Misrepresentation, and Section 410(a)(2)**

      1.    *Overview*

            a.    <u>Fraud</u>[60]

To recover for fraud under Massachusetts law, a plaintiff must prove, by a preponderance of the evidence, <u>Compagnie de Reassurance D'ile De France v. New England Reinsurance Corp.</u>, 57 F.3d 56, 72 (1st Cir. 1995), that: (1) the defendant made a statement; (2) "the statement was knowingly false;" (3) the defendant "made the false statement with the intent to deceive;" (4) "the statement was material to the plaintiffs' decision;" (5) "the plaintiffs reasonably relied on the statement;" and (6) "the plaintiffs were injured as a result of their reliance."  <u>Kenda Corp.  v.  Pot O'Gold Pool League</u>, 329 F.3d 216, 225 (1st Cir.  2003)  (quoting <u>Turner v.  Johnson & Johnson</u>, 809 F.2d 90, 95 (1st Cir. 1986)); <u>see also</u> <u>Damon v.  Sun Co., Inc.</u>, 87 F.3d 1467, 1471-72 (1st Cir.  1996) (quoting <u>Barrett Assocs., Inc., v. Aronson</u>, 190 N.E.2d 867, 868, 346 Mass. 150 (1963)).

            b.    <u>Negligent Misrepresentation</u>

Unlike a claim for fraud, liability for negligent misrepresentation may arise where the defendant makes a false statement, but has no knowledge of its falsity.[61]  <u>Marram v.</u>

_____

   [60]  Also referred to in Massachusetts common law as "intentional misrepresentation," "fraudulent misrepresentation" or "deceit." <u>See</u> <u>Twin Fires Inv. LLC v. Morgan Stanley Dean Witter & Co.</u>, No. 00-00751-F, 2002 WL 31875204, at *25, 15 Mass. L. Rep. 542 (Mass. Super. Dec. 16, 2002), <u>aff'd</u>, 837 N.E.2d 1121, 445 Mass. 411 (2005).

   [61]  Fraud and negligent misrepresentation are often conflated in the case law, as described by the court in <u>Pearce v.  Duchesneau Group, Inc.</u>:

      The First Circuit has noted that Massachusetts case law is unclear on what "knowledge of falsity" means and indeed whether "knowledge of falsity" is a required

Kobrick Offshore Fund, LLC, , 809 N.E.2d 1017, 1031 n.25, 442 Mass. 43 (2004).  To

prevail on a claim for negligent misrepresentation, the plaintiff must prove that the

defendant: (1) "in the course of his business, . . . supplie[d] false information for the

guidance of others in their business transactions;" and (2) failed to "exercise reasonable

care or competence in obtaining or communicating the information."  Marram, 809 N.E.2d

at 1031 n.25.  The plaintiff must also demonstrate: (1) justifiable reliance on the information

and (2) a pecuniary loss incurred as a result of that reliance.  Marram, 809 N.E.2d at 1031

n.25; see also Damon, 87 F.3d at 1479; Briggs v. Carol Cars, 553 N.E. 2d 930, 993, 407

Mass. 391 (1990);  Danca v. Taunton Sav. Bank, 429 N.E.2d 1129, 1133, 385 Mass. 1

(1982);  Snyder v. Sperry & Hutchinson Co., 333 N.E.2d 421, 368 Mass.  433 (1975); Twin

Fires, 2002 WL 31875204, at *25.

---

element of fraud under Massachusetts law. See, e.g. Cummings v. HPG, Intern., Inc., 244 F.3d 16, 22-23 (1st Cir. 2001) (noting "lack of clarity in Massachusetts law"); Cambridge Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 768 n.16 (1st Cir. 1996) (discussing "knowledge of falsity" requirement).  For example, some Massachusetts cases require a plaintiff simply to show "a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77, 575 N.E.2d 70, 74 (Mass. App. 1991) (and cases cited). Cf. also Linton v. N.Y. Life Ins. & Annuity Corp., 392 F. Supp. 2d 39, 2005 U.S. Dist. LEXIS 3044, 2005 WL 478000, *2 (D. Mass. 2005).

392 F. Supp. 2d 63, 72 n.5 (D. Mass. 2005).
The Massachusetts Supreme Judicial Court has explained, however, that *fraud* requires proof of scienter – an intent to deceive – while negligent misrepresentation *does not.*  Marram v. Kobrick Offshore Fund, LLC,  809 N.E.2d 1017, 1031 n.25, 442 Mass. 43 (2004) (quoting Kitner v. CTW Transp., Inc., 762 N.E.2d 867, 874 (Mass. App. 2002) ("negligent misrepresentation differs from an action for fraud because liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff""); Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054,  1066 , 437 Mass. 443 (2002).

c.   Section 410(a)(2)

"[F]ormally known as the Uniform Securities Act and commonly known as the Massachusetts Blue Sky Law," Twin Fires, 2002 WL 31875204, at *31, Mass. Gen. Laws ch. 110, § 410(a)(2) (2008) provides, in pertinent part:

> Any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the buyer not knowing the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him . . . .

Section 410(a)(2) creates "civil liability for sales [of securities] by means of fraud or misrepresentation." Marram, 809 N.E.2d at 1025 (quoting L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 410(a), at 147 (1976)). "While not imposing strict liability on the seller for untrue statements or omissions, it holds the seller to the heavy burden of proof 'that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,'" Marram, 809 N.E.2d at 1026; Mass. Gen. Laws ch. 110A, § 410(a)(2).  Section 410(a)(2) creates a "strong incentive for sellers of securities to disclose fully all material facts about the security" and "'provide[s] a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser,' regardless of the actual cause of the investor's loss." Marram, 809 N.E.2d at 1026 (citing Casella v. Webb, 883 F.2d 805, 809 (9th Cir. 1989) (interpreting § 12(2) of the Securities Act of 1933)).

A plaintiff may recover under § 410(a)(2)[62] when: (1) the defendant offers or sells a security;[63] (2) in Massachusetts; (3) by (a) making any untrue statement of a material fact; or (b) omitting to state a material fact necessary to make the statement not misleading; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant (a) knew, or (b) in the exercise of reasonable care, would have known, of the untruth or omission.  Marram, 809 N.E.2d at 1026. Once the plaintiff has demonstrated that the defendant has made an untrue statement of material fact or omitted a material fact necessary to make a statement not misleading, the burden shifts to the defendant to demonstrate either that the plaintiff knew of the falsity or omission or that the defendant did not know and could not, in the exercise of reasonable care, have known of the falsity or omission. See Adams, 838 F. Supp. at 688 ("The 'seller' bears 'the burden of persuasion in establishing his lack of negligence.'  As such, '[t]he seller is exculpated if he proves that he did not know, or, in the exercise of reasonable care, could not have known of the untruth or omission.'") (discussing § 410(a)(2) and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2)) (quoting Davis v. Avco Fin. Servs., Inc., 739 F.2d 1057, 1068 (6th Cir. 1984); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 209 n.27 (1976)).

---

[62]  Section 410(a)(2) provides for the recovery of "the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition."  Mass. Gen. Laws ch. 110A, § 410(a)(2).

[63]  In contrast to the federal securities laws, Massachusetts securities laws, and § 410(a)(2) in particular, apply to public and private sales of securities; the federal securities laws apply only to public sales of securities.  See Feldman v. Aspen Techs., Inc., No. SUCV2006-3021BLS2, 2007 WL 1089220, at *5, 22 Mass. L. Rep. 341 (Mass. Super. March 3, 2007).

2.   *Elements*

That these three causes of action have common elements is clear – an unsurprising fact given that § 410(a)(2) is founded upon traditional common-law notions of actionable misrepresentations.   For each of the fraud, negligent misrepresentation, and § 410(a)(2) claims, the plaintiff must *at least* prove: (1) that the defendant made a misstatement or omission of fact; (2) that the misstatement or omission was material; and (3) that the defendant either knew, or through the exercise of reasonable care, could have known, that the statement was either false or misleading on account of an omission.[64]

---

[64] Cases decided under the federal securities laws also inform the interpretation of claims based on § 410(a)(2).   The Massachusetts legislature has directed that the Massachusetts securities laws be interpreted and administered in coordination with the existing federal securities laws, Marram, 809 N.E.2d at 1025, and the SJC has noted that:

> General Laws c. 110A, § 410(a)(2), "is almost identical with § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2)." . . . Accordingly, we look to Federal decisions under § 12(2), as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of [§ 410(a)(2)].

Id. (citations omitted).   See also Adams, 838 F. Supp. at 684 n.9 ("The Massachusetts securities laws ('the Blue Sky Laws') are substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well.") (citing Quincy Co-Op. Bank v. A.G. Edwards & Sons, Inc., 655 F. Supp. 78, 87 (D. Mass. 1986); Valley Stream Teachers Fed. Credit Union v. Comm'r of Banks, 384 N.E. 2d 200, 376 Mass. 845 (1978)); Feldman, 2007 WL 1089220, at *5; Twin Fires, 2002 WL 31875204, at *31 (citing Cabot Corp. v. Baddour, 477 N.E. 2d 399, 400-01, 394 Mass.  720 (1985), superseded by statute, Mass. Gen. Laws ch. 93A, §§ 2, 9 (West 2006); Birch v. Choinski (In re Choinski), 214 B.R. 515, 523 (1st Cir. B.A.P. 1997), aff'd 187 F.3d 621 (1st Cir. 1997)).
    And similar elements of  common-law claims for fraud and negligent misrepresentation are interpreted in accord with both federal and state securities laws.   See, e.g., Adams, 838 F. Supp. at 694 (the standard for common-law negligent misrepresentation is substantially the same as the standard under § 12(2)).

a.    <u>Falsity</u>

I.    Affirmative Misrepresentations

It is axiomatic that a defendant will not be liable for an affirmative false statement if the statement is, in actuality, *not false*.  Thus, if the plaintiff fails to demonstrate the falsity of the statement, assuming that it is not misleading on the account of an omission (see below), no fraud, negligent misrepresentation, or § 410(a)(2) claim will lie.[65]  For an affirmative statement to be actionable, it generally must be one of fact – something "susceptible of knowledge," <u>Zimmerman v.  Kent</u>, 575 N.E.2d 70, 75 (Mass.  App.  Ct. 1991) – generally not a statement of opinion, judgment, belief, expectation, or prediction.[66]

Under certain circumstances, however, statements of opinion, belief, prediction, or future intention may be actionable.  For example, such a statement may be actionable where "the speaker 'knew that the prediction [opinion, judgment, expectation, or future intention] was false when it was made." <u>Pearce v. Duchesneau Group</u>, 392 F.  Supp.  2d 63, 74 (D. Mass. 2005) (quoting <u>Lawson v.  Affirmative Equities, Co., L.P.</u>, 341 F.  Supp.

---

[65]  "[S]imply referring to a series of public statements and then alleging, in a general and conclusory manner, that those disclosures were false or misleading is insufficient."  <u>In re Cambrex Sec. Litig.</u>, No. 03-CV-4896 (WJM), 2005 WL 2840336, at *4 (D.N.J. Oct. 27, 2005) (quoting <u>In re Party City Sec. Litig.</u>, 147 F. Supp. 2d 282, 300 (D.N.J. 2001)); <u>see also</u> <u>Suna v. Bailey</u>, 107 F.3d 64, 68 (1st Cir. 1997); <u>Serabian v. Amoskeag Bank Shares Inc.</u>, 24 F.3d 357, 361, 363 (1st Cir. 1994); <u>In re Cytyc Corp. Sec. Litig.</u>, No. Civ.A. 02-12399-NMG, 2005 WL 3801468, at *25 (D. Mass. March 2, 2005); <u>Guerra v. Teradyne, Inc.</u>, No. Civ.A. 01-11789-NG, 2004 WL 1467065, at *9, 13 (D. Mass.  Jan. 16, 2004); <u>Van Ormer v. Aspen Tech. Inc.</u>, 145 F. Supp. 2d 101, 105 (D. Mass. 2000); <u>In re Boston Tech. Inc. Sec. Litig.</u>, 8 F. Supp.  2d at 54, 59, 61-62 (D. Mass. 1998); <u>In re Stratus Computer, Inc.  Sec.  Litig.</u>, No. Civ.A. 89-2075-Z, 1992 WL 73555, at * 5 (D. Mass. March 27, 1992).

[66]  <u>See, e.g.</u> <u>Damon</u>, 87 F.3d at 1472 (quoting <u>VMark Software, Inc.  v.  EMC Corp.</u>, 642 N.E.2d 587, 593 n.9 (Mass.  App.  Ct.  1994)); <u>Serabian</u>, 24 F.3d at 366; <u>Armstrong v. Rohm & Haas Co., Inc.</u>, 349 F.  Supp.  2d 71, 81 n.14 (D. Mass. 2004); <u>Marram</u>, 809 N.E.2d at 1030 n.24; <u>Briggs</u>, 553 N.E.2d at 993; <u>Yerid v. Mason</u>, 170 N.E.2d  718, 719, 402 Mass 650 (1980) ; <u>Twin Fires</u>, 2002 WL 31875204, at *26.

2d 51, 65 (D. Mass. 2004) (citing <u>Starr v. Fordham</u> 187, 648 N.E.2d 1261, 1267, 420 Mass. 178 (1995)); <u>see also</u> <u>Kenda</u>, 329 F.3d at 226.[67]   And forecasts may be actionable if "they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made."   <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 627 (1st Cir. 1996).[68] Such unsupported or contradicted statements are "affirmative misrepresentations," because they are false misrepresentations of what the speaker knows to be true (or knows he doesn't know to be true).   Standing alone, however, optimistic predictions are not false misrepresentations simply because they do not come to fruition.   <u>Suna v. Bailey</u>, 107 F.3d 64, 69 (1st Cir. 1997) (plaintiffs needed to "show that statements made were more than tempered predictions about the future that later proved incorrect"); <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 363 & n.7 (1st Cir. 1994); <u>In re Boston Tech. Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 54 (D. Mass. 1998).

---

[67] Similarly, promises are generally not considered false statements merely because the promise is ultimately not kept, but a statement that is promissory in nature may be actionable if there is no intent to perform the promise at the time the statement is made.   <u>Armstrong</u>, 349 F.Supp.2d at 81 n.14;<u>Barrett</u>, 190 N.E.2d at 868.

[68] <u>See also</u>, <u>Colby v. Hologic, Inc.</u>, 817 F. Supp. 204, 210, 212 (D. Mass. 1993) (for a claim based on forecasts, plaintiff needed to show that the forecasts "were not reasonably based or were not made in good faith") (citing <u>Kirby v. Cullinet Software, Inc.</u>, 721 F. Supp. 1444, 1450 (D. Mass. 1989)); <u>Fourth U.S. Akar, Inc. v. Cohen</u>, 1990 WL 138945, at *13 (D. Mass. August 27, 1990) (plaintiffs alleged a claim under § 10(b) of federal securities laws by asserting that defendant's projections had no reasonable basis at the time they were presented to plaintiffs); <u>Massaro v. Vernitron Corp.</u>, 559 F. Supp. 1068, 1074 (D. Mass. 1983) (plaintiffs raised genuine issue of material fact sufficient to defeat summary judgment motion when they presented evidence that company had knowledge of facts contradictory to representations made); <u>Briggs</u>, 553 N.E. 2d at 933 (where defects in vehicle were readily ascertainable, "defendant's representation that the vehicle was in good condition reasonably implied that it was safe and operable . . . .") (citing Restatement (Second) of Torts § 539 (1977)); <u>Twin Fires</u>, 2002 WL 31875204, at *27 (where defendant told plaintiff he could get 75,000 in an IPO when all indications were that he would not be allocated any shares, the statement was actionable) (quoting <u>Cellucci v. Sun Oil Co.</u>, 320 N.E.2d 919, 924 (Mass. App. Ct. 1974), <u>aff'd</u>, 331 N.E.2d 813 (Mass. 1974) (where company predicted it would sign a contract, company was liable for misrepresentation because the action was within the exclusive control of the company)).

ii.     Omissions

Failure to disclose material information may also give rise to liability under common-law and securities fraud theories.  There are two circumstances where omissions may be actionable.  The first is where the defendant fails to disclose material information *when the defendant has a legal duty to do so*.  The Massachusetts Supreme Judicial Court (the "SJC") has long adhered to the "rule of nonliability for *bare nondisclosure*," Kannavos v. Annino, 247 N.E.2d 708, 711, 356 Mass. 42 (1969); a defendant is not liable for simple failure to disclose material information.  Instead, liability for a material omission arises only where the defendant was under a duty to disclose the information.  Milton v. Van Dorn Co., 961 F.2d 965, 968 & n.4 (1st Cir. 1992) (citing Royal Bus Group, Inc. v. Realist, Inc., 961 F.2d 1056, 1064 (1st Cir. 1991); Nei v. Burley, 446 N.E.2d 674, 676, 388 Mass 307 (Mass. 1983)).[69]  Statutes or regulation under the state and federal securities laws impose specific duties to disclose certain types of information, see, e.g., Cooperman v. Individual, Inc.,171 F.3d 43, 50 (1st Cir.  1999) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1204 (1st

---

[69] The "duty to disclose" requirement is found in both common-law fraud and negligent representation and securities fraud claims.  First Marblehead Corp. v. House, 473 F.3d 1, 10 (1st Cir. 2006) (negligent misrepresentation claim based on failure to disclose first requires a showing that there was a duty to disclose); Milton, 961 F.2d at 968 & n.4 (1st Cir. 1992) ("Duty to disclose" requirement is same under Massachusetts common law and federal securities law); Robertson v. Gaston Snow & Ely Bartlett, 536 N.E.2d 344, 349, 404 Mass. 515 (1972) (in order to recover under negligent or fraudulent misrepresentation theory based on omission, there must be a duty to disclose); Kannavos, 247 N.E.2d at 711 (citing Swinton v.  Whitinsville Sav. Bank, 42 N.E.2d 808, 808-09, 311 Mass.  677 (1942)).
     The existence of a duty to disclose also depends on the materiality of the undisclosed information.  In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 57 (D. Mass. 2006) ("When a person speaks, but chooses to omit information, the liability for that omission will be judged by its materiality. . . .") (quoting In re Worldcom Inc. Sec. Litig., 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003)); Boston Tech., 8 F.  Supp.  2d at 53 ("a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement").

Cir. 1996));  Guerra v. Teradyne, Inc., No. Civ.A. 01-11789-NG, 2004 WL 1467065, at *6

n.4 (D. Mass.  Jan. 16, 2004) (citing Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st

Cir. 1987)); Boston Tech., 8 F. Supp. 2d at 53 n.8, and a pre-existing fiduciary relationship

may also give rise to a specific disclosure duty.

The second type of culpable omission is one that renders an otherwise accurate

statement misleading.  Accurate statements of past events, standing alone, are rarely held

to be misleading, and a duty to disclose does not arise merely because circumstances have

changed or might change in the future.  See, e.g., Suna v. Bailey, 107 F.3d at 68 (accurate

statements about past performance, even if present circumstances are less rosy, do not

give rise to liability);  Serabian, 24 F.3d at 361; In re Cytyc, 2005 WL3801468, at *25;

Guerra, 2004 WL1467065, at *13-14; Boston Tech., 8 F.  Supp.  2d at 54, 59, 61-62.

Instead,  a duty to disclose information related to an earlier statement generally arises only

where the original statement was misleading *at the time it was made.*  Colby, 817 F.  Supp.

at 213 (discussing Backman v.  Polaroid Corp., 910 F.2d 10, 16-17 (1st Cir. 1990)); Guerra,

2004 WL1467065, at *6, 10.

Thus, a defendant may remain silent and choose not to disclose material information

absent an independent duty to do so.  But both common-law fraud and misrepresentation,

as well as the securities laws, compel full and accurate disclosure if the defendant

volunteers information.  When a defendant chooses to speak, all material information

necessary to make the statement not misleading must also be divulged.[70]  If the statement

---

[70]  See, e.g.,  Computervision, 90 F.3d at 635 & n.27 ("A duty to disclose technical or
developmental problems with a product may arise where a company makes strongly optimistic or
concrete statements about that product that are in stark contrast to its internal reports," but no duty
arose where prospectus was not so optimistic as to be misleading and contained statements

is one of opinion, prediction, or forecast, the failure to disclose known facts that contradict

the bases for the statement may be actionable.[71]   However, where a statement relates to

this so-called "soft information" (opinion, prediction, forecast, and the like), the alleged

material omission itself must relate to "hard" information.   Shaw, 82 F.3d at 1210 n.21("It

bears reemphasizing that the plaintiffs' claim is sustainable only to the extent it relates to

the nondisclosure of "hard" material information, as opposed to "soft" information in the

nature of projections.") (citing In re Verifone Sec. Litig., 784 F. Supp. 1471, 1482 (N.D. Cal.

1992), aff'd, 11 F.3d 865 (9th Cir. 1993)).

---

regarding the uncertainties associated with the release of a new product.);   Damon, 87 F.3d at
1478 ("[A] party who discloses partial information that may be misleading has a duty to reveal all
the material facts he [or she] knows to avoid deceiving the other party.") (quoting V.S.H. Realty,
Inc. v. Texaco, Inc., 757 F.2d 411, 415 (1st Cir.  1985)); Shaw, 82 F.3d at 1212 (If speaker
voluntarily characterizes something that it did not have to disclose, then the speaker has an
obligation to ensure that the representation is not misleading.); Lucia v. Prospect St. High Income
Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994); Milton, 961 F.2d at 968 n.4 ("A duty to disclose may
arise, for example, where the defendant volunteers disclosure and the law implies the corollary duty
to refrain from incomplete, inaccurate, or misleading disclosures.") (citing Backman, 910 F.2d at
12); Hoffman v. Estabrook & Co., 587 F.2d 509, 515 (1st Cir. 1978) (statement that product had
certain capability was misleading where defendant failed to disclose that the product would require
a part manufactured by a competitor); Credit Suisse, 465 F. Supp. 2d at 57 ("Those who choose
to speak . . . must speak honestly – not in half-truths, in bad faith, or without a reasonable basis
for their statements.") (quoting Worldcom, 294 F. Supp. 2d at 427-28); Guerra, 2004 WL1467065
at *11-12 (where company did not broach subject, there was no obligation to disclose, as previous
statements on subject were not misleading); Adams, 838 F. Supp. at 694 (if the speaker broaches
a particular subject, then the speaker has a duty to disclose relevant material information  required
to make statement not misleading); Kannavos, 247 N.E.2d at 711-12 (If defendant "does speak
with reference to a given point of information, voluntarily or at the other's request, he is bound to
speak honestly and to divulge all the material facts bearing upon the point that lie within his
knowledge.  Fragmentary information may be as misleading . . . as active misrepresentation, and
half-truths may be as actionable as whole lies.") (citing Harper & James, Torts § 7.14) (collecting
Massachusetts cases)).

[71]  See, e.g., Suna v. Bailey, 107 F.3d at 70 (no liability for statement that new production
facility would be more cost-efficient, which turned out to be incorrect, because plaintiffs failed to
demonstrate that company had knowledge of contradictory facts at the time the statement was
made); Serabian, 24 F.3d at 64-65 (descriptive statements of company that are made in the face
of internal awareness that the characterization may not be correct may give rise to liability for
failure to disclose contradicting facts).

This obligation to ensure that a statement is not misleading does not require disclosure of every relevant, or even material, piece of information.  Disclosure must, of course, be "complete and accurate," <u>Lucia v. Prospect Street High Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir.  1994); <u>Backman</u>, 910 F.2d 10 at 16, but that "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" <u>Backman</u>, 910 F.2d at 16 (quoting <u>SEC v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 862 (2d Cir. 1968)); <u>see also</u>, <u>Romani v.  Shearson Lehman Hutton</u>, 929 F.2d 875, 879 (1st Cir. 1991) (plaintiffs' allegations that defendants failed to disclose a recessionary period in the industry were insufficient predicate for liability because the defendant had disclosed the high risks associated with the investment in a meaningful way).

Given the basic principles governing liability for both affirmative misrepresentations and culpable omissions, case law has consistently held that allegations of mismanagement, without more, are insufficient to state a claim for common-law fraud, negligent misrepresentation, or securities fraud.[72]  That is, a plaintiff does not state a claim for fraud

---

[72] <u>See Shaw</u>, 82 F.3d at 1206 (citing <u>Santa Fe Indus., Inc.  v.  Green</u>, 430 U.S. 462, 477-80 (1977); <u>Craftmatic Sec. Litig. v.  Kraftsow (In re Craftmatic Sec.  Litig.)</u>, 890 F.2d 628, 638-39 (3d Cir.  1989)); <u>Van Ormer</u>, 145 F.Supp.2d at 105, 106 (Plaintiffs' allegations that defendants had no basis for their earnings projections since they lacked a global cost reporting system was merely a claim for mismanagement, especially since the plaintiffs "fail[ed] to set forth any specific facts explaining why [the] earnings projections were unacceptable or why the method that [was] utilized was inadequate." And vague allegations that defendants released a product too early in order to create the false appearance of an increasing revenue stream were "nothing more than complaints of poor management, not securities fraud.") (citing <u>Suna v. Bailey</u>, 107 F.3d at 68; <u>Fitzer</u>, 119 F. Supp. 2d at 33-34; <u>In re Number Nine Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp. 2d 1, 22 n.18 (D. Mass. 1999); <u>Boston Tech.</u>, 8 F. Supp. 2d at 62-63);  <u>Colby</u>, 817 F.  Supp. at 212 ("only fraud, not poor management or even gross mismanagement is actionable under the securities laws") (quoting <u>Boyle v.  Merrimack Bancorp, Inc.</u>, 756 F.  Supp.  55, 58 (D.  Mass.  1991)); <u>Massaro</u>, 559 F.

or misrepresentation by simply asserting that the defendant failed to disclose poor management practices; "poor management is a risk that every investor takes." Fitzer v. Security Dynamics Techs., Inc., 119 F. Supp. 2d 12, 33-34 (D. Mass. 2000). Instead, the plaintiff must prove either that the defendant made a false statement regarding certain management or business practices,[73] or made a misleading statement by discussing management while failing to disclose inconsistent material[74] information regarding that management.[75]

        b.    Materiality

Whether the allegation is one of affirmative misrepresentation or culpable omission, liability for fraud, negligent misrepresentation, or securities fraud will only arise when the statement or omission relates to material information.

> The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, *information is*

---

Supp. at 1079.

[73] See, e.g., Fitzer, 119 F. Supp.2d at 22 ("business difficulties . . . are, of course, not themselves actionable . . . . [the plaintiff] must show that the defendants knowingly made fraudulent misrepresentations in order to mislead the securities market"); Wells v. Monarch Capital Corp., 1991 WL 354938, at *7 (D. Mass. Aug. 23, 1991) (plaintiff plead more than mismanagement by alleging not only that unlawful dividends and risky, unsecured loans were made, but also alleging that defendant made false statements that no such transactions were being entered into).

[74] As with other alleged omissions, the undisclosed information must also be material. Fitzer, 119 F. Supp.2d at 22 (plaintiff must show that "[business] difficulties were material to investors").

[75] See Suna v. Bailey, 107 F.3d at 68; Serabian, 24 F.3d at 361 ("[P]laintiffs must plead more than that defendants acted irresponsibly and unwisely, but that they were aware that 'mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.'") (quoting Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992)); Shapiro v. UJB Fin. Corp., 964 F.2d at 282 (3d Cir. 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

> *"material" only if its disclosure would alter the "total mix" of facts available to the investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision.*

Milton, 961 F.2d at 969 (emphasis added) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). [76]   This standard for materiality obtains under both the common-law and Massachusetts securities laws. Id. (materiality analysis is same under both Massachusetts common law and Federal securities law); Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 687 (1st Cir. 1996) ("this standard of materiality applies generally throughout the federal and Massachusetts securities laws"); Eagle Fund, Ltd. v. Sarkans, 823 N.E.2d 783, 788 (Mass. App. Ct. 2005).[77]   The inquiry is an objective one, looking to whether a reasonable person would have found the information material.   Milton, 961 F.2d at 1030.

Assessing the materiality of predictions or forecasts can be complex, requiring a close analysis of the nature of the statements and the circumstances under which they were made.   While projections and financial targets *may* be "material to any sensible evaluation of [a] company's performance," In re Cytyc, No. Civ. A. 02-12399-NMG, 2005 WL38014, at *23 (D. Mass. March 2, 2005) (quoting Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 302 (D. Mass. 2004)),  generalized forecasts are usually not actionable, because, among other reasons,  they are "inherently difficult and unreliable . . . and are not likely to be 'material' to investors."   Colby v. Hologic, Inc., 817 F.  Supp.  204, 211 (D.

---

[76]  See also,  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); Computervision, 90 F.3d at 632 ("information is material when there is a reasonable likelihood that a reasonable investor would consider it important").

[77]  Because the materiality standard under § 10(b) of the federal securities laws is the same as that under § 12(2), Shaw, 82 F.3d at 1217, cases interpreting materiality under § 10(b) may be instructive.

Mass. 1993); see also Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 245

(D. Mass. 2001) ("[C]ourts in the First Circuit generally have declined to impose liability for

so-called 'forward looking statements' . . . because these courts regard such statements

as unlikely, as a matter of law, to be material to a reasonable investor."). Similarly,

statements or omissions related to future events may or may not be material, depending

on the context. The First Circuit has emphasized the fact-based inquiry required to

determine materiality in such circumstances:

> If an alleged omission involves speculative judgments about future events,
> . . . materiality "will depend at any given time upon a balancing of both the
> indicated probability that the event will occur and the anticipated magnitude
> of the event in light of the totality of the company activity."

Milton, 961 F.2d at 969-70 (quoting Basic, 485 U.S. at 238); see also Rand v. Cullinet

Software, Inc., 847 F. Supp. 200, 205 (D. Mass. 1994).

Closely related to general forecasts and predictions are those statements that

amount to no more than "corporate puffery" – "optimistic, vague projections of future

success." Priest v. Zayre Corp., Civ. A. No. 86-2411-Z, 1987WL10741, at *2 (D. Mass.

May 1, 1987). Mere puffery is not actionable, since the statements are "so vague [and] so

lacking in specificity . . . that no reasonable investor could find them important to the total

mix of information available." Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 250,

256-57 (D. Mass. 2006) (citing, quoting Shaw, 82 F.3d at 1213, 1217).[78] "The more

---

[78] See also, Suna v. Bailey, 107 F.3d at 72 ("'[S]oft,' 'puffing' statements . . . generally lack
materiality because the market price of a share is not inflated by vague statements predicting
growth.") (quoting Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993)); Gross v. Summa
Four, Inc., 93 F.3d 987, 995 (1st Cir. 1996); Computervision, 90 F.3d at 635-636; Shaw, 82 F.3d
at 1217-18 & n. 32 (collecting cases); Fitzer, 119 F. Supp. 2d at 23; Guerra, 2004 WL 1467065
(collecting cases); In re No. Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 20 (D. Mass.
1999) (In cases of alleged corporate puffery, the court "considers whether the statement is so

specific, definite or concrete the outward statement is, however, the greater the likelihood

the statement is material and not mere puffery."  Cytyc, 2005 WL3801468, at *13 (citing

Gross v. Summa Four, Inc. 93 F.3d 987, 995 (1st Cir. 1996); Computervision, 90 F.3d at

635-36.[79]

---

vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information." (internal citations ommitted)); Boston Tech., 8 F. Supp. 2d at 60, 63, 71 (While statement by company "may indeed have 'emphasized positive themes and suppressed negative information,' it is too vague in meaning and . . . too general for a reasonable investor to take into account when making an investment decision.") (quoting Shaw, 82 F.3d at 1217); Rand, 847 F. Supp. at 208 (general, optimistic statements are not material) (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083(1991)); Colby, 817 F. Supp. at 211; Stratus Computer, 1991 U.S. Dist. LEXIS 21587 at *19 (quoting Morgan v. Fin. Planning Advisors, 701 F. Supp. 923, 927 (D. Mass. 1988); Pepsi Cola Metro. Bottling Co. v. Pleasure Island, Inc., 345 F.2d 617, 622 (1st Cir. 1965)); Priest v. Zayre, 1987 WL10741, at *2 ("Optimistic, vague projections of future success which prove to be ill founded are not, without more, sufficiently material to incur Rule 10B-5 liability."); Bachini v. A.G. Edwards, 2008 WL2359727, at *8 (Mass. Super. 2008) (citing Marram, 809 N.E.2d at 1030 n.24) (optimistic statements regarding the state of the stock market were not actionable; "puffery or sales talk regarding the likelihood of . . . [the] portfolio's success cannot by itself form the basis for a claim under GL c. 110, § 410.").

[79] "Similarly, more cautious or subdued statements are less likely to be actionable than more strongly optimistic or concrete statements that contrast sharply with internal reality." Id. at 74-75; see also id. at 32, 86-88 (although the statement that "[the defendant] could capture 100% of the marke"t is corporate puffery, the statement that "[it] had 57% of the market" is not puffery; quantification of revenue projections provided sufficient specificity to make it not puffery); Brumbaugh, 416 F. Supp. 2d at 256-257, 258 (company statement that a "partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers" "encompasse[d] a representation of present fact" and was actionable under § 10(b) of the federal securities laws, while statements that the company could "clearly see the growing momentum for trusted computing in the marketplace" and expected "substantial growth" were mere puffery, as they were "vague [and] lacking in specificity'") (citing, quoting Shaw, 82 F.3d at 1213, 1217); Boston Tech, 8 F. Supp. 2d at 74 ("As long as an issuer declines . . . to supplement these kinds of remarks with specifics, they are mere puffery."); Priest v. Zayre, 1987 WL10741, at *2 ("When . . . projections are accompanied by either specific qualifications of projected results implying *certainty* (e.g., earnings *shall* increase at least 30% next year) or statements of fact which prove to be erroneous, then such statements can be the basis of Rule 10b-5 liability.") (emphasis added).

Even where more specific statements of "soft" information constitute more than mere puffery, sufficient cautionary language may render a statement immaterial – a principle often referred to as the "bespeaks caution" doctrine.

> [The bespeaks caution doctrine] embodies the principle that when statements of "soft" information, such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws. In short, if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail . . . .

Shaw, 82 F.3d at 1213.[80]

Cautionary language alone cannot give carte blanche to misstate or materially misrepresent hard facts, and the bespeaks caution doctrine is limited to alleged misrepresentations dealing with "soft" information. Romani, 929 F.2d at 879; see also Blatt v. Muse Techs., Inc., 2002 U.S. Dist. LEXIS 18466, Fed. Sec. L. Rep. (CCH) P92004 (D.

---

[80] See also Suna v. Bailey, 107 F.3d at 70; Computervision, 90 F.3d at 626 & n.11, 635 (Where forecasted earnings in a prospectus were read in context, they were "anything but a guarantee;"the prospectus explicitly and specifically noted factors that could affect the price," and "these cautionary statements in the Prospectus are, in and of themselves, reason to find this claim not actionable.") (citing Shaw, 82 F.3d at 1213; In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)); Raab, 4 F.3d at 290; Romani, 929 F.2d at 879 ("Documents such as this, which 'clearly "bespeak caution,"' are not the stuff of which securities fraud claims are made.") (citing Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986)); Guerra, 2004 WL 1467065, at *18 (forward-looking statements fell under "bespeaks caution" doctrine where statements were "clearly tempered by the language that a positive future is always a 'big if' and that the company 'certainly [is] not in a position to put any numbers around' any projections."); Fitzer, 119 F. Supp. 2d at 31; Fisher v. SpecTran Corp., 2001 WL3464431, at *4 n.5 (D. Mass. 2001) (projections were concrete and specific and not puffery, but were still not actionable as they were adequately couched in language that "bespeaks caution," including the disclosure of assumptions driving the predictions and the possibility that those assumptions may not obtain); Boston Tech., 8 F. Supp. 2d at 53, 60-61 (while specific predictions were more than sales talk, sufficient cautionary language made the statements not actionable under securities law).

Mass. 2002). Furthermore, the cautionary language must be "sufficiently related to the subject matter" of the statement; boilerplate warnings will not suffice. Cytyc, 2005 WL3801468 (quoting In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 162 (D. Mass. 2001)).

c.    Reliance

To recover for common-law fraud or negligent misrepresentation,[81] a plaintiff must also demonstrate reasonable or justifiable reliance on the material misrepresentation or omission.[82] Whether a plaintiff's reliance is reasonable or justified, especially in the securities context, is influenced by several factors, including:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal

---

[81] A plaintiff need not prove reliance on the material misrepresentation or omission to recover for securities fraud under § 410(a)(2). Marram, 809 N.E.2d at 1027; Eagle Fund, Ltd. v. Sarkans, 63 Mass. App. Ct. 79, 83-84, 823 N.E.2d 783, 787 (Mass. App. Ct. 2005).

[82] Although "reasonable" and "justifiable" reliance have been distinguished in other contexts, see, e.g., Field v. Mans, 516 U.S. 59, 74-75 (1995) (§ 523(a)(2)(A) of the Bankruptcy Code "requires justifiable, but not reasonable, reliance"), neither the SJC nor the First Circuit have held that such a distinction obtains under Massachusetts common law. Rather, both the SJC and the First Circuit have generally used the terms interchangeably when discussing the reliance element of common-law fraud and negligent misrepresentation. See, e.g., The First Marblehead Corp. v. House, 473 F.3d 1, 10-11 (1st Cir. 2006) (discussing element of "reasonable" reliance in negligent misrepresentation claim); Rodi v. Southern New England School of Law, 532 F.3d 11, 15, 17 (1st Cir. 2008) (plaintiff's reliance in fraudulent misrepresentation claim described as both unreasonable and unjustified); Kenda, 329 F.3d at 225, 227 (common-law fraud requires proof of reasonable reliance; later referring to justifiable reliance); Cummings, 244 F.3d at 20 (negligent misrepresentation claim requires proof of justifiable reliance); Massachusetts School of Law at Andover v. American Bar Ass'n, 142 F.3d 26, 41 (1st Cir. 1998) (negligent misrepresentation claim requires proof of justifiable reliance); Gossels v. Fleet National Bank, 902 N.E.2d 370, 377, 453 Mass. 366 (2009) (negligent misrepresentation claim requires proof of justifiable reliance); Masingill v. EMC Corp., 870 N.E.2d 81, 88, 449 Mass. 532 (2007) (fraudulent misrepresentation claim requires proof of reasonable reliance) (citing Restatement (Second) of Torts § 537(b) (1977)); Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1134, 445 Mass. 411 (2005) (fraudulent misrepresentation claim requires proof of reasonable reliance); Marram, 809 N.E.2d at 1031 (stating that "justifiable reliance is integral to a claim for negligent misrepresentation," and citing cases discussing reasonable reliance).

relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Kennedy, 814 F.2d at 804 (quoting Zobrist v. Coal-X, Inc., 708 F.2d 1511 (10th Cir. 1983) (§ 10(b) claim)).  Courts also consider whether allegedly misleading oral statements are clearly contradicted by written materials.  Id.; see also Marram, 809 N.E.2d at 1031.

But the plaintiff has no independent duty to investigate the truth of every statement. A plaintiff is generally entitled to rely on a statement presented as fact, unless the statement is so "preposterous or palpably false" that no reliance on it would be reasonable or justified.  Snyder, 333 N.E.2d at 429; Kenda, 329 F.3d at 227; Damon, 87 F.3d at 1480 (quoting Roadmaster Indus., Inc. v. Columbia Mfg. Co., 893 F. Supp. 1162, 1176 (D. Mass. 1995)); Kannavos, 247 N.E.2d at 712-13.

Just as predictions or forecasts may be immaterial, a plaintiff's reliance on such "soft" statements may be unreasonable or unjustified as well.  As the First Circuit explained,

> [P]redictions . . . are actionable only if the forecast might affect a "reasonable investor" in contemplating the value of a corporation's stock. . . . While [predictive] statements may convey the company's desire for profitable performance in the future, [where] they do not convey any *promises* about future performance and do not project specific numbers that the company will *certainly* attain[, n]o reasonable investor would have read the[ ] statements, especially [when] they are accompanied by cautionary language, as promises or guarantees of future performance.

Suna v. Bailey, 107 F.3d at 70 (emphasis added) (quoting Colby, 817 F. Supp. at 21); see also id. at 72 (a reasonable purchaser of securities would not reasonably rely upon or be mislead by "optimistic predictions of future potential."); Computervision, 90 F.3d at 626

("Forecasts are not guarantees of, or insurance policies for, a firm's future performance, nor are they understood as such by reasonable investors.").

Most importantly, where a plaintiff basis a claim for fraud on a written statement, the plaintiff cannot successfully demonstrate *any* reliance without first establishing that the plaintiff actually read the allegedly false or misleading statement.  See, e.g., Wells v. Monarch Capital Corp., 1991 WL354938, at *12 (D. Mass. Aug. 23, 1991) (where plaintiff did not state that he read any of the documents that were allegedly false, plaintiff failed to establish reliance and fraud claim was dismissed).

d.    Knowledge of Falsity and Intent to Deceive

Finally, in order to recover for fraud under Massachusetts common law, the plaintiff must establish the defendant's knowledge of the statement's falsity and the defendant's intent to deceive, often referred to as the scienter requirement under analogous provisions of the federal securities law.[83] See Massaro, 559 F. Supp. at 1079 (knowledge requirement for fraud claims under Massachusetts common law treated as parallel to the scienter requirement found in federal securities laws).  Scienter may be proved by showing that "the defendants consciously *intended to defraud*," Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) (emphasis added), by showing that the defendant "knew the statements were false when [the defendant] made them . . . ," Massaro, 559 F. Supp. at 1077 (citing SEC v. MacDonald, 699 F.2d 47 (1st Cir. 1983)), or by demonstrating that the defendant,

---

[83] A plaintiff is not required to prove the defendant's knowledge of falsity or intent to deceive to establish either negligent misrepresentation, Snyder v. The Sperry & Hutchinson Co., 333 N.E.2d 421, 428, 368 Mass. 433 (1975); Chatham Furnace Co. v. Moffatt,18 N.E. 168, 169, 147 Mass. 403, (1888), or securities fraud under § 410(a)(2), Feldman, 22 Mass. L. Rep. 341 (citing Marram, 809 N.E.2d at 1027).

in making the statement, "acted with a high degree of recklessness" as to the truth of the matter.  Id. Similarly, where liability is predicated on an omission of material information, a defendant may be liable for reckless failure to disclose; as the First Circuit explained, this standard requires the plaintiff to prove that the defendant made:

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)) (additional citations omitted).

But there can be no "fraud by hindsight."  Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 90 (1st Cir.  2008); Suna v. Bailey, 107 F.3d at 71; Serabian, 24 F.3d at 367; Greenstone v. Cambex Corp., 975 F.2d 22, 25-26 (1st Cir. 1992); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990); Guerra, 2004 WL 1467065, at *25 (quoting In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251,  261 (D. Mass. 2001)).  That is, the plaintiff may not rely on:

> allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier.  "[A] plaintiff may not simply contrast a defendant's past optimism with less favorable actual results, and then contend[ ] that the difference must be attributable to fraud.'"  Shaw, 82 F.3d at 1223 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

Boston Scientific, 523 F.3d at 90; see also Romani, 929 F.2d at 880 (fraud claim could not be based on plaintiff's "speculat[ion] that defendants committed fraud based solely on the partnership's failure to be as profitable as the offering materials indicated was possible").

3.    *Analysis*

The Plaintiffs allege that Fincke made various affirmative misrepresentations, materially misleading statements, and complete omissions of material information that give rise to liability for fraud, negligent misrepresentation, and securities fraud under § 410(a)(2). "In this circuit, securities fraud cases are 'decided by a statement-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement.'" Blatt v. Muse Tech., Inc., Nos. Civ.A. 01-11010-DPW, Civ.A. 01-12173, 2002 WL31107537, at *6 (D. Mass. Aug. 27, 2002) (quoting Carney, 135 F. Supp. 2d at 243).[84]

a.    General Allegations

The Investors raise several general allegations of fraud and misrepresentation in both the Complaint and the Plaintiffs' post-trial brief.  The Court characterizes these claims as "general" in nature, because the Investors neglected, at times, to specify which transactions or investments  were affected by the alleged misrepresentations, which specific documents contained the alleged misrepresentations, or *how* specific statements were false or misleading.  They preferred instead to rely on more general, and at times grandiose, claims of wrongdoing.  The general allegations of fraud or misrepresentation involve representations or omissions related to projections, problems with vendors caused by overdue payables, the Philips litigation, and the Cadent litigation.

I.    Projections

-----

[84] See also Guerra, 2004 WL1467065, at *7 (citing Carney, 135 F. Supp. 2d at 243; Boston Tech, 8 F.  Supp.  2d at 55; In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 219 n.1 (D. Mass. 1999)); Boston Tech., 8 F. Supp. 2d at 56 ("[I]t is not the law that a [federal securities fraud] complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time.").

In the Plaintiffs' post-trial brief, the Investors assert:

Fincke's representations to the Investors . . ., which they relied upon, were knowingly false, because of the following:

A.     There was inadequate basis, at any time, for the sales or income projections Fincke provided.

B.     There was inadequate basis, at any time, for the manufacturing projections Fincke provided.[85]

Apart from their obvious hyperbole, these types of allegations do little to assist the Court in evaluating the Investors' claims.   Nonetheless, because the Investors have provided a modicum of supporting examples related to these particular claims, the Court will analyze each to the extent possible given the lack of specificity.

A.     SALES AND INCOME PROJECTIONS

Even if the Investors had identified with the requisite specificity *which* sales and income projections and which investment transactions the allegation refers to, the Court finds that they have nonetheless failed to demonstrate that sales or income projections generally lacked an inadequate basis.   Instead, the Court finds that the weight of the evidence supports Fincke's contention that, while perhaps overly optimistic, the sales and income figures were not false representations of Fincke's actual beliefs regarding what Access could achieve, see In re PDI Sec., No. Civ.A. 02-211(GEB), 2006 WL3350461, at *4 (D. N.J. Nov. 16, 2006) (plaintiff must show a lack of sincere belief) (collecting cases), nor were they unreasonable in light of the information known to Fincke and the

_____

[85]   In addition to the allegations in parts A and B, the Investors also stated that the projections were false because "[t]here was an inadequate basis, at any time, for the representation by Fincke that the Access technology was proprietary to Access and did not infringe any competitor's patents."   The Court considers this a matter largely separate from the claims involving the projections, and will discuss this particular allegation in a separate portion of the memorandum.

circumstances in which they were generated.  In re Cambrex Corp. Sec. Litig, No. 03-CV-4896(WJM),  2005 WL2840336, at *13 (D.N.J. Oct. 27, 2005) ("a plaintiff must not only allege the statements are false, but must also allege why there is no reasonable basis for the forecasts.")

Sales and income projections were contained in various documents presented to the Investors, primarily spreadsheets accompanied by narrative descriptions of information contained in the spreadsheets.  Two types of financial spreadsheets were maintained at Access.  Early in his employment as a contractor at Access, Jay Bounty created the Financial Forecast Model, which he continued to maintain as the company's CFO.  Trial Tr. day 2, 15-17.  The Financial Forecast Model contained various data entries that were linked such that the inputted data – both actual results and estimates – would affect projected financial outcomes.  Trial Tr. day 2, 23.  The Financial Forecast Model was stored on Bounty's computer, and data could only be entered by Bounty, Grosberg, or Fincke. Bounty testified that the Financial Forecast Model was updated regularly with actual data as it became available.  Actual results were ascertained from Access's books and records or from management personnel who oversaw different aspects of the company.[86]  Trial Tr. day 2, 20.  There was no coherent evidence that any of the actual numbers were false,[87]

---

[86]  Bounty testified that he received information on sales from Klegerman and Dufford, on manufacturing from Nawn, and on marketing from Heer, although he sometimes obtained information from others at the company as well.  Trial Tr. day 2, 81-82.

[87]  At one point in his testimony, Grosberg intimated that some of the actual numbers in the financial models were incorrect.  He testified that after certain (unspecified) data were entered, he "later realized that certain orders were debooked as a result of things that happened in the company."  Trial Tr, day 5, 166. But there was no credible testimony to the effect that any false data was intentionally entered by Fincke or anyone else, and Grosberg also testified that any changes in actual numbers were corrected as soon as the change became apparent.
Radley also testified that Fincke provided the Board with "actual figures that were 100

and there was no indication that figures in the spreadsheet were changed without Bounty's knowledge prior to the distribution of information from the model to the Investors or the Board.  Trial Tr. day 2, 32-33.

Grosberg assisted Bounty with the creation of the Financial Forecast Model and also maintained his own financial forecasting model to track Access's weekly cash flow (the "Cash Flow Model").  Trial Tr. day 2, 59.  The purpose of the Cash Flow Model was to assist managers in running the company and to generate a weekly cash requirement report.  Similar to the Financial Forecast Model, the Cash Flow Model relied upon a series of linked variables, including certain assumptions, and would be updated and maintained with actual results on a regular basis.  Trial Tr. day 2, 54.  Bounty testified that he and Grosberg regularly reviewed and discussed both financial models; they discussed financial matters and cash flow at least weekly, working to ensure adequate cash was available to support the business and make payroll. Trial Tr. day 2, 59-60.

The Financial Forecast Model was used not only for internal assessments of Access's actual and projected performance, but also provided the basis for information provided to the Investors.  Bounty would use the Financial Forecast Model to create KPIs (spreadsheets containing Access's "key performance indicators") and related narratives summarizing critical financial, sales, and manufacturing results and projections that would be provided to the Investors and, later, the Board.  According to Bounty, "the role of the

---

percent untrue."  Trial Tr. day 9, 121-123.  He could not point to any document containing the allegedly untrue figures, and then stated that the false actuals were given by Fincke orally.  The Court declines to give any weight to this accusation.  No independent testimony or evidence supports the claim that Fincke provided the Investors or the Board with false reports of actual company results.  And, at any rate, Radley was unable to provide any specific example of Fincke having provided false reports of actual results in connection with any of the investments.

KPIs was to advise the Board and the management of the company with how well the company performed for that particular period of time against the projection for that period of time." Trial Tr. day 2, 53.

In addition to gathering actual data related to company performance, Bounty and Grosberg worked with Fincke and Access managers to obtain the company projections that underlay the assumptions and determined outcomes in the Financial Forecast Model. Trial Tr. day 2, 23. Bounty testified that actual and projected sales figures were received from Fincke and members of the Access sales team; manufacturing information was obtained from Fincke and others responsible for manufacturing, such as Nawn and Rice and projected shipments were based on estimates from manufacturing personnel, although Fincke was also intimately involved in providing shipping estimates. Trial Tr. day 2, 81-82. In addition, Grosberg noted that the projected average selling price that went into the Cash Flow Model was updated almost daily as information was received from Fincke and other members of the sales team. Trial Tr. day 5, 124-125.

The projections, once made, were not static; they were revised at the impetus of Bounty, Grosberg, Fincke, or other Access personnel when circumstances changed or clarification of the assumptions was required. Fincke reviewed all assumptions and projections prior to release of the financial information (through KPIs and the related narratives) to the Investors or the Board. Trial Tr. day 2, 30-31. Bounty recalled that Fincke would at times review the financial models, make notations, and request that changes be made to some of the underlying numbers. Trial Tr. day 2, 23. Grosberg testified likewise. In fact, according to Grosberg, although he could not remember details of a specific instance, Fincke would instruct him to change projected numbers in the

80

models, resulting, Grosberg said, in cash inputs larger than he originally anticipated.  Trial Tr. day 5, 125-27.

Grosberg could not recall a specific time when changes were made to projections or assumptions at Fincke's behest, but testified that there were times when "we believed, for instance, that we may not be able to for a period of four weeks, for instance, ship any product. I would present that to Mr. Fincke and Mr. Fincke would say, 'No, you'll put 500 in, 500 in, 500 in, 500 in an Excel model.'"  Trial Tr. day 5, 126.  Not only was Grosberg unable to point to the document where this change was allegedly made, but he also did not clarify who the "we" were that believed shipments would be halted for four weeks.  In light of this lack of specificity, the Court is unable to credit this portion of Grosberg's testimony as referring to a specific event.

Grosberg further testified that Fincke was not only intimately involved with the preparation of the cash projections, but would also edit the projections, particularly with respect to revenue.  Grosberg said Fincke's revisions would always show a cash requirement less than what Grosberg believed was necessary to run the company.  He claimed that he would be instructed by Fincke to "back into" predetermined cash requirements, necessitating changes to the Cash Flow Model required to reach the target number.  Again, he could not recount a specific instance, document, or transaction associated with this general recollection.

Fincke described the process by which he would create the projections provided to Bounty and Grosberg as a collaborative process between himself and other Access management personnel.  According to Fincke, projected sales numbers were prepared with input from various sales personnel, including Klegerman, Heer, and Ide.  The Court found

81

Fincke's testimony on this subject credible and consistent with both Bounty's and Grosberg's testimony that projected figures were obtained from both Fincke and the sales team.[88]  The Investors have not directed the Court's attention to discrepancies between the sales projections contained in the financial models and information gathered from the sales team to assess sales prospects.

Based on the testimony and documents in evidence, the Court concludes that the Investors have not demonstrated that Fincke falsely provided projected sales figures that he believed were unobtainable; nor have they shown that the sales projections lacked a reasonable basis. See PDI Sec., 2006 WL3350461, at *4; Cambrex, 2005 WL2840336, at *13.  Rather, the assumptions regarding sales that were incorporated into the financial models and presented to the Board through KPIs and financial spreadsheets were based on information from various Access employees with relevant knowledge.  While Fincke may have contributed to the formulation of the sales numbers, there is no evidence that he disregarded contrary evidence that would have identified the projected sales figures as unreasonable at the time they were entered into financial models or presented to the

---

[88]  Although little evidence on the matter was admitted, at least one document supports Fincke's characterization of the process used to generate sales estimates as a collaborative effort. For example, one email from Fincke to several Access managers, including sales personnel, discussed a sales meeting to be held on April 14, 2003.  Included with the exhibit were several pages of detailed information on various "sales channels" and projected sales figures for different markets.  The email requested sales management employees to prepare presentations and written materials for discussion of the April sales goals.  Pl.'s Ex. 68; Def.'s Ex. 47. At trial, the Court noted that the email had been sent in the early morning on the date the meeting was to be held.  Upon inquiry as to whether it was customary for Fincke to send such an extensive request to employees on short notice, Fincke explained that this meeting, and the employees' participation therein, had been anticipated for some time, as sales meetings were held on a regular basis.  Trial Tr. day 4, 120.

Investors.  See Computervision, 90 F.3d at 629 (plaintiffs have duty to plead factual allegations sufficient to allow inference that defendants did not consider data).

Likewise, the Investors have failed to carry their burden regarding allegations that the financial information and projections were unreasonable or false representations of Fincke's then present belief.  See PDI, 2006 WL3350461, at *4.  The testimony with regard to the financial models showed that other highly qualified individuals were involved in all aspects of the financial forecasting – from formulating the assumptions, to gathering and entering actual and projected data, through maintaining and updating the Financial Forecast and Cash Flow Models.  In fact, the testimony with regard to the integrity in the development and maintenance of Access's financial forecasting models outweighed any credence the Court could give to generalized, non-specific claims that Fincke revised projections, assumptions, or other factors in the model to achieve predetermined misleading or unreasonable results for presentation to the Investors or to the Board.

B.   MANUFACTURING PROJECTIONS

The Investors also assert that there was an inadequate basis for the manufacturing projections presented to the Investors and the Board.  With the exception of the Company Overview, discussed below, the Investors did not identify which documents they allege were false or misleading on account of manufacturing projections.  Instead, they assert that manufacturing was consistently projected to produce and ship 2000 units per month (or 100

units per day).[89]  The Investors claim that this projection was misleading or false and that "all projections provided by Fincke to the Plaintiffs based on this capacity were knowingly false statements of material fact . . . ."

But the Plaintiffs' allegation that all manufacturing forecasts were premised on consistent production of 100 units per day is significantly overstated.  The Business Plan, dated October 18, 2002, disclosed that manufacturing was, at that time, producing units at a rate of 125 to 200 units per *week*, with a goal of reaching 250 per week in November, 300 per week in December and 425 per week thereafter – none of these projections equate to production of 100 units per day.  Pl.'s Ex. 107.  During early March 2003, when Fincke began discussions with the Investors regarding additional funding, Fincke clearly anticipated in the projections and assumptions underlying the financial models that Access could achieve a higher level of production, reaching 100 units per day or more.[90]

But subsequent manufacturing projections were revised, at times downward and at other times upward, as the company gained more experience and additional information became available.[91]  This is consistent with the testimony of several witnesses to the effect

---

[89]    The 100 unit per day or 2000 unit per month manufacturing rate is actually drawn primarily from estimates of unit shipments.  Because manufacturing, production, and shipment of units are interrelated (in that Access generally projected to ship most, if not all, units produced in a particular time frame), and often referred to interchangeably in witness testimony and admitted evidence, the Court will consider them in tandem as well.

[90]    For instance, in the projections attached to the March 13, 2003 email from Fincke to the Investors in connection with the initial discussions leading to the April 2003 Transaction, shipments were projected to reach at least 100 units per day in April, with increased production and shipments monthly thereafter.  Pl.'s Ex. 13.

[91]    For example, in the Weekly Cash Flow Projections spreadsheet included in the April Board Meeting presentation materials, shipments were projected at 250 for the first week of April (a rate of 50 units per day), and thereafter through July of 2003, shipment projections fluctuated between 300 and 450 per week, with a fairly consistent projection of 375 units per week (or 75 units

that manufacturing and shipping estimates included in the financial models and given to the

Investors and the Board were not static, but were based on information received from

several sources, including Fincke and other manufacturing employees.  As Rice testified,

although Fincke generally wanted Access to produce 100 units per day, "clearly we could

only produce so many, so he accepted what we produced."  There simply was not a

constant projection of 100 unit per day shipments, as the Investors have alleged.  See

Computervision, 90 F.3d at 634-635 (finding no liability for securities fraud where

defendant's document did not say what plaintiffs asserted it did).

Nonetheless, given that many of the projections did contemplate Access's ability to

ultimately achieve that level of production, the Court will examine the Investors' claims in

this regard more closely.   The Investors first attempt to support their fraud and

misrepresentation claims regarding manufacturing projections by arguing that Fincke failed

to present evidence that supported the reasonableness of the manufacturing goals.  It is

the Investors' burden, however, to demonstrate that Fincke's projections were

---

per day).  Def.'s Exs. 51, 52, 68.

 At the May Board Meeting, however, shipment projections were revised upward.  As the presentation materials note, Access achieved the production of 100 units in one day during the last week of May, apparently as a result of the influx of materials necessary to complete a large number of units.  This achievement drove an optimistic objective to thereafter produce 600 units per week (120 units per day) through July of 2003.  Pl.'s Exs. 61, 77.

 The May projections were not achieved, although shipment rates during June of 2003 rose somewhat.  The Weekly Cash Flow Projections spreadsheet attached to the June Board Meeting presentation materials shows actual shipments between 300 and 500 units per week, with projected shipments ranging from 375 to 500 (a majority of the projections being 375) per week through the remainder of July and August, and then increasing to 600 units per week in September.  Def.'s Ex. 68.

 These later projections, unlike those contained in the Business Plan or Company Overview, are not so clearly tied to any particular investment transaction.  However, the fact that projections were changed over time tends to support Fincke's argument that manufacturing projections were not static, monolithic figures devoid of connection to business realities.  Instead, Fincke, and others, considered changing circumstances and revised the projections in response.

unreasonable or lacked an adequate basis in the information available to Fincke at the time the projections were provided.  See PDI, 2006 WL3350461, at *4.

Next, in support of their contention that the 100 unit per day goal was unreasonable or inadequately supported, the Investors allege that Fincke was advised by "numerous management employees" that Access could not achieve production of 100 units per day. Nawn, Rice, and Bowers each testified that they believed the 100 unit per day manufacturing goal could not be maintained *given the resources available* during the time their opinions were expressed.  Trial Tr. day 5, 20-22, 102-103; day 7, 139-140. Understanding the testimony in context, however, is essential to determining whether Fincke's projected manufacturing figures were so unreasonable as to give rise to claims for fraud or misrepresentation.

Manufacturing the Access AED was a somewhat complicated affair, involving a combination of both in-house assembly and partial manufacturing of control boards by contract manufacturers. Generally, Access would buy raw parts for the units from suppliers, which they would "kit up" (i.e., gather together certain components); the kits were then sent to contract manufacturers to build the boards to a specified level; the partially completed boards would be returned to Access and tested; Access employees would complete the final assembly; the units were put through more test operations; and, assuming passage of final testing, the AED would be shipped or placed in inventory.

Several factors complicated the manufacturing process.  For example, the AEDs could be configured in a variety of ways depending on customer specifications.[92]  Most

---

[92] Because the Access AED was being marketed in many foreign countries, one particularly difficult challenge, at least early on, was deciding to which language a particular device should be

significant, however, were manufacturing problems caused by lack of raw materials and by product changes prompted by safety concerns or customer demand. Capital constraints often led to shortages of raw materials required for assembly of the "kits" sent to the control board manufacturers.  Absent a control board, an Access AED could obviously not be built. In addition, changes to the product would result in manufacturing delays or slow-downs as the changes were being introduced or previously completed units were reconfigured to incorporate the changes.

Given the level of disruptions associated with these complications, Nawn believed that Access would not be able to manufacture 100 units per day.  Trial Tr. day 5, 20-21. He discussed his opinion with Fincke on several occasions, expressing the difficulty of producing 100 units per day due to the lack of parts, product changes, and sales configurations.  Nawn testified that, when he communicated this opinion, Fincke would reiterate that 100 units per day remained the goal. Trial Tr. day 5, 22-23.  Bowers and Rice similarly testified to telling Fincke more than once that the 100 units per day level could not be achieved without more people and investment into production.  Trial Tr. day 5, 102-103; day 7, 139-140.  While it was clear from the testimony that manufacturing at Access suffered from a variety of difficulties, this testimony does not inform on the question of whether Fincke's projections as to *future* production levels were unreasonable.  None of

---

configured.  The choice of language had to be made early in the manufacturing process, which required an accurate estimate of the number of units that would be needed in a particular language; otherwise, the company would be stuck with unsaleable units in the wrong languages or the units would have to be deconstructed and the language changed. According to Nawn, this language re-configuration amounted to 20-25% of the manufacturing disruptions.  Trial Tr. day 5, 45.  Flexibility was later injected into the process through the use of a dual-language chip; most of the units would have English as one available language, which made them more marketable for sale and lessened disruptions caused by language configurations.

the testimony sufficiently demonstrated the inadequacy or unreasonableness of the 100

unit per day projection if sufficient resources were available.[93]

------

[93] The Investors did elicit the testimony of one witness and produced one document related to the issue of whether Access's manufacturing *capacity* was sufficient to produce 100 units per day. The testimony came from Bowers, who claimed to have done an informal analysis of manufacturing flow by watching employees engaged in the manufacturing process, timing them at manufacturing stations, and looking at the flow of manufacturing through different stations. Bowers testified that he told Fincke the conclusions he reached, which were presumably less than favorable, but claimed that Fincke "wouldn't listen." But Bowers did not say when this event occurred, nor could the Court assess the adequacy of his informal review of the manufacturing process. This vague and otherwise unsubstantiated testimony falls short of demonstrating that Fincke presented manufacturing projections despite evidence that the projections could not be reached because manufacturing capacity was insufficient. Furthermore, Bowers went on to describe that Fincke *did* make changes to manufacturing flow (which Bowers believed was still inadequate) and worked toward improving manufacturing processes. Trial Tr. 135-136.

The Investors also introduced copies of slides from a presentation given by Analytics Operations Engineering, Inc. ("Analytics") regarding an "operations audit." Pl.'s Ex. 122. The presentation slides ("Analytics Presentation") are dated July 8, 2003, although the information in the presentation shows that the audit was actually performed early in June. The "Problem Statement" in the Analytics Presentation is stated as the "Need to . . . Produce consistently at 100 per day; Ramp seamlessly from 100 to 200 in 50-unit increments; [and] Utilize resources efficiently." The presentation expressly noted, however, that the described analysis was preliminary and the numbers included therein needed to be validated through better data collection.

Radley referred to the Analytics analysis as one piece information known to Fincke that cast doubt on Fincke's ability to obtain his stated projections. According to Radley, this study showed that producing 100 units per day was "absurd." Trial Tr. day 9, 123. The Court was not provided with a copy of the Analytics report apart from the copies of presentation slides, and the Court does not interpret the Analytics Presentation as reaching the conclusion given by Radley.

The presentation identified factors influencing the production rate and analyzed capacity. It also gave specific suggestions on how manufacturing could be improved. The Analytics Presentation identified a number of changes that would be required in order to produce 150 units per day (such as outsourcing additional manufacturing processes and adding an additional manufacturing station). The capacity to produce 100 units per day is not identified as then unobtainable, although the presentation addresses changes to the process Analytics identified as needed in order to reach that level. The Analytics Presentation also detailed the types of changes that would improve production, including making logistical changes to increase capacity, balancing the assembly line, improving inventory organization, building up resources, and improving forecasting.

The Analytics Presentation also discussed Access's manufacturing fall-out rate – i.e., the percentage of units rejected at some point during production. According to the presentation, the fall-out rate during early June was above 30%. Fincke was concerned with this level of fall-out and discussed the issue with Nawn and Rice. Trial Tr. day 5, 26. Nawn and Rice then took a more current look at production and determined that, by July 15, 2003, the underlying causes of the fall-out rate had been addressed and the rate had been lowered to 14%-16%. Trial Tr. day 5, 40; Pl.'s Obj.-to Ex. 9. Although Nawn testified that this rate was still not "acceptable," Trial Tr. day 5, 41, neither the testimony nor the documents demonstrated that either level of fall-out precluded Access

Fincke continually anticipated, in connection with additional investments, that those adequate resources would be made available, allowing the company to increase production levels and ship more units.  He clearly overestimated the degree to which additional funding and revenues would improve the availability of raw materials and did not foresee the degree to which product changes necessitated by safety or customer concerns would slow production in the future, but these failures of foresight are not the stuff of which fraud and misrepresentation claims are made.

While management concerns regarding manufacturing communicated to Fincke raise questions about the sincerity of his optimism, the underlying causes of management's concerns – primarily raw material shortages and product changes – *were* disclosed to the Investors and Board.  See In re Trump Hotels S'holder Derivative Litig., Nos. 96 Civ. 7820 DAB, 96 Civ. 8527 DAB, 2000 WL1371317, *14 (S.D.N.Y. Sept. 21, 2000) (disclosure of underlying problems or risks precludes claim that more disclosure was required).  The Court concludes that the Investors have failed to establish, by a preponderance of the evidence, that the projections of *future* manufacturing levels were unreasonable, false or misleading.

## C.     EUROPEAN DISTRIBUTORS

The Investors claim that the  problems with the European Distributors caused them not to meet their contractual minimums, "which were a basis for sales and revenue

---

from achieving its stated projection estimates. For this reason, and because the Analytics Presentation did not state that the estimated level of production could not be achieved, the Court does not find the report persuasive in supporting the claims the Investors have raised.

And, finally, the Analytics study was conducted subsequent to the late 2002 and April 2003 investments.  The Investors have failed to connect the Analytics Presentation to projections provided in connection with their other investments.

projections provided to the Investors and Board members." They further state that "the poor relationship with the European Distributors made all of the projections provided by Fincke substantially and materially misleading."  Bounty, Grosberg and Fincke, however, testified that sales projections were based on information obtained from various sales employees, including Fincke.  Trial Tr. day 1, 86; day 2, 141; day 5, 124-125.  It does not appear that the minimums contained in the distribution contracts were the sole basis on which projected sales were based – in fact, the Investors did not show how the contractual minimums related to the projected sales orders.  In short,  there is no evidence that any expected downturn in European orders were ignored in providing expected order rates and the Investors have not even directed the Court's attention to any evidence showing how order rates were actually affected by the alleged failure of European Distributors to place orders.[94]  The fraud, negligent misrepresentation, and securities fraud claims based on these assertions thus fail.  See, e.g., PDI, 2006 WL3350461, at *3.

### D.    PROJECTIONS OR GOALS?

In their post-trial Brief, the Plaintiffs say that "none of the documents provided to the Plaintiffs on which they relied indicated that the projections, assumptions, and statements were merely goals."  The Investors insist that the projections generally, and the 100 unit per day projection particularly, were really just "goals," which Fincke did not expect to achieve. Relying on testimony given by Nawn and Rice, the Investors draw a distinction between

---

[94]   Although copies of Access's distribution agreements with Dolby and Kivex were produced,  Pl.'s Ex. 8; Pl.'s Obj.-to Ex. 6, Fincke testified that the minimum orders detailed in the agreements were not used as the sole basis for sales projections.  Trial Tr. day 3, 53.  This testimony was consistent with testimony by Bounty and Grosberg that new order projections were based on estimates provided by Fincke and other sales personnel.  Trial Tr. day 2, 141; day 5, 124-125.

goals and forecasts or predictions.  Nawn and Rice both testified that a "goal" represents

a level of achievement in production or sales the company would *like* to reach, while

predictions or forecasts required more supporting data.  Trial Tr., day 5, 49-50, 117.  For

example, according to Nawn, the 100 unit per day or 2,000 units per month production level

was a consistent "goal," but was not a basis for projected shipment estimates he gave to

Fincke.[95]  Trial Tr. day 5, 20-22.  Grosberg, Bowers, and Rice also testified that they could

not recall Fincke ever informing the Board that the 2000 unit per month projection was a

"goal."[96]  Trial Tr. day 5, 105, 151-152; day 7, 139-140.

---

[95]  Nawn testified that he interpreted the 2,000 unit per month figure to be a "goal," but it was not a "projection" given from Nawn to Fincke of what "manufacturing operations would or could do . . . at some specific time."  Trial Tr. day 5, 50.

[96]  The Court does not interpret the Investors' argument to be a semantic one, despite the pains they took to elicit testimony on  subtle differences in the witnesses' understanding of the meanings of "forecast," "projection," and "goal."  Nor would the Court agree with such an argument, to the extent it was made. The documents provided to the Investors tend generally to conflate these terms, sometimes using them interchangeably and other times distinguishing their use.
    For example, the Business Plan, authored in October of 2003, discussed manufacturing "goals" for subsequent months.   In the discussion of risk factors, however, the Business Plan referred to Access's "projections" and "forecasts."   The Company Overview disclosed that it contained "new *projections* for orders, inventory builds, unit shipments, average selling price, and planned staff increases" and, in discussing the 2,000 unit per month production figure, the Company Overview described it as "the basis for our previous production and shipment *forecasts*." Immediately following, the document explains the reasons for the failure to achieve that production level, describing the actual results as "47% of our *goal*."  In the discussion of the price increase, the Company Overview also characterized increased prices as goals and described the "forecasted" average selling price. Def.'s Ex. 33.
    The April Board Meeting presentation materials also used the term "forecast" to describe sales projections, but then distinguished the forecasts from the confirmed and expected orders for the remainder of the month (which were less than those previously forecast).  The Finance section referred to  "projections" in connection with the weekly cash flow model, and the Inventory section referred to the company's "goal" with reference to the backlog. Def.'s Ex. 68.
    The KPIs and associated narrative for May further differentiated between "actual," "plan," and "goal" figures, with the "planned" numbers consistently at or below the stated goals.  Def.'s Ex. 55.  Fincke explained that the "goals" described in that document related to projections from Access sales personnel and reflected the business they were attempting to secure.  While Fincke had a role in establishing those goals, he also explained that the "goal" numbers in that document represented potential business and were not used to formulate the projections.  The "plan" figures, however, were the expected numbers, what Access thought it could actually accomplish.  Trial Tr.

The Investors claim that they were never informed that the projections were simply goals, and therefore the projections were false or misleading because they were presented as projections that Access expected to actually achieve. The Court does not find, however, that general company goals were used in lieu of reasonably formulated projections where the goals and the projections did not coincide. As previously explained, the projections included in the financial models were provided through more extensive and collaborative analysis. And where those projections coincided with purported "goals," the Court finds that those figures were used because Fincke actually believed Access could achieve those goals at that time. See PDI, 2006 WL3350461, at *4. The Court finds that Fincke did not represent company "goals" as legitimate projections without an adequate basis for doing so. Instead, he attempted to provide reasonably-based projections of Access's expected performance.

ii.      Problems with Vendors and Suppliers

In the Complaint, the Investors allege that they, and later the Board, were not apprised of problems arising from Access's failure to timely pay suppliers and vendors – such as the necessity to obtain parts from alternate suppliers that were more costly, had unreliable lead times, or lacked appropriate upfront qualification by the technical team, resulting in unnecessary delay and modification to the product. But the Investors have not pointed to any specific statements that were false or misleading related to problems arising from Access's overdue accounts payable. Furthermore, the Court finds that those difficulties were adequately disclosed to the Investors. Computervision, 90 F.3d at 626.



day 1, 144.

At no time during Fincke's tenure at Access did the company have sufficient working capital to fund its operations.  The lack of cash handicapped every aspect of the company, especially its ability to obtain raw materials required to produce enough AEDs to satisfy orders and generate more cash.  And, as Access began accruing overdue accounts payable to suppliers, the ability to obtain additional parts to continue manufacturing became ever more restricted.  These problems were well known to Access employees, Fincke, the Investors, and the Board.  Regardless of whether Fincke, the Investors, or the Board maintained an optimistic outlook on the future, the looming cash constraints were obvious to all.  As Moriarty explained:

> [T]here was a constant need for additional working capital. . . . It seemed like an endless requirement for discussion about working capital, but it was always interspersed with the good news first. . . .  We didn't focus on the bad news that came later, and we focused on whether or not we were going to put in some more money.

Trial Tr. day 6, 131.

At various times during trial, the Investors professed ignorance of the severity of Access's problems meeting its accounts payable.  Moriarty testified that, as of April 2003, he was unaware of the extent of problems with the vendors and was not aware that vendors were refusing to ship parts due to Access's non-payment or that suppliers were changed to acquire new parts.  Trial Tr. day 6, 106-109.  The Court finds, however, that Moriarty was made aware of the severity of the problem by at least the end of March 2003 – MSL had drafted on its letter of credit guaranteed by him, he had discovered that Access was behind in its rent, and in the March 27, 2003 email from Fincke, he was made aware of the fact that second source vendors were being solicited to obtain additional parts.  Trial

93

Tr. day 4, 64-65, 97-98; day 5, 149. Moreover, his deposition testimony contradicted his assertions at trial. At his deposition, Moriarty testified that, at the time he invested additional funds in March 2003, he knew that "[Fincke] was having horrible times with suppliers . . . to the point where they wouldn't ship him anything [and] he would have to clean up these credit issues to move forward." Trial Tr. day 6, 108-109.

The other Investors were also made aware of the extent of Access's debt to its suppliers and other vendors. Shortly after Access began shipping product domestically and internationally, relationships with its vendors and suppliers quickly became strained as the overdue accounts grew. This situation was disclosed in the Business Plan distributed in October of 2002, which stated:

> Access at September 30, 2002 had accounts payable of $1,770,383, including substantial amounts owed to the suppliers of components for its products. The suppliers may suspend shipments to Access or insist upon COD payment terms. The suspension of shipments could prevent Access from manufacturing units. The imposition of COD payments terms could strain the cash resources of Access.

Pl's. Ex. 107.

And, in addition to the disclosure in the email to Moriarty noted above, the Company Overview distributed in March 2003 contained numerous references to the depth of Access's problems with vendors caused by its failure to pay on its severely past-due accounts. The Company Overview stated that, at the end of February 2003, Access had accounts payable of $1.85 million aged at over 100 days, that Access was "unable to procure raw materials . . . due to significant past due balances and credit issues with certain key parts vendors . . .," which "led to many of the production difficulties" at Access.

94

In short, the Investors were well aware that Access's precarious financial situation had resulted in problems with various vendors. Fincke made no affirmatively false representations in this regard, nor did he omit this material information in statements made to the Investors in connection with their Investments. For these reasons, the Court finds that the Investors have failed to establish liability for fraud, misrepresentation or securities fraud on this basis.

iii.    Investment Required

The Investors generally allege that Fincke misrepresented or made false statements regarding the amount of money Access needed to become cash flow positive. In connection with the initial investments made by Moriarty and Connolly in 2001, the Investors say that Fincke represented to them that the amounts loaned would be adequate to support Access until it could generate sufficient cash to fund its operations. The Investors claim that this was an affirmative misrepresentation because, in an email to several Access management employees on May 31, 2002, Fincke characterized Moriarty's investment as "bridge funding" that would "be minimal for our short-term needs while we continue to hold further rapid buildup of product quantities." He also noted that he was speaking with other investors, who, he anticipated, would be capable of providing more long-term funding. Pl.'s Ex. 2.

At this time, however, each of Moriarty and Connolly was aware that the other was investing in Access. And, in the spring of 2002, Connolly had begun discussions with Radley regarding a potential investment in Access, evidencing his understanding that Access was looking for additional investments. Given the close pre-existing relationships

between Fincke, Moriarty, and Connolly, coincident with Radley's interest in a possible investment at the time Fincke sent the referenced email, the Court concludes that Moriarty and Connolly were not misled into believing that Access would require no additional investments to sustain operations.  While Fincke may have maintained an optimistic view that the funds would see Access through to self-sustainability, the ultimate failure of the company to reach positive cash flow as a result of the initial investments does not, without more, give rise to liability for any statements Fincke may have made to the effect that he believed that the funds would be sufficient.  See Computervision, 90 F.3d at 626; Polin v. Conductron Corp., 552 F.2d 797, 805 (8th Cir. 1977) (Even though "defendants' roseate economic anticipations were doomed, . . . economic prognostication, though faulty, does not, without more, amount to fraud.").

In the fall of 2002, Fincke is alleged to have again falsely represented that the additional investments made at that time would be sufficient and that no additional investment would be needed.  The Investors have failed to demonstrate, however, that any such representation was known to be false when made.  First, such a representation, necessarily invoking a belief as to how events would unfold in the future, is not one of fact, but of prediction .  The mere fact that the anticipated outcome did not come to fruition is insufficient to establish its falsity when made.  See, e.g., Computervision, 90 F.3d at 626; Polin, 552 F.2d at 804.  Furthermore, there is no indication that Fincke did *not* believe the funds would be sufficient, nor have the Investors demonstrated that Fincke lacked a reasonable basis for any such statement.  See PDI, 2006 WL3350461, at *4; Cambrex, 2005 WL2840336, at *13.

96

And nothing in the Business Plan distributed to the Investors in the fall of 2002 conclusively stated or ensured that the investments at that time would certainly be sufficient. The Business Plan clearly described Access as "an early stage company in a precarious financial position," and described in much detail the risks attending an investment in the company.  Among the risks associated with investing in the company, the Business Plan stated:

> 1.  Access is an early stage company with no prior experience and limited resources.   There can be no assurance that Access will be able to successfully execute its business plan.
>
> 2. Access has operated to date on investor capital and borrowed funds. Through September 30, 2002 it experienced an operating loss of $6,029,680. The investment by investors sought by this offering is required to enable Access to operate until cash generated by operations is sufficient to cover its operating costs.  There can be no assurance that Access will reach cash break-even with the funds provided by this offering. If it does not, Access will exhaust its cash. Access has no sources of additional funds and in such event might have to cease operations.
>
> 3. Access at September 30, 2002 had accounts payable of $1,770,383, including substantial amounts owed to the suppliers of components for its products.  The suppliers may suspend shipments to Access or insist upon COD payment terms.  The suspension of shipments could prevent Access from manufacturing units.  The imposition of COD payments terms could strain the cash resources of Access.
>         . . . .
>
> 5. Access is indebted to certain investors in the aggregate amount of $4,600,000.  Access is in arrears in its obligations to such investors, entitling them to demand payment in full of their notes.  Access does not have the ability to make such payments and would have to cease operations or seek bankruptcy protection in such event.

Pl.'s Ex. 107.

The Business Plan clearly disclosed that " if Access is unable to generate cash flow within the period forecast, . . . Access will be required to seek additional investors or cease

operations."  Thus, to the extent the Investors believed their investments in the fall of 2002 would be sufficient to support the company until it achieved independent viability, that belief was clearly contradicted by the Business Plan upon which they claimed to have relied in making their investments.[97]  See Computervision, 90 F.3d at 626 (warnings and risks disclosed could, standing alone, preclude securities fraud claim); Polin, 552 F.2d at 805 (disclosure of contingencies and risks regarding projections undermined securities fraud claim).

The Court rules that the Investors have not demonstrated that Fincke made an affirmative, material misrepresentation regarding the amount of money needed to make Access cash-flow positive.  Thus, they have failed to establish liability for fraud, negligent misrepresentation, or securities fraud on that basis.

iv.    Philips Litigation and Intellectual Property

According to the Investors, Fincke's  failure to disclose the receipt of the First and Second Philips Letters prior to the Investors' loan and equity investments made in 2001and 2002 and in conjunction with the April 2003 Transaction constitutes fraud, negligent misrepresentation, and securities fraud under § 410(a)(2).  The Investors argue that knowledge of these communications would have impacted their willingness to lend money to Access and would also have been material to their review of the assumptions underlying the financial projections.

---

[97]  The Investors have made a similar argument relative to the investments made in April 2003.  Because those allegations involve the Company Overview, which is discussed below, the Court reserves the discussion for that section of the memorandum.

Because the Philips matter was not discussed at all in the documents provided to the Investors, the Court must determine whether Fincke had a duty to disclose the receipt of the First and Second Philips Letters.

The Business Plan distributed to the Investors in the fall of 2002 made affirmative statements regarding intellectual property litigation; it stated:"Access is a defendant in a patent infringement claim brought by Cardiac Sciences, Inc. . . . The cost of litigation may have a material adverse impact on Access, even if Access prevails . . . ," and, further, that "Access has been advised by its patent counsel that its product does not infringe any patents known to him. . . . " Pl.'s Ex. 107.  Although the last sentence is followed immediately by a warning that the "opinion" of patent counsel is not assured to be correct in all respects, these two sections give the misleading impression that the Cardiac Sciences litigation was the only *known* threat to Access's Intellectual Property.

But, although the omission of Access's receipt of the First Philips Letter rendered the statement misleading, the Court finds that the threat of actual litigation was too attenuated at that time to render the omission *material*.  As Pandiscio testified, as of the fall of 2002, Philips had not seen an actual Access AED, Trial Tr. day 6, 14-15, and Philips did not respond to Pandiscio's request for more specificity regarding the nature of its alleged infringement claims.  In fact, Philips did not raise the issue again for several months.  The Court therefore concludes that the omission was not material in light of the indefinite and ambiguous nature of the infringement asserted during the fall of 2002.

The Investors also argue that Fincke's failure to disclose the receipt of the First and Second Philips Letters in the Company Overview and in conjunction with the April 2003

99

Transaction constitutes a culpable omission.  They argue that the information was material as the Philips litigation raised potential risks and costs of litigation that were not included in any projections provided to the Investors.

Unlike the Business Plan, the Company Overview did not broach the subject of intellectual property litigation.  Therefore, Fincke did not have a duty to disclose the Philips correspondence.  Furthermore, to the extent the Investors argue that the projected budget failed to account for possible litigation costs, the Court finds that the information possessed by Fincke as of March 2003 was not sufficiently concrete to establish that the projected figures were unreasonable on account of any failure to include anticipated litigation costs related to the Philips matter.  As with the first letter, the Second Philips Letter lacked specificity and merely requested a meeting with Access representatives.  In fact, despite Elefante's testimony that he would have disclosed the Philips litigation had he known of the First and Second Philips Letters, the Court notes that he *did* receive copies of the correspondence and apparently did not actually find the matter particularly pressing at the time the Company Overview was drafted.  Because the Philips matter had not yet reached a level of materiality necessary for disclosure, Fincke did not act unreasonably, recklessly, or fraudulently in failing to disclose the Philips correspondence.

The Investors further argue that Fincke affirmatively misled the Investors after the lawsuit was filed by misrepresenting the gravity of the Philips litigation and the ability of Access to defend or design around the alleged infringements.  This claim fails for several reasons.  First, the Investors fail to specify which transaction was connected with the allegedly misleading information, as a result of which they suffered damages.  Instead, the

100

arguments raised by the Investors sound in breach of duties owed to them or the company, and not in fraud or misrepresentation in connection with a specific transaction.

Second, the Investors did not show that any statements Fincke allegedly made regarding the Philips matter were actually false or misleading. Moriarty testified that Fincke told him the lawsuit was "nothing" and that Access "had stuff on Philips," indicating that Access's litigation position was strong. According to Moriarty, Fincke expressed Access's "need to fight them [Philips]." Trial Tr. day 6, 92, 94. Connolly testified that, after learning that Philips had filed a complaint, Fincke told him that Access could "handle virtually anything," and would be able to re-engineer the Access AED to eliminate any legitimate infringement issues. Trial Tr. day 9, 31. Radley testified that Fincke told him such lawsuits were "normal," he thought the claims were inconsequential, and Access could design around any infringement issues. Trial Tr. day 9, 98.

Elefante testified that Fincke took an "aggressive posture" toward the Philips matter. Trial Tr. day 8, 47. He said Fincke did not believe the Access AED infringed some of the Philips intellectual property claims, thought that some of the Philips patents were invalid, and insisted that the proposed licensing revenues were too high.[98] Trial Tr. day 8, 45-46.

---

[98] These characterizations of Fincke's opinion regarding the Philips matter are supported by a July 11, 2003 memo from Elefante to Fincke and Pandiscio summarizing a meeting that was held to discuss options relative to the Philips matter. In the memo, Elefante noted that part of the plan was to gather information to provide to Philips demonstrating that the proposed royalty payments were too high. The memo also noted that they would explore challenging the Philips patents. Pl.'s Ex. 32. A subsequent letter from Elefante to the Board members, Connolly, and Fincke, dated September 12, 2003, summarized the initial strategy discussed at a meeting with Ropes & Gray. According to that letter, Access was pursuing a "multi-pronged" approach, including challenges to some of Philips's patents and a re-design or elimination of certain Access AED features. According to the letter, Access would "put up a fight," an approach intended to put Access in a strong negotiating position. Def.'s Ex. 75.

He also, testified, however, that Fincke seemed willing to get expert advice regarding the appropriate level of royalties that might resolve the issue.  Trial Tr. day 8, 46.

Even assuming that all of this testimony were true – i.e., that Fincke led the strategy with Philips, that Fincke wanted to aggressively defend against the infringement claims, at least in part, and that Fincke resisted Philips's proposed licensing terms – the Investors have failed to prove that Fincke's stated position was a false representation of his present intention or that it was unreasonable based on information at his disposal.  To the extent that the Investors claim his strategy was ultimately unsuccessful (which they have not shown, as no testimony as to the outcome of the litigation was provided), that argument is nothing more than an allegation of mismanagement, which does not, standing alone, give rise to liability for fraud or misrepresentation.

In one respect, however, Fincke did make a material and false statement regarding Access's Intellectual Property.  The Business Plan plainly stated that: "Access has been advised by its patent counsel that its product does not infringe any patents known to him. . . ."  Although this statement is followed by the  warning that this "opinion" may turn out to be incorrect, that warning cannot cure the obvious falsity of this clear representation of fact. Neither Pandiscio nor any other attorney had given a formal opinion related to the Access Intellectual Property.  Fincke testified at trial that he discussed the claims referenced in the First Philips Letter with Pandiscio and related his personal conclusion that the Access AED did not infringe any of Philips's patents.  Trial Tr. day 3, 90-91.  But this is a far cry from receiving "advice" from counsel on the matter.   And his review, unlike the statement included the Business Plan, was limited to Philips's patents, and not the universe of

102

potential infringement problems in the AED field.   As a sophisticated inventor with knowledge of the patenting process and experience with handling intellectual property claims, Fincke knew, or at the very least, should have known, that no such opinion had been formally given.

The Court finds that the statement was also material.   Investments in companies developing new medical devices are necessarily fraught with the risk that competitors will assert patent infringement claims.   By affirmatively representing that a professional in the patent field has reviewed and preliminarily passed muster on the patent soundness of the intellectual property, the risk of those claims is, in the eye of a reasonable investor, greatly reduced.   Such a statement would "alter the mix of total information available," and is highly material to an investor in the medical device field.

The Court therefore concludes that Fincke is liable for fraud, negligent misrepresentation, and securities fraud under § 410(a)(2) for making a false statement of material fact (that the Access AED's patent was reviewed by patent counsel and that Access had been advised by that counsel that it infringed on no other patent known to that counsel).   The question of damages, if any, remains, however, to be decided during the damages phase of trial.

v.      Cadent Litigation

The Investors assert that Fincke's failure to disclose the outcome of the Cadent litigation – namely, the judgment against him personally – is actionable, as the information would have been material to their decisions to invest in Access.   The Plaintiffs further imply that Fincke's alleged representation of the judgment as a "vindication," – owing to the fact that he prevailed on a majority of the counts against him – was misleading for failure to

103

disclose the outcome of the remaining claims.   Regardless of whether Fincke ever represented that the verdict was a vindication, the Court finds that the bare non-disclosure of the personal judgment against him does not constitute a material omission under Massachusetts common law or § 410(a)(2).

The Plaintiffs have pointed to no case law that would suggest that Fincke had a duty to disclose the outcome of the Cadent litigation.   Any representation to Moriarty that the verdict was a vindication could be, in a subjective sense, literally true.   Furthermore, at the time the alleged statement was made, Fincke was not seeking an investment from Moriarty and any discussion regarding the lawsuit was one between friends.   The Court finds that the statement was not a misleading statement that gave rise to a duty to correct.

Similarly, the failure to disclose this information to the other Investors, who were not aware of the Cadent litigation at the time their investments were made, does not give rise to liability.   The Investors have pointed to no legal basis that would give rise to a duty to disclose the outcome.   Silence, absent a duty to disclose, is not actionable.   Even assuming its materiality, Fincke was not obliged to disclose the Cadent litigation and its outcome, and his failure to do so does not amount to fraud, negligent misrepresentation,  or securities fraud.[99]

---

[99]   One other matter must be briefly discussed relative to the Investors' fraud and misrepresentation claims.   In the fall of 2003, according to the investors, Fincke shipped approximately 400 units to a German distributor after being warned by Grosberg and Rice that the customer would not pay for the units.   Fincke recalled being told by some at Access that the distributor would not pay for the units, but says that others had different input. Trial Tr. day 3, 64. According to Grosberg, Fincke directed the shipment to "goose the accounts receivables," Trial Tr. day 5, 143 – i.e., to create a large account receivable that he hoped the Investors would then finance.   The Investors rely on this testimony for the conclusion that Fincke shipped the units  "in order to fraudulently obtain additional debt financing against the accounts receivables."   First, the Court notes that the Investors did not show that any investments were actually made, or even solicited, in connection with the shipment.   And, as Fincke points out in his post-trial brief, there

b.    The Company Overview

A large portion of the Complaint centered around allegedly false and misleading statements made in the Company Overview distributed to Investors in March of 2003, although little testimony related to the document was elicited at trial.  Nonetheless, the Court has reviewed the allegations originally made by the Investors, and finds them unsupported.

The Investors say that they relied on information contained in the Company Overview in making their offer for additional investments that eventually culminated in the April 2003 Transaction.  According to the Investors, they "soon discovered . . . that [the Company Overview] was riddled with false and materially misleading (a) statements concerning the company's achievements, and (b) projections based on the company's purported achievements."  For each alleged false or misleading statement, the Investors may not rely on bare allegations that statements were false, but must specify which statements they claim are false or misleading, *how* the statement was false or misleading and that the statement (or omission) was material.  See PDI, 2006 WL3350461, at *3 ("When the plaintiff challenges a forward-looking statement made by the defendant, plaintiff's mere usage of catchwords or bold assertions that defendant's statement was false or misleading because the defendant knew it to be false or misleading cannot lend support to plaintiffs claim."); Loan v. FDIC, 717 F. Supp. 964, 967(D. Mass. 1989) ("Merely

---

were other customers awaiting shipment of units during that time as well; the creation of an account receivable in order to obtain financing would just as easily (and more logically) have been achieved by shipping the units to a customer more likely to pay.  Even without fully understanding why the shipment was made to that particular customer, the Court easily concludes that it was not done in order to fraudulently obtain accounts receivable financing.

claiming that a statement is untrue does not make it so.  A plaintiff has an obligation to explain what is untrue about each of the challenged statements . . . .").

With regard to several of the allegedly false statements contained in the Company Overview, the Plaintiffs failed to explain how the statements were misleading or false.  As such, they do not give rise to liability for fraud, negligent misrepresentation, or securities fraud under § 410(a)(2).[100]  For other allegedly false or misleading statements, however, the Investors provided some evidentiary support, which the Court considers at more length.

---

[100]  The following statements are those in the Company Overview alleged by the Plaintiffs to be false or misleading, but for which they failed to provide sufficient evidentiary support or testimony that the particular statements were false or misleading:

(1)      "Purchase to ship cycle . . . currently 8 weeks." The Investors alleged that this statement was false because the purchase to ship cycle typically ran 10-12 weeks.  However, they failed to provide sufficient testimony or documentary evidence related to the shipping cycle.

(2)      "Improved systems and processes (Order entry; Inventory planning)." According to the Investors, this statement was false because as of March 2003, "Access had inadequate manual inventory planning processes. Fincke refused to invest in the necessary software and management tools necessary to achieve the reported level of system process improvement."   The Investors provided no testimony or documentary evidence regarding the falsity of this statement.

(3)      "Key accessory products released and shipped."  The Investors say this statement was false because, at the time it was made, some accessory products were not available or ready for shipment.  The unavailability of some accessories, however, does not demonstrate the falsity of the statement, as the Investors failed to substantiate a claim that no key accessories were released or shipped as of that time.  The statement does not claim that *all* key accessories were available, so the lack of certain accessories does not render the statement false.

(4)      "Necessary materials for first 500 units in house."  The Investors assert that, upon joining the company as VP of Operations in March 2003, Nawn discovered that "key components for the planned shipments had not yet been obtained."  No testimony on this particular matter was introduced and the Investors have not directed the Court's attention to any document to substantiate the alleged inaccuracy of this claim.

106

The Investors allege that two statements in the Company Overview regarding manufacturing give rise to liability because Fincke failed to disclose other material information necessary to make the statements not misleading.  First, the Investors claim that the assertion in the Company Overview that the "main circuit board manufacturing moved . . . from MSL to NuVisions . . . to improve both delivery schedules and circuit board assembly quality" was misleading, because the document failed to also disclose that the "switch was precipitated by Access's failure to pay on the overdue account with MSL." Similarly, the Investors allege that the statement "manufacturing issues with the main control board are improving as we add additional qualified multiple suppliers" was misleading, because it did not further disclose that suppliers were being added to exploit new credit lines and that these new suppliers were, at times, "less qualified, second and third tier suppliers, and some were added before they were qualified by the company."

For each of these statements, the Investors have failed to demonstrate how the statements made were affirmatively false.  They have not argued that the changes in board manufacturer and suppliers did *not* improve delivery schedules and manufacturing problems.  Loan, 717 F.  Supp. at 967; Quirk v. Glick, No. 2007-4173, 2008 WL2677233, at *4, 24 Mass. L. Rep. 221 (Mass. Super. June 30, 2008).

The statements were also not misleading on account of the failure to disclose that the changes were also precipitated by credit problems with the manufacturers and vendors involved.  Taken as a whole, the Company Overview does not attempt to obscure the fact that Access's manufacturing was suffering as a result of credit problems and overdue

107

accounts.  In fact, those difficulties were readily disclosed in other portions of the Company Overview.[101]

Thus, the Court concludes that the statements are not materially misleading.  Absent some other independent duty to disclose the allegedly omitted information in connection with that particular part of the Company Overview, which duty has not been identified by the Investors, the omissions do not give rise to liability under the Investors' claims for fraud, negligent misrepresentation, or securities fraud under § 410(a)(2).[102]  See Computervision, 90 F.3d at 626; Polin, 552 F.2d at 805.

The Investors also claim that the Company Overview contains a false statement purporting that Access had "Achieved product manufacturing stability" (the "Manufacturing Stability Statement").[103]  The Investors say that this statement is false, because Fincke's

---

[101]  For example, elsewhere in the six-page document, it is stated:

"We were unable to procure raw materials on a predictable basis (due to significant past due balances and credit issues with certain key parts vendors), which contributed to shortages on the production floor and delayed production."

". . . we continue to experience delays in the acquisition of the raw materials and components . . . due to credit issues with key vendors. . . ."

"Accounts payable at the end of February was $1.85 million and is currently aged at over 100 days. . . . this has made it extremely difficult to purchase raw materials and services . . . ."

[102]  Although the point is rendered moot by the Court's conclusion that the statement was not false or misleading, it should also be noted that the statement regarding the switch from MSL to NuVisions, even if misleading, would be immaterial, as the the first sentence of the statement says the move took place in mid-January.  While the information regarding the failure to pay MSL may have been interesting, it would not necessarily have had relevance two months later, and the Court concludes that it would not have significantly altered the total mix of information available to the Investors.

[103]  This statement appears as a bullet point in the the Key Accomplishments section of the Company Overview.

continual revision of the Access AED prevented the manufacturing process from *ever* reaching stability. They rely on several exhibits and the testimony given by Nawn, Rice, and Grosberg in support of this claim.

A determination that the Manufacturing Stability Statement was false necessarily requires an understanding of what was meant by "product manufacturing stability," a definition that proved elusive at trial. Several different witnesses testified as to their opinion on its meaning, but no expert testimony on the subject was presented, nor did the parties provide any evidence of an industry-wide usage of the term. Rice testified that manufacturing stability is the ability to produce a significant number of medical devices or products using the same documentation and test procedures that do not change over time. Trial Tr. day 5, 97. Bowers testified that manufacturing stability is the ability to reliably build product on a consistent basis. Trial Tr. day 7, 136. Nawn, who was hired as VP of Manufacturing shortly before the Company Overview was distributed in March of 2003, did not provide testimony as to his understanding of the phrase.

Fincke testified that the meaning of "manufacturing stability" depends on a particular company's state of production and its progression – what qualifies as "stable" for one company may not so qualify for another. According to Fincke, for a young company working toward an initial product release, stability may be achieved when the company demonstrates that units can build product using a reproducible process that yields reproducible results, Trial Tr. day 1, 115; a "mature" manufacturing process would indicate a more evolved process and structure that could yield more predictable results, Trial Tr. day 4, 19-20. And, according to Fincke, manufacturing stability does not indicate a "frozen" design, as changes in product features would be an expected part of the process.

109

Nawn, Rice, and Bowers each testified that the *product* itself had not reached a desired level of stability.[104]   Trial Tr. day 5, 24, 97; day 7, 136.   The Court found this testimony credible, but it did not inform on the question of whether the *manufacturing* process was stable.   Product changes, as explained by Nawn and Bowers, caused disruptions in the manufacturing process as the company worked to incorporate and accommodate those changes, but the Court is disinclined to equate *product* instability with *manufacturing* instability.   Similarly, delays in manufacturing caused by the unavailability of parts (a significant problem which was disclosed throughout the Company Overview) does not mean the actual manufacturing process was unstable.

In sum, the Court concludes that the Manufacturing Stability Statement does not refer to stability of the product design, nor does it indicate that the manufacturing process was unaffected by material shortages (which it clearly was).   Instead, the stability of the manufacturing process was an independent concept which, in the testimony and

---

[104]   The Access AED clearly underwent many design changes, either in response to customer demand, safety issues, or the need to design toward more readily available parts.   Nawn extensively testified to the effect that product changes had on the manufacturing process – usually resulting in delays or cessation of manufacturing to accommodate the incorporation of changes. And Nawn, Rice, and Bowers testified that the product continually underwent changes; changes, they say, that exceeded the norm, in their experience.   The evidentiary record also establishes that Access handled a certain number of returned devices, documented problems with the AEDs on a "Project Bug List," Pl.'s Obj.-to Ex. 22, and experienced a variable "fall-out rate" – the number of devices that failed testing at some point during the manufacturing process.

110

documentary evidence, was not clearly negated.[105] Therefore, the Court concludes that the Manufacturing Stability Statement was not affirmatively false.

The Investors have also not shown that the statement was misleading owing to the omission of any material information. Stability does not imply perfection; a reasonable person would understand that the manufacture of a new complex medical device may be attendant with various problems. And the Company Overview described delays in manufacturing caused by lack of raw materials, even noting that the board manufacturer switch had resulted in more limited supplies of circuit boards. Thus, to the extent the statement regarding manufacturing stability was interpreted by the Investors as implying that there were no interruptions in manufacturing, the Company Overview clearly disclosed that there *were* delays and manufacturing constraints – the very deleterious conditions which concerned Nawn and others. Because adequate disclosure was given to prevent the statement from being misleading (and because it was not affirmatively false) the Manufacturing Stability Statement does not give rise to liability for fraud, negligent misrepresentation, or securities fraud under § 410(a)(2). See Computervision, 90 F.3d at 626.

The Investors also contend that the statement in the Company Overview that "manufacturing capacity has demonstrated the ability to produce in excess of 100 units per day (2000 units per month)" (the "Manufacturing Capacity Statement") was false and

---

[105] In fact, the Court finds compelling the fact that Access was, as agreed upon by all parties, certified to manufacture the Access AED at all relevant times. Rice testified that during the early part of 2002 (prior to international and domestic approvals), Access focused on developing and validating the process by which units would be manufactured, and received and maintained its ISO 9000 and FDA certifications. Trial Tr. day 5, 110-111. These certifications indicate that Access had achieved some level of stability in its manufacturing process.

misleading.   According to the Investors, it was "generally known within Access, and by Fincke, that there was no ability to sustain this rate on a regular basis in March 2003 or for a considerable period of time thereafter."   They claim that various management personnel had indicated their disbelief that the asserted manufacturing level could be maintained, and, as additional support, the Investors point to the fact that "Access was only able to produce 100 units in one day in its existence."

First, the Court finds that the Investors failed to demonstrate that the Manufacturing Capacity Statement was false when made.   The statement does not represent that 100 units per day were actually being manufactured; only that the manufacturing system had the *capacity* to reach that level of production.   But the Investors say that Fincke's belief (and assertion in the Company Overview) regarding manufacturing capacity was patently false or unreasonable, because other management personnel were telling Fincke that a 100 unit per day level of production could not be achieved or sustained. Nawn did testify that he told Fincke repeatedly that he did not think the company could achieve a 100 unit per day manufacturing rate.   Trial Tr. day 5, 22-23.   Nawn, however, was hired immediately preceding the release of the Company Overview, and took six to eight weeks to understand the current status of manufacturing operations at Access.   Trial Tr. day 5, 11.   He did not testify that he made any comments to Fincke regarding manufacturing capacity prior to the distribution of the Company Overview, and given that he was very recently hired at the time of its release, the Court finds that any relevant opinion given by Nawn on the matter would have post-dated distribution of the document.[106]

---

[106] And the degree to which Nawn was attuned to Access's capacity to manufacture higher numbers of AED units given adequate resources was not clear, as he admitted that, during his

In addition, Nawn, Rice, and Bowers did not testify that manufacturing *capacity* was specifically identified as inadequate. Instead, they each testified that disruptions caused by product changes and the lack of raw materials were the main impediments to achieving a higher manufacturing rate. Trial Tr. day 5, 11-12; 114-115. But the reasonableness of Fincke's belief that Access's manufacturing capacity was higher than had yet been achieved as of March 2003 is supported by the fact that Access was able, when adequately supplied with raw materials, to manufacture 100 units in a day. The Court agrees with Fincke that the capacity to build product and the number of units actually produced were separate issues, and the Court concludes that the Investors failed to demonstrate that the Manufacturing Capacity Statement was false or unreasonable.

The Court also finds that the Manufacturing Capacity Statement was not misleading on account of any material omission. It was obvious from the data disclosed in the Company Overview that Access had not actually achieved a 100 unit per day manufacturing rate in March of 2003. No further disclosure on that point was thus required. See Trump Hotels, 2000 WL1371317, at *14. Similarly, although the Company Overview does not specifically refer to Bowers, Nawn, Rice or other Access personnel as the sources of various management concerns, it did disclose the very problems, such as lack of sufficient capital to buy raw materials, which were identified by those employees as underlying their opinion that Access could not achieve the full extent of its manufacturing capacity. Given that the Company Overview disclosed the problems hindering the production of more units, the Manufacturing Capacity Statement was not misleading. See

---

employment at Access, his attention was focused on determining the shipping rate based on backlog and not on projecting maximum manufacturing capacity. Trial Tr. day 5, 51.

Computervision, 90 F.3d at 626; Polin, 552 F.2d at 805.   In sum, the Manufacturing

Capacity Statement does not give rise to liability under Massachusetts law for fraud,

negligent misrepresentation, or securities fraud under § 410(a)(2).

In addition to statements regarding manufacturing, the Investors have alleged that

the order rate listed under the Key Accomplishments section of the Company Overview was

false or misleading.  One bullet point under that section says "Order rate at 1,500/month

($1.8 million or $22 million annual rate)" (the "Order Rate Statement").  The Investors claim

that this was "false in several regards."  They first point out that Access had never achieved

a 1,500 unit per month new order rate, and that the order rates for January, February and

March of 2003 were 1,159, 1,251, and 736, respectively. According to the Investors, "these

were some of the highest monthly sales figures Access had ever experienced. Therefore,

Fincke's statement regarding this 'accomplishment' was patently false and intentionally

misleading."

Quite frankly, the Court is mystified by the Order Rate Statement.  It is clear, as the

Investors allege, that Access had not achieved a 1,500 unit per month order rate in the two

full months preceding the distribution of the Company Overview (January and February),

and had also not received 1,500 new orders until that point in March (which was not yet

complete).  Thus, the Investors appear at first blush to be correct in their assertion that the

statement was simply false.  The Order Rate Statement, however, refers not to total orders

achieved in any one month, but to a *rate* that was achieved.   Without knowing when,

exactly, the Company Overview was drafted, the Court is unable to discern whether or not

the rate of orders for the beginning of March substantiated a claim that an order rate of

1,500 for the month would be reached.  The fact that this level of orders was *not* ultimately reached is not dispositive, as the Plaintiffs cannot impute falsity by hindsight alone. Computervision, 90 F.3d at 626; Polin, 552 F.2d at 804.  Without more, the Investors have not demonstrated by a preponderance of the evidence that the claimed order rate was false at the time the statement was made.

But more importantly, the Court cannot find that the Order Rate Statement was material given other information disclosed in the Company Overview.  The remainder of the document presents accurate order totals for December, January, and February, and notes that the *projected* amount of orders for March was 1,500.  In addition, the Company Overview stated that "significant management effort is directed towards organizing and managing the activities of the direct sales force. *This activity has not yet produced the steady and predictable flow of orders that are needed to grow the business*." (emphasis added).  Armed with more specific information, which demonstrated that Access had not yet reached 1,500 orders in one month, as well as the company's statement that the rate of orders was not steady or predictable, a reasonable investor would not have found the bullet point Order Rate Statement, ambiguous as it was, a substantial factor in any decision to invest in Access.[107]

---

[107]  The Plaintiffs also assert that the "$1.8 million or $22 million annual rate" representation was misleading because, when the *actual* number of sales is multiplied by either $1,200 per unit or by the actual average sales price, the monthly and annual rates are much lower. In their post-trial brief, the Plaintiffs assert that "there is no basis in the evidence that the sales or revenue projections had any basis in fact."  The $1,200 figure originally came from the Investors' allegation in the Complaint that the Company Overview had misrepresented the average sales price as $1,200 per unit.  The Court has reviewed the document innumerable times and is unable to discern a $1,200 unit average selling price represented anywhere except by way of calculating $1.8 million divided by 1,500.  The remainder of the document greatly details the average sales price that had been reached and explained expected increases in average selling price in light of projected sales of more expensive product bundles and a planned price increase.  Given the greater level of

In addition to the specific statements referenced above, the Investors allege generally in the Complaint that the Company Overview contained "false and misleading projections." In support, the Investors compare ultimate outcomes with projected figures and ask the Court to find that the statements and projections were false or unreasonable because the actual results were ultimately less than anticipated.[108] But, again, the law does not permit fraud or negligence to be proved by hindsight alone. See Computervision, 90 F.3d at 626; Polin, 552 F.2d at 804.

The Investors attempt to further bolster their argument, however, by alleging generally that "others at Access had advised [Fincke] that the projections were not accurate or obtainable." The testimony in this regard was ambiguous at best. Little of the testimony was directed toward the projections contained in the Company Overview specifically, and the Court is unable to discern any specific examples of employees making such statements with regard to the projections presented in that document. Perhaps Fincke was overly optimistic in his projections, assuming that an additional investment would be sufficient to overcome the capital constraints Access was facing and would allow the company to achieve milestones that proved ultimately beyond reach. But this, alone, does not render the projections false, misleading, or unreasonable. See Polin, 552 F.2d at 805.

The Investors further allege that Fincke misrepresented the amount of investment needed in the spring of 2003 to enable Access to become cash flow positive. Fincke's

specificity and detail provided in other portions of the document, the Court cannot find that this statement, which appears, more than anything, to have been an error, would have been material to a decision to invest.

[108] For example, the Investors compare the projected orders in the Company Overview to the actual orders obtained for March through June of 2003 and conclude that the projections were false or misleading.

failure to make an accurate prediction of the amount of required investment, however, does

not itself give rise to a claim for fraud or misrepresentation.  See Computervision, 90 F.3d

at 626; Polin, 552 F.2d at 805.  Moreover, the Investors ground their claim of falsity in their

assertions regarding the falsity or unreasonableness of the projections upon which the

anticipated cash need was based.  Having found that the projections, while ultimately

inaccurate, were not, as the Investors argue, false and misleading, the Court concludes

that the Investors have not shown that any representation regarding the adequacy of the

requested $2 million investment was unreasonable, false, or misleading.[109]

---

[109]  It was also unclear from the documents and testimony whether Fincke was primarily responsible for the determining that $2 million would be an adequate investment.  Following the conference call regarding investment options held in March 2003, it was Zimmell who presented a proposal to Access, a proposal which contained the $2 million figure.  Trial Tr. day 9, 49-50. Even assuming that amount of $2 million came from Access's side of the table, it is far from clear that Fincke had the primary responsibility for determining the amount to request.  According to Bounty, the $2 million was "what we believed that the cash forecast, the cash requirements were of the company," although he did not specify of whom the "we" consisted.  Trial Tr. day 2, 49.  In addition, although Grosberg stated that during 2002 he was unable to make any reliable financial forecasts due to the state of the books and records, he then testified:

Q:    When, if ever, were you able to make reasonable reliable financial projections from the books and records of Access?

A:    Probably by March of 2003 I began to have a good hold on reconciliation of accounts, make sure that the balance sheet was reconciled properly, and started to understand some business dynamics, that I had a fairly good handle at that point on what we would be able to project.

Q:    Did you have any role at all in preparing any of the materials that were submitted to the investors prior to the April 2003 conversion of debt to equity?

A:    Yes.

Q:    What was your role?

A:    I worked with Mr. Bounty and Mr. Fincke in creating a financial model that was used for projections and what would be necessary for cash requirements of the company.

117

The Investors also say that Fincke omitted material information from the Company Overview.  They first argue that Fincke is liable for fraud, negligent misrepresentation, and securities fraud for failing to disclose the European Distributors' reported problems with the Access AED and with Access's failure to meet their needs.  The Investors assert that the European Distributors were complaining about the proposed price increase, Access's failure to comply with product specifications, incomplete shipments, untimely shipments, and the non-responsiveness of Access to their concerns and complaints.  The Investors also state that the European Distributors were threatening to discontinue doing business with Access and threatening to stop placing orders or fulfill contractual quotas unless the issues were addressed.  In fact, according to the Investors, the European Distributors "did not meet the minimum orders contained in their agreements which were a basis for sales and revenue projections." The Investors say that this information was material, as it would have affected the Investors' assessment of the Company Overview and "the company's purported record of achievement." Furthermore, they claim that "the poor relationship with

_____

Trial Tr. day 5, 123.  And he testified later to working with Fincke to determine the amount of investment needed:

> Q:    In connection with the vendors, did Mr. Fincke ask you, prior to the April infusion of money from the investors, did Mr. Fincke ask you how much money would be needed?
>
> A:    Yes.
>
> Q:    All right, and what did you tell Mr. Fincke?
>
> A:    I can't remember exactly at any given time how much money -- like I would prepare a model that would try to bring current liabilities in line, and I would sit with him and go through the model in detail so he understood the situation.

Trial Tr. day 5, 133-134.

118

the European Distributors made all of the projections provided by Fincke substantially and materially misleading."

In support of their claim that Fincke was aware of these problems prior to the distribution of the Company Overview, they rely on witness testimony and (1) correspondence from Nielsen at Kivex in December 2002, wherein Nielsen complains of non-receipt of Danish language units and asks for a firm shipment date or return of his pre-paid deposit, Pl.'s Obj.-to Ex. 4; (2) correspondence from Nielsen in February 2003, expressing frustration with long delivery times for an additional order, Pl.'s Obj.-to Ex. 5; (3) correspondence in September 2003 from Dolby and Christian Ecker of Shiller Handelsges m.b.H. Austria, Pl.'s Obj.-to Exs. 11, 12, 13, 20, complaining of problems with AED units, Access's failure to appropriately respond to concerns and product complaints, and stating that an appropriate and satisfactory response from Access within ten days was a prerequisite to acquiescence to further price increases, acceptance of subsequent deliveries, and placement of future orders; (4) correspondence from Dolby during October through December of 2003, regarding various product and business complaints and also discussing price increase negotiations; and (5) the February 2003 correspondence from Barry Klegerman at Access, reporting three distributors' dissatisfaction with the price increase and threats to stop doing business if the price increase were implemented.

At trial, Fincke denied none of these problems. He acknowledged Access's shortcomings and admitted that products were slow to ship and did not contain certain features the Europeans were requesting. He was also aware that, in response to the proposed price increases in early 2003, certain distributors were threatening to cancel their

119

contracts or to stop ordering at the contractual minimums. According to Fincke, however, these problems were but part of the "business relationship," "dialogue," and "dynamics" between Access and the European Distributors, and Access continually negotiated with them to work toward resolution.  Trial Tr. day 1, 115-117; day 3, 46-47.

Although this omission presents a closer call, the Court cannot conclude that the Investors have carried their burden of proof on this issue.  First, many of the strongly-worded European Distributor complaints post-dated the release of the Company Overview. Although the communications state that those particular European Distributors felt their complaints were long-standing, the extent of their dissatisfaction as of March 2003 is far from clear.  Given that problems with Access obviously compounded over the summer of 2003, eventually culminating in the September 2003 correspondence, the Court is unable to discern their level of expressed dissatisfaction with Access during March 2003. Therefore, the Investors have failed to demonstrate that Fincke possessed material information – i.e., information that would have affected particular portions of the Company Overview – as of the distribution of the Company Overview in March of 2003.  See Computervision, 90 F.3d at 629.

With specific regard to the February 2003 letter from Klegerman and his report that one European Distributor (Mortara) had threatened to stop doing business with Access if the price increase were implemented, the Court again concludes that the Investors have failed to demonstrate the materiality of this complaint in the context of the European Distributor relationships as a whole.  There was no testimony or documentary evidence demonstrating the portion of business supplied by that distributor, nor did the Investors

120

show that the possibility of that distributor failing to place further orders was *not* factored into the projections presented in conjunction with the Company Overview.   And the Investors have not presented evidence that other European Distributors were threatening to discontinue business with Access prior to the release of the Company Overview. Therefore, the Court concludes that the Investors have not shown that failure to disclose the isolated complaint and threats by one European Distributor was material as of March 2003.

Furthermore, the Investors have not specified which statements in the Company Overview – beyond "projections," generally – were rendered misleading by the failure to disclose the information received in February 2003 from Klegerman.   Under the section of the Company Overview discussing the average selling price, it was noted that a list price increase was effective as of March 1 and that Access had created more expensive "product bundles" which were expected to drive an increased average selling price.   The list price, however, did not correlate to the price paid by distributors.   Instead, the implementation of the price increase for both domestic and European distributors was discussed separately, making clear that the increase had not yet taken effect.   Although the Company Overview states that the increased price for European Distributors would be effective "immediately," it is evident that the increase was not yet in effect and was further dependent upon the European Distributors' waiver of their right to sixty days' notification in exchange for a one year contract extension.[110]   Although Fincke may have been overly-

---

[110] Specifically, the Company Overview Stated:

Based on the terms of our distribution agreements, the price increases will be effective in 90 days for the US distributors (June) and immediately for the international distributors (the international distributor contracts require a 60 day

121

optimistic with regard to the European Distributors' willingness to agree, the fact that such

an agreement would first be required and had not yet been reached was clearly disclosed.

As such, the Court finds that the discussion of the price increase in the Company Overview

was not rendered materially misleading by the failure to disclose the information received

by Fincke from Klegerman in February 2003.

Having found that none of the Investors' claims related to the Company Overview

are actionable, on account of their failure to establish the statements and projections were

false, misleading, or material, the Court's analysis of the document is essentially concluded.

An additional ground for rejecting the Investors' fraud and negligent misrepresentation

claims merits discussion, however.

Despite the heavy reliance on the Company Overview as the source of many of the

Investors' claims in the Complaint, the Court notes that the evidence was ambiguous

regarding the degree to which each of the Investors relied on the Company Overview in

connection with the April 2003 Transaction.  Moriarty was the only investor who expressed

unequivocal familiarity with the Company Overview.  Trial Tr. day 6, 103.  But when

Connolly was presented with a copy of the Company Overview, he could not recall reading

the document. Trial Tr. day 9, 37.  Zimmell also testified that he did not recall seeing the

Company Overview and did not know if it had been attached to the Complaint.  Trial Tr. day

9, 62.  And Radley provided no testimony as to his reliance on the Company Overview,

although he did state that he relied on an "earlier memo" (which was not identified) and the

Business Plan distributed in October of 2002 in making his decision to invest additional

---

notification period but we plan on offering a one year contract extension to these
distributors in exchange for a waiver of the notice period).

funds in April of 2003.  Trial Tr. day 9, 105-106.  Thus, to the extent that any portion of the

Company Overview was materially false or misleading, Radley,  Zimmell, and Connolly are

precluded from recovery under fraud or negligent misrepresentation, as they did not

establish *any* reliance, reasonable or not, on that document.

### B.   Breach of Fiduciary Duty

Count II of the Complaint alleges that Fincke breached fiduciary duties owed to both

Access and to the Investors under Massachusetts law, and Fincke has not objected to the

application of Massachusetts law to the fiduciary duty claims in this case.  But, because the

Massachusetts Supreme Judicial Court (the "SJC") has held that, absent unique

circumstances, the laws of the state of incorporation generally control internal corporate

governance, Harrison v. NetCentric Corp., 744 N.E.2d 622, 628-29, 433 Mass. 465 (2001),

the Court pauses briefly to consider whether a thorny choice of law issue has arisen.

Massachusetts and Delaware law impose substantially the same fiduciary duties on

corporate officers and directors.   But one substantial difference *does* exist – under

Massachusetts law, shareholders in a close corporation owe heightened fiduciary duties

to one another,[111] while Delaware law does not impose such heightened duties on

_____

[111]  As the SJC explained:

In the case of a close corporation, which resembles a partnership, duties of loyalty
extend to shareholders, who owe one another substantially the same duty of utmost
good faith and loyalty in the operation of the enterprise that partners owe to one
another, a duty that is even stricter than that required of directors and shareholders
in corporations generally. . . . "[N]ot honesty alone, but the punctilio of an honor the
most sensitive, is then the standard of behavior" that describes this more rigorous
duty."

Demoulas v. Demoulas Super Mkts., Inc., 677 N.E.2d 159, 179, 424 Mass. 501 (1997) (citing
 Donahue v. Rodd Electrotype Co. of New England, Inc., 328 N.E.2d 505, 367 Mass 578 (1975)
(quoting Meinhard v. Salmon, 164 N.E. 545 (N.Y. 1928)).

shareholders of close corporations. <u>Harrison</u>, 744 N.E.2d at 629 (citing <u>Riblet Prods. Corp.</u> <u>v. Nagy</u>, 683 A.2d 37, 39 (Del. 1996); <u>Nixon v. Blackwell</u>, 626 A.2d 1366, 1380-81(Del. 1992)).   The Plaintiffs refer to this heightened duty in their discussion of applicable standards by which Fincke's behavior should be measured, asserting that Access was a close corporation.  While it is debatable whether Access would, ultimately, be deemed a close corporation, the Court ultimately concludes that the determination is immaterial. Because the duties referenced by the Plaintiffs and allegedly breached by Fincke were owed to Access, and not to the individual Investors, and because Massachusetts and Delaware law are substantially in accord regarding what those duties are, the Court adopts the parties' assumption that Massachusetts law applies to the fiduciary duty claims.

The heightened duties owed under Massachusetts law among shareholders of a close corporation are "derived from the strict standard of behavior applied to partnerships," <u>O'Brien v. Pearson</u>, 868 N.E.2d 118, 125, 449 Mass. 377 (2007).  By requiring good faith and loyalty between shareholders in closely held corporations, the law attempts to prevent shareholders, especially those in the majority, from "frustrating the [other] stockholder[s'] purposes in entering on the corporate venture" or denying their "reasonable expectations of benefit."  <u>Id.</u> (quoting <u>Wilkes v. Springside Nursing Home, Inc.</u>, 328 N.E.2d 657, 370 Mass. 842 (1976); <u>Brodie v. Jordan</u>, 857 N.E.2d 1076, 1079, 447 Mass. 866 (2006)).  But where the "alleged wrong sought to be redressed is to the *corporation* and not to some portion of the stockholders," "application of the stringent 'close corporation' fiduciary duties 'is not necessarily appropriate . . . .'"   <u>Dynan v. Fritz</u>, 508 N.E.2d 1371, 1378 n.17, 400

Mass. 230 (1987) (emphasis added) (citing <u>Durfee v. Durfee & Canning, Inc.</u>, 80 N.E.2d 522, 527, 323 Mass. 187 (1948)).

For example, in <u>Bessette v. Bessette</u>, the SJC held that recovery of excessive cash distributions and salary paid to a majority stockholder inured to the corporation and not the other shareholders.   434 N.E.2d 206, 208, 385 Mass. 806 (1982) (quoting <u>Stratis v. Andreson</u>, 150 N.E. 832, 254 Mass. 536 (1926)).   The Court reasoned that recovery for breach of fiduciary duties owed to individual stockholders of close corporations, such as in <u>Donahue v. Rodd Electrotype Co. of New England, Inc.</u>, is reserved for situations where "it would be difficult for the plaintiff . . . to establish breach of a fiduciary duty *owed to the corporation*. . . ." <u>Bessette</u>, 434 N.E.2d, 207-08; <u>Donahue</u>, 328 N.E. 2d 505, 367 Mass. 578 (1975).   Because the plaintiffs did not "allege that the defendant's conduct was an attempted 'freeze-out' of the minority stockholders, . . . the vulnerability of minority stockholders, which [the SJC] found controlling in *Donahue* [was] missing." <u>Bessette</u>, 434 N.E.2d at 208 n.5 (citations omitted).

The First Circuit Court of Appeals reached a similar conclusion in <u>Prof'l Brushes, Inc. v. Gottsegen (In re Mi-Lor Corp.)</u>, stating that:

> When a corporation sues its fiduciaries or a stockholder brings a derivative suit against corporate fiduciaries to enforce the corporation's rights, any recovery for the fiduciary breach belongs to the corporation. . . . Sums recovered by a corporation are paid first to creditors, before any distributions are made to shareholders. . . . In some circumstances, the *Donahue* doctrine permits stockholders of close corporations to sue for direct injuries and recover personal relief for breaches of fiduciary duties owed directly to them. Such a suit for personal relief is appropriate where it would be difficult to establish a breach of duty owed to the corporation, as in the case of a freeze-out of minority shareholders.

125

348 F.3d 294, 301 & n.9 (1st Cir. 2003) (citations omitted).[112]

Here, as in <u>Bessette</u> and <u>Mi-Lor</u>, the allegedly wrongful actions implicate fiduciary duties Fincke owed to Access under general corporate law principles.  Were this Court to rule that Fincke breached his fiduciary duties of care or loyalty by failing to apprise the Board of material information necessary to manage the company, by delaying acceptance of the Investors' proposed financing in the spring of 2003, or by engaging in self-interested transactions, the recovery would belong Access.  Because these violations invoke general principles of corporate law related to the fiduciary duties owed by Fincke *to the corporation*, and not to the individual Investors, the Court concludes that it is immaterial whether Access was a close corporation and the analysis is the same under either Massachusetts or Delaware law.

As its controlling shareholder, officer and director, Fincke owed fiduciary duties of care and loyalty to Access.  The fiduciary duties attendant to one in Fincke's position have been well-stated by the SJC:

---

[112] <u>See also</u>  <u>Samia v. Central Oil Co. of Worcester</u>:

*The usual practice in Massachusetts has been to afford relief in a case of this character to the corporation*, on the ground that the stockholders have only derivative rights against one who has wronged their corporation. . . . The rule that all recovery in cases like the present must accrue to the corporation is not inflexible . . . In some other jurisdictions, direct relief to shareholders, rather than through the wronged corporation, has been given where that would more justly apportion the burden of the recovery among the wrongdoers. . . . On the unusual facts here established, equity should thus flexibly frame relief to do substantial justice and to avoid . . . unjust enrichment . . . .

158 N.E.2d 469, 482-483, 339 Mass. 101 (1959) (emphasis added).

> The directors of a corporation stand in a fiduciary relationship to the corporation. They owe to the corporation both a duty of care and . . . a paramount duty of loyalty. They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation. . . .

Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 179, 424 Mass. 501(1997) (citations omitted); see also Prod. Mach. Co. v. Howe, 99 N.E.2d 32, 35-36, 327 Mass. 372 (Mass. 1951); Durfee, 80 N.E.2d at 527; Spiegel v. Beacon Participations, Inc., 8 N.E.2d 895, 904, 297 Mass. 398 (1937). A corporation may recover damages on account of an officer or director's breach of fiduciary duties, and a debtor-in-possession may bring an adversary proceeding to prosecute any such violation.[113] Mi-Lor, 348 F.3d at 300; Baker v. Allen, 197 N.E. 521, 524, 292 Mass 169 (1935).

In the context of bankruptcy, it is often the case that a failed corporation (and its shareholders) cast about for someone to blame for the company's demise. And it may be that one or more individuals are liable for wrongdoing. But corporate officers and directors are not liable "for mere errors of judgment or want of prudence. . . . [T]hey cannot ordinarily be held to personal responsibility for loss unless there is 'clear and gross negligence' in their conduct.'" Spiegel, 8 N.E.2d at 904, 915.[114]

---

[113] The plaintiff bears the burden of proof on claims for breach of fiduciary duties, see Spiegal, 8 N.E.2d at 905; Crowell & Thurlow S.S. Co. v. Crowell, 182 N.E. 569, 572, 280 Mass. 343 (1932), which burden shifts only where there is a showing that the matter involves an officer's or director's self-dealing or usurpation of a corporate opportunity, see, e.g.,Samia, 158 N.E.2d at 485; Dynan, 508 N.E.2d at 1377-78 (in self-interested transaction, defendant had burden of proof on good faith and fairness to corporation); Henderson v. Axiam, Inc., No. 962572D, 1999 WL33587312, at *50 (Mass. Super. June 22, 1999), aff'd, No. 01-P-1059, 797 N.E.2d 502, 59 Mass. App. Ct. 1107, 2003 WL22359347 (Mass. App. Ct. Oct. 16, 2003).

[114] See also Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996) ("if officers or directors act in good faith, albeit imprudently, they are not subject to personal liability absent clear and gross negligence in their conduct"); Massaro, 559 F. Supp. at

1.   *Duty of Care*

Officers and directors of a corporation owe the company a fiduciary duty of care; they must "exercise the degree of care which a prudent person ordinarily would use," Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 737 (1st Cir. 1982) (internal citations omitted), and "act, also, with reasonable intelligence . . . ," Spiegel, 8 N.E.2d 895, 904, 297 Mass. 398 (1937).   Here, the Plaintiffs say that Fincke failed to exercise the requisite degree of care when he failed to disclose vital information to Access's Board.   As with many of the fraud and misrepresentation claims, the Investors have failed to provide the Court with much specificity regarding these particular claims.   Instead, in both the Complaint and their post-trial brief they make the same broad, conclusory statement that "Fincke failed 'to act with the strictest good faith in caring for and managing Access's property, and to exercise reasonable intelligence in conducting the affairs of [Access].' Instead Fincke acted all times to advance and protect his personal interest."   Despite the lack of clarity, the Court reads the claim as an attack on the sufficiency of Fincke's disclosures to the Board, to which the Court now turns.

The Plaintiffs say that Fincke's behavior is akin to that of the defendant in Boles v. Filipowsky (In re Enivid, Inc.), 345 B.R. 426 (Bankr. D. Mass. 2006).   In that case, the trustee of a Chapter 11 debtor's liquidation trust brought an adversary proceeding against, among others, the corporate debtor's founder and CEO (the "defendant"), claiming that he breached his fiduciary duties to the corporate debtor while acting as a corporate officer and

---

1080-81 (under Massachusetts and Delaware law, a breach of fiduciary claim cannot rest on allegations of mismanagement alone); Baker v. Allen, 197 N.E. at 523; Manning v. Campbell, 162 N.E. 770, 771, 264 Mass. 386 (1928); Blake v. Smith, No. 0300003B, 22 Mass. L. Rptr. 173, 2006 WL4114305, *7 (Mass. Super. 2006) ("gross negligence, . . . without more, falls short of constituting a breach of the fiduciary duty to act in good faith").

director.  Id. at 434.   Prior to the debtor's bankruptcy case filing, the defendant had embarked on a strategy of acquisitions that created the appearance of increased revenue without actual profitability. Id. at 435.  As the debtor's situation became increasingly dire, several of the company's managers attempted to dissuade the defendant from the acquisition strategy. Id. at 436.

Despite the managers' stated beliefs and persistent warnings that the acquisition strategy was doomed, and even after negative financial reports to that effect became available, the defendant insisted on presenting over-inflated and unrealistic projections to the board of directors and failed to disclose management concerns.  Id. at 437.  Lacking this relevant information, the board continued to approve acquisitions, resulting in the company's eventual financial collapse.  Id. at 437-38.  The trustee's complaint alleged that the defendant violated his fiduciary duties toward the company by disseminating false or inflated financial information to the board; by concealing material information about the true condition of the company and the impact of the acquisition strategy; and by failing to consider advice provided by other company officers.  Id. at 444.  According to the trustee, the defendant had breached not only his duty of care, but also his duty of loyalty toward the debtor, as his actions were motivated by his own self-interest and not the best interests of the company.

In ruling on the defendant's motion to dismiss, the court held that the facts as alleged – i.e., that the defendant maintained the acquisition strategy despite all evidence that it was failing – stated a claim for breach of the fiduciary duty of care.  Id. at 451.  The court held that the business judgment rule did not protect the defendant's decisions as an officer of the company, because the *process* by which those decisions were made was

129

"irrational and reflective of a knowing and deliberate indifference to the potential risk of harm to the company," and his decisions "were either 'not in good faith' or involved 'intentional misconduct.'" Id.

Moreover, the court rejected the defendant's contention that the trustee had failed to allege facts sufficient to demonstrate the defendant's self-interest. Id. at 445.[115] Instead, the court held that self-interest was sufficiently pled, because the defendant's

> employment, stock position and perquisites, which constituted material benefits to him, coupled with his unwavering personal adherence to the acquisition strategy in the face of mounting operational and financial problems and warnings, especially from the company's chief operating officer, permit a reasonable inference of the self-interest of entrenchment . . . inconsistent with the interests of the Company and its creditors.

Id. In so holding, the court found that defendant's actions were *principally motivated* by his desire to maintain his position and benefits as CEO.

The Plaintiffs claim that Fincke's actions are on par with those of the Enivid defendant.  They maintain that Fincke withheld material information from the Board because he, like the defendant in Enivid, was motivated by a desire to protect and maintain his position at Access.  They say that Fincke not only breached the duty of care, but also the duty of loyalty, because his own self-interest underlay his failure to disclose facts related to, *inter alia*, Access's woeful financial condition, its inability to manufacture AED

---

[115] As the Mi-Lor Court explained:

A director or officer may be "interested" under Massachusetts law if she is a party to the transaction; has a business, financial or familial relationship with a party to the transaction; has a material pecuniary interest in the transaction; or is subject to a controlling influence by a party to the transaction who has a material pecuniary interest.

348 F.3d at 306.

units at projected rates, its poor relationship with the European Distributors, and the severity of the Philips litigation.  These actions, according to the Plaintiffs, breached Fincke's fiduciary duties of loyalty and care, preventing the Board from properly managing Access and timely providing the company with additional working capital.

Fincke argues otherwise, claiming that adequate disclosure of material company matters was provided to the Board through the KPIs and associated narratives, the Board meeting presentation materials, and the presence and availability of key management personnel at Board meetings.  Fincke says that, at trial, at least one Investor (Zimmell) admitted that he was provided with sufficient information to gauge Access's performance.  In essence, Fincke argues that the Investors' claims are little more than corporate governance by hindsight, amounting to no more than allegations that he mismanaged the company.  According to Fincke, the fact that the Investors allowed him to remain in control of Access despite having voted him out of his position as president and CEO demonstrates that the problems now alleged to be fiduciary breaches (the very problems that prompted his removal) were not that serious after all.

Despite their vociferous assertions to the contrary, the Court does not find that the Plaintiffs have provided adequate evidence that Fincke was motivated by self-interest in his management decisions.  Unlike the defendant in Enivid, Fincke *did* disclose difficulties and problems at Access, including, as discussed earlier, the substance of articulated management concerns.   In addition, there is no evidence that Access managers consistently voiced the type of vehement and strongly-worded disagreements that were present in the Enivid case.  And Fincke, unlike the Enivid defendant, did not conceal

131

missed projections – financial and performance data were provided to the Board on a regular basis, and the associated narratives repeatedly disclosed and quantified the missed production, sales, and shipping projections.  While Fincke obviously maintained a personal interest in Access's success, the Court finds that Fincke's decisions as an officer and director were not primarily motivated by self-interest.

Having found that the Plaintiffs failed to establish that Fincke purposefully withheld information from the Board in breach of his duty of loyalty to Access, the Court must still determine whether the Plaintiffs are correct in their assertion that Fincke's failure to disclose information to the Board violated his duty of care.  The question is whether, in providing information to the Board, Fincke acted with "reasonable intelligence" and prudence expected of a reasonable person in his position.  See Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996).

### a.   Information Provided to the Board

While Fincke and the individual Investors and Board members sometimes discussed company matters on an informal basis,[116] information was primarily provided to the Board members at monthly Board meetings.  Prior to the scheduled meetings, Bounty would provide financial spreadsheets (the KPIs) and related narratives to the Board members, to be discussed in greater detail during the presentations given at the meetings.

Fincke would lead these presentations, and various managers would present information related to their particular areas of responsibility. Copies of computer-generated

---

[116]  According to Moriarty, the Investors and Board members generally discussed events at the company among themselves, which discussions were more frequent after the Board was established. According to Connolly, after the April 2003 Transaction, Radley "took the lead" on behalf of the other investors. Trial Tr. day 9, 36.

slides used to guide these Board meeting presentations were admitted into evidence, each consisting of general outlines, summaries, and bullet point lists reflecting the general topics discussed.   Nawn testified that he presented materials at some Board meetings regarding order shipments and the impact of product changes on production.  Trial Tr. day 5, 35-36. Bounty testified that he presented financial information to the Board through review of the KPIs and the assumptions driving the projected financial outcomes.  Trial Tr. day 2, 30-31. Bounty noted that the points outlined in the presentation materials were discussed in greater detail with the Board.  With the exception of the meeting held in November, Access management personnel were present at all Board meetings.

Radley and Zimmell corroborated this testimony; both acknowledged that the Board meetings involved discussions regarding important company matters and updates related to key achievements, marketing, sales, finance, and product development.   Trial Tr. day 9, 51, 82-83.   Although Zimmell expressed some degree of dissatisfaction with the completeness of the materials provided to the Board, he also stated that they were working to improve the reporting and flow of information and that the types of materials received were in line with that expected of a young start-up company.  Trial Tr. day 9, 51.

I.      Financial, Manufacturing, and Production Matters

The Plaintiffs maintain that FIncke failed to provide adequate information to the Board regarding the Access's financial situation, as well as its manufacturing and production problems.  As discussed in connection with the fraud and misrepresentation claims, the Court finds that the Investors  were well aware that Access's financial status was unstable, and the Court also finds that the Board was kept adequately informed of

Access's financial situation after the April 2003 Transaction.  In addition, problems related to manufacturing, shipment, and sales were disclosed in the materials provided to the Board and through discussions at the Board meetings.

The presentation materials from the April Board Meeting, held the day the April 2003 Transaction closed, refer to Access's objectives to achieve consistent 100 unit per day shipments and build a "buffer stock" of materials.  Def.'s Exs. 51, 52.  Receiving components on schedule was identified as one of the company's challenges.  In May, the Board received a KPI (the "May KPI") that disclosed that both orders and average selling price were lower than planned and provided details regarding the source of variance from the projected figures.  Def.'s Ex. 55.  The May KPI also disclosed the number of units that had shipped – 19 units more than needed to break even – noting that a number of units had not shipped owing to a delay in receipt of raw materials.  The May KPI also quantified the amount of working capital invested in inventory.  And the finance section stated that lower-than-planned cash receipts were offset by "aggressive management of inventory purchases and control of operating expenditures, which resulted in a higher cash balance at the end of May [than planned]."

On June 25, 2003, Bounty provided the Board with the KPI and related narrative for the first three weeks of June (the "June KPI").  Def.'s Ex. 30.  The June KPI noted that sales were much lower than planned (299 new orders versus a plan of 1,125), attributing a portion of the shortfall to delays in international and domestic distributor orders following the price increase. Because the distributors were resisting the proposed price increase,

134

Bounty reported that revisions to list prices and distributor transfer prices were made based on distributor feedback.

The June KPI also disclosed that Access was projecting $2.5 million "invested" in accounts receivable and inventory, and wanted "to discuss with the investor group ways to access some of this cash to help manage the working capital requirements of the business and insure [sic] a steady flow of material through the manufacturing group" at the June Board Meeting.  At trial, Bounty reiterated that the June KPI pointed to the significant amount of money tied up in accounts receivable, which the company was hoping to access through additional investor financing of those receivables.

At the June Board Meeting, held two days later, the financial discussion focused on the cash model projections through September of 2003, which looked positive, assuming shipments could be grown to 2,400 per month and the average selling price raised to $1,300.  The presentation materials for the June Board Meeting, Def.'s Ex. 68, compared the actual June operating results against previous projections.  Despite the low number of actual orders placed compared those previously projected, Access had achieved higher production and shipment levels – up to 500 units shipped the week of the June Board Meeting – and the backlog of units had dropped considerably.  June was also reported as the highest revenue month in company history (estimated at $1.8 million), and Access was predicting sufficient cash flow for July and August.  But, even given these more positive results, the presentation materials explicitly refer to a need for a working capital line of credit.

135

July, however, saw a precipitous decline in new orders and shipments.  During this time, Access secured the El Paso project.  The Plaintiffs fault Fincke for taking on a project that required product changes, despite Fincke's initial expectation that the change would be relatively minor.  As previously indicated, the Plaintiffs say that the El Paso changes resulted in serious production problems and negative financial consequences, and they further allege that these problems were not disclosed to the Board.  According to the Plaintiffs, the El Paso Project  led to a six to eight week shut- down on the manufacturing floor which was not communicated to the Board.  And according to Radley, Nawn, and Grosberg, when the problems caused by the El Paso project were finally revealed, Fincke confronted Nawn in Grosberg's office, requesting Nawn to draft a false email to the Board stating that the shut-down was only two weeks.  Trial Tr. day 5, 29-20; day 9, 150.  Fincke denied that the El Paso project disrupted manufacturing for six to eight weeks, although he admitted that manufacturing slowed during that time.  He denied trying to "hide" the manufacturing problems from the Board and also denied asking Nawn to falsely represent the length of production shut-down to the Board.  Trial Tr. day 3, 68-70.

Radley further testified that he was told in the early fall of 2003 that production had stopped for four to six weeks beginning in July due to the changes required by the El Paso project, and that this was confirmed by Nawn, Grosberg, Rice, and other members of the management team.  Trial Tr. day 9, 88-89, 148.  According to Radley, he discussed the situation with Fincke, who denied it, insisting that production had been stopped for only a week or two as a result of both the El Paso changes and changes required to appease the European Distributors.  Trial Tr. day 9, 89.

136

But Radley's answers in his interrogatories gave a different version of events.  In the interrogatories, he stated:

> My understanding is that around Thanksgiving 2003, Fincke ordered two employees not to talk with the Board . . . specifically told them not to tell the Board that he was continuing to revise the product against explicit instructions. This conversation resulted from a conversation Fincke had just been having with another Investor who was concerned about unnecessary tweaking of the product. Fincke had told us that the revision had only slowed down production by a few days when in fact, when it was on the order of a couple of weeks, which as usual had exacerbated revenue and payment issues. Fincke specifically asked Bill Nawn . . . to write a memorandum that stated the delay was only two days.

Trial Tr. day 9, 151.  The discrepancies between these two versions of events call into question the accuracy of the witnesses' memories at trial.  Although Radley attempted to clarify the contradicting statements, the Court found the testimony not credible.[117]

---

[117]  On cross examination, Radley testified as follows:

Q:    Now, sir, you would agree with me, wouldn't you, sir, that there's a difference between a production delay in July of close to six weeks and a purported associated request by Mr. Fincke to untruthfully state the delay was two weeks on the one hand, and a production slowdown in the Thanksgiving time frame of a couple of weeks and a purported associated request by Mr. Fincke to untruthfully state the delay was two days on the other hand, correct?

A.    They were two different and distinct incidents.

Q.    So there were two incidences. You forgot in your interrogatory answer to mention the six-week incident?

A.    I just testified that there were a number over the period of time we were there. I said I didn't know how many slowdowns there were. I think I just testified that there were a number of them.

Q.    But the big one was the six-week, right?

A.    The big one was the summer one, yes.

Q.    And why wasn't that inside here, Mr. Radley?

A.    I should have put it in. If we didn't put it in, I apologize for not putting it in.

The Court finds that the truth, as is often the case, probably lies somewhere in between.  As previously noted, shipments were well below projections for the month of July – the documents show that slightly more than 400 units shipped that month – but shipments did not actually cease.  In fact, Nawn conceded at trial that Access was able to fill some orders that month and acknowledged that production, although reduced, did continue through July.  Moreover, both Bowers and Nawn testified that, during the same time period, they were incorporating changes that the European Distributors were demanding. And, according to Bowers, they were also working on a solution for the low battery detection problem.  <u>Trial Tr. day 7, 130</u>.  Ultimately, the Court was unable to determine the extent to which the El Paso changes impacted production.[118]

At any rate, the Board was made aware, by at least late August, of the abysmal number of shipments for July.  On August 20, 2003, Bounty sent an email to the Board requesting a conference call by week's end to discuss Access's "immediate working capital needs."  <u>Pl.'s Ex. 34, Pl.'s Obj.-to Ex. 21</u>. The memo attached to that email contained a chart demonstrating an increase in average order bookings, described the management of working capital as "aggressive," stated that aggregate accounts payable were reduced by $400,000, and explained that raw materials were "procured on a just in time basis matched with working capital availability."

The memo rang a distinctly positive tone regarding the El Paso situation.  It stated that Access was "again winning a high percentage of rural grants after a two-month period

_____

<u>Trial Tr. day 9, 152</u>.

[118]  It appears that the El Paso order eventually shipped out in late July and early August. <u>Pl.'s Ex. 123, 124, 125</u>.

where our success was limited.  Most recently in El Paso, we successfully reconfigured our product (within a very short time cycle) to overcome what was a lock out product specification.  We have also made numerous software upgrades in response to customer feedback . . ."  As for the low number of shipments during July, the memo attributed this to a "combination of factors including . . . requested delivery dates of orders received in late July [800 units] . . . delays in new software release [150 units] . . . [and] the timing of the [April] funding, . . . resulting in lower than expected cash receipts in June."

Because none of the testimony regarding the El Paso situation yielded a coherent picture of events, the Plaintiffs have not carried their burden to demonstrate that Fincke's characterization of events was false or that Fincke attempted to hide the production troubles from the Board.  Instead, the Court finds that the poor July performance, as well as the underlying causes, were reported to the Board.

More important was the financial situation at Access as described in the August 20 memo.  The memo noted that accounts receivable had increased from $750,000 at the end of April to $1.3 million in August, with an expected additional increase to $2 million by the end of September.  It further stated:

At the July Board of Directors meeting[119] we discussed the requirement for additional working capital. At that time the expected need was $500,000 to cover working capital requirements and Philips litigation costs . . . actual July revenue was $1 million below the revenue estimate.

To meet the immediate short-term cash requirement, we are requesting a loan from the investor group of $750,000. This loan will be used to meet the August month end payroll . . ., fund the initial costs related to the Philips litigation . . . and accelerate the procurement of inventory to ensure product is available to meet September shipments. Our current projections show that an additional $250,000 will be needed in mid September and an additional $250,000 in mid October to meet working capital requirements . . . .

In response to this email, Fincke, Bounty and some (if not all) members of the Board participated in a conference call regarding Access's need for additional funding.    And on August 25, 2003, a formal Board meeting was held.    The presentation materials for the August Board Meeting, Pl.'s Obj.-to Ex. 21, provided a financial overview, stating that the company had $2.3 million invested in "working capital" – $1.6 million in backlog, $1.5 million in accounts receivable, and $800,000 in inventory.    The materials also referenced a $1.0 million working capital line of credit.    Other basic company information, including average sales price, sales order growth, priorities, personnel information, unit shipments, and cost of goods were outlined in the materials.

_____

[119] There was some debate at trial about whether a Board meeting was held in July and whether certain relevant information was provided to the Board during that time. Moriarty testified that he didn't think there was a Board meeting in either July or August, but he said the Board could have met at Connolly's house in late August. Trial Tr. day 6, 93.  Fincke insisted that there *was* a Board meeting in July, held at Connolly's house, and testified that he was the sole presenter at that meeting.  Trial Tr. day 7, 61.  Regardless of whether there was a formal meeting of the Board during July, the Court finds that events at Access were almost certainly communicated to individual Board members between June and August.   This finding is premised on the July 16, 2003 email from Elefante to the Board requesting a Board meeting in late July to discuss the Philips litigation, in conjunction with the reference in Bounty's August 20 email to discussions held during a July Board meeting.

The KPIs for September (the "September KPIs") and associated narrative, Def.'s Ex. 69, disclosed a severe shortfall of orders in September versus the plan (241 orders received against a plan of 1,500).  It also noted that production yields had dropped owing to problems with a contract manufacturer, problems that had since been identified and corrected.  The narrative noted that the Access had a $1.1 million shortfall against planned accounts receivable.  The narrative further explained  that  working capital was needed to pay down vendors (accounts payable had reached $2.2 million) in order to ensure the flow of raw materials.

Consistent with the August Board Meeting materials, the narrative attached to the September KPIs referenced a $1 million investment from the Investors that had been expected in late August, but was not received until late September or early October, resulting in a shipment shortfall for September. Due to Access's desperate financial condition, the company was looking into additional financing alternatives, such as factoring accounts and obtaining additional SBA loans, to acquire more raw materials.  The narrative made clear that additional working capital was needed promptly; waiting to collect on outstanding accounts receivable to buy raw materials could delay shipments until December.

The Plaintiffs complain that relevant financial, manufacturing, sales, and other data related to company performance were "buried" in the KPIs and reports provided to the Board.  But the evidence establishes otherwise.  The data contained in the spreadsheets were extensive because such was the universe of information needed to explain, analyze, and predict company performance.  Rather than hiding bits of relevant information under

141

volumes of irrelevant noise, the KPIs were targeted at disclosing sufficient information to make analysis of company performance possible.  Furthermore, the narratives and Board meeting presentation materials attempted to make the most relevant date more accessible.  In short, the KPIs, narratives, presentation materials, and other communications with the Board members were not designed to obscure, but to disclose.  The Court discerns no breach of Fincke's fiduciary duty of care to Access in his provision of company performance information to the Board.

ii.      European Distributors

The Plaintiffs also contend that Fincke breached his fiduciary duty of care by hiding Access's problems with the European Distributors from the Board.  The difficulty with evaluating this claim is heightened by the Plaintiffs' lack of specificity regarding what Fincke is alleged to have known, and failed to disclose, at particular times.  As described earlier, the email from Klegerman in February 2003 identified one European Distributor who threatened to stop placing orders if the prices were increased as proposed.  Several witnesses testified generally that problems with the European Distributors worsened throughout 2003.  But, as the Court has noted, the European Distributors continued to place orders throughout that same time period (with the exception of September 2003) and remained a large portion of Access's customer base.

Following the announcement of the proposed price increases, the European Distributors voiced resistance.  This resistance was disclosed to the Board at the May Board Meeting, where it was noted that Fincke and Bob Ide would be visiting five "key" European Distributors. Pl.'s Obj.-to Ex. 21.  And, although the presentation materials state that the company had "improved distributor relationships," the materials also noted that a

142

"Key Objective" was to "make Access an easy company to do business with.  Be proactive, ensure customer satisfaction and retention."   The narrative attached to the May KPIs likewise informed the Board that the purpose of the visit to the European Distributors was to  "understand how price increases can be implemented and to review the distributor sales programs."  It further stressed the importance of price to the European Distributors, stated that Access "need[ed] to provide improved support to our distributors," and indicated that an executive recruiter was hired to search for an International Business Manager.

At the June Board Meeting, Fincke reported on the European trip.  According to the presentation materials, Access had decided to introduce a more "moderate" price increase as a result of distributor feedback. Def.'s Ex. 68.  In the August 20 email from Bounty, the relationships with both domestic and international distributors were described as "strong," noting the steady increase of average monthly new orders.  Pl.'s Ex. 34; Pl.'s Obj.-to Ex. 21.

In early September, however, several European Distributors, including Kivex, Dolby, and Schiller, sent emails expressing their dissatisfaction with Access and providing a list of issues they would like addressed before receiving further shipments.  On September 15, Fincke responded, outlining the steps the company would take to improve the situation and address their concerns. Pl.'s Obj.-to Ex. 14.   Shortly thereafter, in early October 2003, Fincke and other Access managers attended a  meeting with the European Distributors to address their problems.  The October meeting must have calmed the waters between them, as orders from the European Distributors resumed, and little evidence was introduced demonstrating a seriously strained relationship after that date.

The Investors testified that they were unaware of problems between Access and the European Distributors until fall 2003. Fincke maintained that they were apprised of events as they happened. What *is* clear is that things came to a head in September, when the European Distributors stopped placing orders pending resolution of the outstanding issues, a fact which was noted in the September KPIs and narrative. Def.'s Ex. 69. Given that the Board had delegated general management of Access's affairs to Fincke, the Court credits Fincke's testimony that he did not view the situation with the European Distributors as on the brink of collapse throughout the summer of 2003. Rather, the issues over product features and pricing were being managed by Fincke and others at Access to the best of their ability. It was not until September that the European Distributors actually stopped placing orders. And, at that time, the Board was informed of the situation, a plan of action was put in place (the early October meeting), and the problems apparently substantially resolved. Because the Plaintiffs have failed to demonstrate that Fincke withheld material information relative to the European Distributors, the Court finds that the Plaintiffs have failed to demonstrated a breach of Fincke's fiduciary duties.

b.    Philips Litigation

The Plaintiffs contend that Fincke failed to timely disclose the threatened Philips litigation, and, when it *was* eventually disclosed, he misrepresented the gravity of the lawsuit in violation of his duty of care. As previously discussed, the Investors and the Board were not made aware of the communications from Philips prior to the filing of the Philips complaint. As earlier described, however, no one at Access, with the possible exception of Pandiscio, appeared to take Philips seriously when presented with emails and telephone calls requesting a meeting in fall 2002 and spring 2003. Elefante was copied on

144

the communications from Philips and Pandiscio, but he also did not disclose the information to the Board prior to the filing of the Philips Complaint.

At most, the Court finds, Fincke may have been negligent in not raising the issue with the Board, but the Court cannot conclude that his failure to do so amounts to the sort of gross negligence or recklessness constituting a breach of his duty of care.  Instead, Fincke, as well as Elefante, made a judgment call regarding the likelihood that Philips would follow through with litigation.  As Pandiscio explained at trial, the letters sent by Philips were not uncommon in the world of new medical technology.  And Fincke simply did not take it seriously at the time it was received.  This was, perhaps, a poor decision, but not a breach of his fiduciary duties.

When the Philips complaint was finally filed, the Board was immediately informed – on June 25, 2003, Bounty sent an email to the Board noting that Access had just received the Philips Complaint.  Discussions between Pandiscio, Fincke, and Elefante promptly ensued as they began to formulate a strategy for responding to the litigation.  On July 11, 2003, Elefante sent a letter to Fincke and Pandiscio summarizing portions of their discussions:

> 1.     Identify counsel to represent Access in the Philips litigation.  I agreed that I would talk to John Montgomery of Ropes & Gray (which I have done.) . . . Randall is going to talk to a contact of his at Pfizer for recommendations. . . .

> 2.     We will consider what information we can provide Philips that might convince them that the royalty amount they are seeking is way out of line. . . . [Pandiscio] also agreed to research the royalty rates applicable to this industry. [Pandiscio] has identified an expert with knowledge . . . and will consult with him about rates applicable to this industry.

3.     We also discussed challenging one or more of Philips' patents through the patent office.  We viewed that as preferable to contesting the patents in the litigation. . . . Randall and Mark will identify the most promising opportunities.

Pl.'s Ex. 32.

Elefante also formally advised the Board of the Philips litigation by letter dated July 16, 2003. In the letter, he stated:

Access last week was served with a Complaint brought by Philips Electronics . . . . The Complaint alleges that the [Access AED] infringes on 18 patents issued to Philips. . . . Access believes that its product does not infringe on a number of the patents asserted. Moreover, Access believes that a number of the key patents are invalid.

Randall, Access' patent counsel, and I met with representatives of Philips last week. . . . They claim that their interest is in realizing revenues from the intellectual property owned by Philips, not putting Access out of business as a competitor. . . . They offered to license the patents involved in the litigation to Access for a royalty of 15% of Access' gross revenues from sales of the AED product. In our view, although a license will be welcome, the royalty demanded by Philips is excessive. . . . The Philips representatives claim that they would be willing to consider information which would suggest that the royalty demand is excessive. We are currently trying to develop information to provide to Philips in response to that offer.

Patent litigation is very expensive and tends to operate on a relatively fast track. We are currently looking for counsel for Access to defend it in this litigation. We have been advised by some of the lawyers we have interviewed that Philips has a reputation for being particularly aggressive and difficult in these matters. . . . In the meeting, Randall asked Philips to withdraw the litigation while we discuss the possibility of a royalty arrangement. Philips refused to do that and indicated that they would pursue their claim aggressively.

The lawsuit is certainly not good news. At a minimum, it will be expensive to hire counsel and put Access in a position to defend the case or reach a licensing arrangement with Philips. The case also has potential for costing Access damages for infringement and perhaps requiring Access to change its product to eliminate features covered by the patent. Alternatively, Access may have to pay Philips a royalty. . . . I think it is important to get together to discuss how to respond to this litigation and to general protect the

company's competitive position in the industry. Please let Randall know whether you are available for a board meeting next week. . . .

In September 2003, Elefante again apprised the Board of developments related to the Philips matter. Def.'s Ex. 75. In his letter, Elefante reported on a meeting held with Ropes & Gray to discuss Access's litigation strategy:

> [T]here is a multi-pronged strategy for dealing with the litigation. . . .
>     . . . .
>
> The goal overall is to put Access in a position to negotiate a settlement with Philips at the earliest possible point. We believe that we will be in the best position to do that if we:
>
> 1.    Put up a fight with Philips on its infringement claim;
>
> 2.    Reduce the claim by eliminating potentially infringing features;
>
> 3.    Develop counterclaims; and,
>
> 4.    Hit Philips in other vulnerable spots to make the point that fighting with us will be expensive and painful.

According to the Investors, Fincke represented to them individually that Access could "handle virtually anything;" that the type of claim asserted by Philips was normal in the medical device business; that the Access AED did not infringe on some of the asserted claims; that Access could design around possible infringements; and that some of Philips patents could be challenged as invalid.  The Plaintiffs insinuate that Fincke grossly mismanaged the Philips matter by not pursuing a license and deciding to put up a fight – a fight which Access could ill-afford to pursue.

There is no evidence, however, that Fincke's position was unreasonable, self-serving, or irrational.  The communications from Elefante reflect a more collaborative tone toward litigation strategy development, suggesting that Fincke was not flouting the advice

147

of others, even while remaining determined to defend against Philips's claims. Even if Fincke spearheaded the strategy to vigorously defend Access through an "aggressive" posture, there was nothing inherently wrong in his decision to do so. The Board was kept informed of Access's stated position and litigation strategy, and the Plaintiffs have presented no evidence that Fincke withheld any material information in that regard. In short, the Court rules that the Plaintiffs have not demonstrated that Fincke's actions relative to the Philips litigation breached his fiduciary duty of care to Access.

### 2.    *Duty of Loyalty*

As a director and officer of Access, Fincke also owed a fiduciary duty of loyalty to the company. "The duty of loyalty prohibits fiduciaries from 'promoting their own interests in a matter injurious to the corporation. . . . [Personal] pecuniary interests are subordinate to this paramount duty.'" Access I, 340 B.R. at 148 (citations omitted). Fiduciaries must refrain from self-dealing – i.e., they may not engage in transactions with the corporation in which they have a personal or pecuniary interest – unless: (1) the transaction is assented to by a majority of disinterested shareholders or directors following full disclosure of material facts or (2) is otherwise proved to be fair to the corporation. Demoulas, 677 N.E.2d at 182.[120] The business judgment rule[121] does not apply where there is demonstrated self-

---

[120]  See also Mi-Lor, 348 F.3d at 306 & n.18;  Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.), 284 F.3d 216, 227-28 (1st Cir. 2002); Boston Children's, 73 F.3d at 433-34; Starr, 648 N.E.2d at 1265 ("When a partner has engaged in self-dealing, that partner has the burden to prove the fairness of his actions and to prove that his actions did not result in harm to the partnership.") (citing Meehan v. Shaughnessy, 535 N.E.2d 1255, 404 Mass. 419 (1989)); Farley v. Romano (In re Romano), 353 B.R. 738,759-60 (Bankr. D. Mass. 2006); Puritan Medical Center, Inc. v. Cashman, 596 N.E.2d 1004, 1008-09, 413 Mass. 167 (1992); Durfee, 80 N.E.2d at 528-529 ("officers and directors are not permitted to use their position of trust and confidence to further their private interests"); Johnson v. Witkowski, 573 N.E.2d 513, 522 (Mass. App. Ct. 1991); Boylan v. Boston Sand & Gravel, No. 022296BSL1, 2009 WL765404, at *3, 25 Mass. L. Rptr. 209 (Mass.

148

dealing; once the transaction is identified as a self-interested one, the burden shifts to the fiduciary to demonstrate full disclosure and ratification of the transaction or fairness to the corporation.  See Henderson v. Axiam, Inc., No. 962572D, 1999 WL33587312, at *49-50 (Mass. Super. June 22, 1999), aff'd, 797 N.E.2d 502 (Mass. App. Ct. 2003) (collecting cases).  Even the failure of others at the corporation to properly supervise and discover the underlying facts of the transaction will not relieve the self-dealer from liability.  Haseotes v. Cumberland Farms (In re Cumberland Farms), 284 F.3d 216, 231 (1st Cir. 2002); Puritan Med. Ctr. v. Cashman, 596 N.E.2d 1004, 1008-09, 413 Mass. 167 (1992); Durfee, 80 N.E.2d at 531.

Similarly, fiduciaries may not "tak[e], for personal benefit, an opportunity or advantage that belongs to the corporation."  Demoulas, 677 N.E.2d at 180.  As with self-interested transactions, a corporate fiduciary who wants to engage in a transaction that also represents an opportunity for the corporation "must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation."  Id. at 182.

Courts in Massachusetts have also implied greater duties for fiduciaries during periods of corporate insolvency.  See, e.g., Mi-Lor, 348 F.3d at 304, 305 (stating that unanimous shareholder consent can ratify self-interested transactions in close corporations, "subject to special rules for insolvency"); Cumberland Farms, 284 F.3d at 228-29; Martin v. Kagan (In re Tufts Electronics, Inc.), 746 F.2d 915, 917 (1st Cir. 1984); Farley v. Romano

---

Super. Jan. 23, 2009); Henderson v. Axiam, 1999 WL33587312, at *49-50.

[121] "The business judgment rule affords protection to the business decisions of directors . . . because directors are presumed to act in the best interests of the corporation."  Harhen v. Brown, 730 N.E.2d 859, 865, 431 Mass. 838 (2000).

(In re Romano), 353 B.R. 760, 765 (Bankr. D. Mass. 2006); see also Candlewood Shores
Estates, Inc. v. Klein (In re Candlewood Shores Estates, Inc.), 20 B.R. 377, 380-381
(Bankr. D. Conn. 1982) (citing, inter alia, Albert Richards Co. v. Mayfair, Inc., 191 N.E. 430,
287 Mass. 280 (1934)).  In Cumberland Farms, the First Circuit affirmed the lower court's
finding that funds available to repay the debtor-company's loan to a separate corporation
represented a corporate opportunity usurped by a director of both corporations who used
the funds to pay down loans given by other corporations in which he had a personal
interest.  The First Circuit found that the director breached his fiduciary duty toward the
debtor by failing to provide full disclosure prior to engaging in the transaction:  "[T]he
decision as to how to use that money was not his to make . . . . [it was] an 'opportunity' that
rightfully belonged to [the company].'" 284 F.3d at 228-29.[122]

### a.     Payments to Fincke for Loans to Access

When Access was initially formed, Fincke, like others, was compensated only by his
stock interest in Access.  According to the Investment Summary, beginning in August of
2001 and continuing through September of 2003, Fincke received several payments on his

---

[122]   Similarly, the SJC has intimated that directors of insolvent corporations may not
preferentially repay obligations owed them by the company:

> [D]irectors of a corporation which is insolvent or about to become so cannot obtain
> for themselves a preference over other creditors in respect to the assets [of the
> corporation] . . . . [D]irectors are to some extent trustees of the corporation property
> for the creditors, [ ] they should not be allowed to use their superior and far more
> intimate knowledge of the corporation's affairs to the detriment of creditors.

Seder v. Gibbs, 131 N.E.2d 376, 380, 333 Mass. 445 (1956); see also Romano, 353 B.R. at 760
(Directors who took payment on their claims from sale of company violated fiduciary duty in light
of company's insolvency) (quoting Seder, 131 N.E.2d at 380); Albert Richards Co., Inc. v. Mayfair,
Inc., 191 N.E. 430, 287 Mass. 280 (1934); Burke v. Marlboro Awning Co., 113 N.E.2d 222, 330
Mass. 294 (1953)).

loan account. In total, he was re-paid $281,534.62 of his original $325,000 investment, leaving $43,465.38 of his initial loans to Access outstanding.

Fincke testified that Jack Carucci, Access's original accountant, had set up the system so that Fincke's salary would be paid in the form of repayments on his loan account. Trial Tr. day 1, 55, 142. By the end of 2002, however, as Grosberg and Bounty testified, and Fincke acknowledged, Access had contracted with a payroll service, through which Fincke received his salary. Neither Bounty nor Grosberg (who was in charge of handling payroll at the end of 2002) could recall Fincke not receiving salary during 2002. Trial Tr. day 2, 52; day 5, 146-147. Fincke insisted that he believed he had missed some salary payments during 2002 and that checks he wrote to cash or to himself in 2003 were merely to compensate him for those missed payments.[123] Trial Tr. day 1, 62, 157-159.

Fincke testified that he would have informed Bounty or Grosberg when he was writing checks to himself, although he could not recall specifically asking them if there were sufficient funds to cover the amounts withdrawn. Trial Tr. day 1, 159-160. Both Bounty and Grosberg testified that Fincke did not inquire into sufficiency of funds before making payments to himself. Trial Tr. day 2, 14. Although Grosberg was handling payroll beginning in late 2002, he testified that Fincke would write checks to himself (or to cash) without informing him, resulting, at times, in the inability to reconcile cash flow or to pay other liabilities. By March 2003, when Grosberg and Bounty had check-writing authority,

---

[123] Bounty testified that the payments made to Fincke listed on the Investment Summary could not have been salary, as the Investment Summary contains only information related to investments and loan accounts. Fincke does not appear to dispute this point; instead, he testified that he was using *that* account (the loan account) to pay himself because that is what his original accountant had advised him to do.

Grosberg was at least aware of the payments being made to Fincke. He testified that Fincke would request funds from him in lieu of writing the checks himself and that Fincke would ask for such payments following an influx of cash from the Investors, since Fincke then "knew there would be cash there."[124]

These repayments on Fincke's loans, whether characterized as debt or equity, violated his fiduciary duty of loyalty to Access. While directors and officers are entitled to receive reasonable compensation for their services, see Bessette, 434 N.E.2d at 208, Fincke failed to demonstrate that the payments represented either current or past-due salary. Because he was receiving funds directly from the corporation, the transactions constitute self-dealing, and Fincke bore the burden at trial to demonstrate that they were fully disclosed and ratified or were inherently fair to Access.

Apart from Grosberg and Bounty, no one at Access appears to have been aware of these repayments as they were made. Because other shareholders had a stake in the company at all times the repayments were made, Fincke was obligated to fully disclose the transactions and obtain consent of the disinterested shareholders before repaying himself

---

[124] On March 11, 2002, the Investment Summary shows that a check in the amount of $108,000 was written to Fincke, and then deposited back into Access's account later that day. The Investors have argued that this was an attempt by Fincke to withdraw, for his own benefit, this very large sum of money. Fincke was at a loss to explain what had happened. Although he at one point seemed to concede that it may have been an attempted payment to himself, he later testified that it could not have been. He also tried to link the check with the set-up of a separate account for the company. Trial Tr. day 3, 38-41. At any rate, this Court is unable to ascertain the intended purpose of the $108,000 check. Although the Investors' theory is plausible, and Fincke's lack of explanation troubling, the size of the check is also not commensurate with the other withdrawals made by Fincke before and after, which were mostly in the range of $10,000 - $15,000 (although two withdrawals were for substantially more at $54,000 and $43,928.62). At any rate, the money was put back into the account on the same day. And to the extent that the Investors rely on the evidence to indicate Fincke's intentions with regard to Access's funds, the Court finds, as will be discussed below, that any findings in that regard are extraneous to the Court's decision.

the sums of money.  And Fincke was obligated to disclose the payments to the Board after it was formed.  This he did not do.

Furthermore, because Access was at all times in desperate need of cash, Fincke's preferential repayments on his own loan account represented just the sort of corporate opportunity that was present in <u>Cumberland Farms</u>.  Rather than putting the interests of the company paramount in his mind – i.e., leaving the funds available to repay vendors or purchase additional raw materials – Fincke acted in self-interest and unfairly toward the corporation by siphoning off needed funds to satisfy his own debts.  Having done so, the Court rules that the payments were made in violation of his fiduciary duty of loyalty to Access. <u>See</u> <u>Boston Children's</u>, 73 F.3d at 441.

### b.    <u>Reimbursement of Credit Card Expenses</u>

In addition to the payments outlined above, Fincke also received payments from the company as reimbursements for company expenses. Fincke testified that he and others at the company would sometimes charge business expenses on his personal credit cards; that the credit card statements were given to accounting personnel to be audited; and that he would be reimbursed for the business expenses, but not his personal expenses. His testimony in this regard was credible and was supported by Bounty's testimony. Bounty recalled that during the time he was CFO, the accounts payment group processed various travel and expense reimbursements for Fincke, and he did not recall any specific issues or questions arising regarding those payments.  <u>Trial Tr. day 2, 111</u>.

Plaintiff's Exhibit 1, which the Plaintiffs say represents a summary of credit card charges and reimbursements made to Fincke (the "Summary of Credit Card

Reimbursements"), was not prepared by Bounty, <u>Trial Tr. day 2, 114</u>, but by unidentified Access employees following Fincke's departure from Access. The Summary of Credit Card Reimbursements consists of what appear to be credit card statement dates and a corresponding list of company payments,[125] including company check numbers. In the right-hand margin of the document, there are notations regarding specific expenses said to have been taken from detailed credit card statements (the credit card statements themselves were not produced). Some of the entries note that certain charges "[a]ppear to be valid business expenses," while others contain notes detailing certain personal expenses that are alleged to have been contained on particular credit card statements and list the amount of those personal expenses.[126]

The Court finds that Fincke received legitimate repayment of company expenses charged to his personal credit cards. <u>See, e.g.</u>, 18B Am. Jur. 2d Corporations § 1644 ("An officer or director of a corporation has a right to be reimbursed for money properly advanced or expenses necessarily incurred on behalf of the corporation.") Reimbursements for personal expenses, however, constitute self-interested transactions which, to the extent established during the damages phase of the trial, may be recoverable.

---

[125]  The Summary of Credit Card Reimbursements also indicates that $25,001.32 in credit card expenses were "credited to loan account via a journal entry in the amount of $25,000 in June 2001," which is consistent with the Investment Summary.

[126]  For instance, some of the entries note charges for airline tickets for Barash, Heer, Fincke, and other of their family members, charges to retailers, charges related to a boat, charges related to ski trips, a charge for a rental car, charges for plane tickets for Heer's and Barash's wives (June 2002), a marine boating charge (August 2002), a charge for Travel and Leisure magazine (March 2003), finance charges (March and April 2003), charges for retail stores, a car dealership, boat dealership and jewelry store (April 2002), and charges in April and June 2002 which are simply noted as "no support could be located."  A second version of this Summary omits the finance charges and the charge for Travel and Leisure magazine from 2002.

c.    Delay in Accepting Financing in April 2003

The Investors also argue that Fincke's delay in accepting additional financing in spring 2003 violated his fiduciary duty of loyalty to Access.  According to the Investors, this delay resulted from Fincke's own self-interest in maintaining a majority stake in the company and harmed Access by preventing the timely influx of funds required to maintain the company's operations.

While Fincke has conceded that he was hesitant to accept the Investors' proposal in early 2003 because he was wary of losing his majority shareholder position, the Court does not find that the negotiations that transpired in March and April 2003 were driven primarily by Fincke's pursuit of personal gain.

The evidence demonstrates that Fincke and Elefante were both involved in the negotiations surrounding the April 2003 Transaction.  Instead of jumping headlong into the deal, Fincke and Elefante took time to carefully consider the Investors' proposal and spent much time working through an apparent misunderstanding regarding the transaction.  In addition, Fincke was not the only one concerned with the proposed terms.  Bounty, too, was at least minimally involved in suggesting a revision to the Investors' proposal.  And both Bounty and Fincke were actively pursuing alternative investment proposals.

Regardless of whether the month-long delay in receiving additional funds hurt Access in the long run, this Court does not view the complex and considered actions of Fincke during March and April 2003 as indicative of a self-serving attitude in connection with securing additional funding for Access.  Thus, the Court rules that Fincke did not

155

breach his fiduciary duties toward Access in his conduct surrounding the negotiation of the April 2003 Transaction.

### C.      Counterclaims

1.      *Employment Claims: Breach of Contract, Promissory Estoppel, Breach of Fiduciary Duty, and Wrongful Discharge*

In contrast to the claims previously discussed, Fincke's Counterclaims present exceedingly more straightforward questions of Massachusetts law. Fincke's first allegation, found in his various claims for breach of fiduciary duty, breach of contract, promissory estoppel, and wrongful discharge, is that Access and the Investors wrongfully deprived him of benefits to which he would have been entitled under a negotiated employment agreement.

Fincke claims that Access and the Investors breached not only their promise to execute an employment agreement, but their fiduciary duties as well, and wrongfully discharged him in retaliation for his reports to the FDA in early 2004. After considering the testimony and submitted evidence, however, the Court does not find that the Board or Access, acting through Radley as interim president, retaliated against Fincke for reporting his safety concerns to the FDA.

Fincke first began to strenuously vocalize his concern with the AED s shipped during his absence in late December when he returned from vacation in early January of 2004. By that time, the Board vote to remove Fincke as president and CEO had been festering for more than a month. As evidenced by Radley's memo given to Fincke as a suggested template for announcing his change in status at the company, the Board was growing

156

impatient of the wait-and-see approach Fincke seemed to be taking toward the situation. At the time he was removed from office, Fincke had raised no safety concerns, and by the time he *did* voice the concerns, he had not accepted the Board's offer of the chief technology officer position. This Court credits the testimony of the witnesses who felt that, as of late December, Fincke had essentially rejected that offer and the Board was ready to move ahead without him.

Once Fincke began to communicate with the FDA and report his concerns about the shipped units, the Board and others at Access reacted negatively. Regardless of the authenticity of Fincke's belief that the shipped units posed a problem, the Board understandably interpreted his actions as an attempt to damage the company. But this does not mean that the ultimate decision to terminate the employment relationship and to refuse further negotiations was a retaliation in the classic sense. Rather, the testimony revealed that the Board's actions were more a reaction to the sometimes passive-aggressive and other times wholly unrealistic approach that Fincke took to the question of his severance from the company.

With this in mind, the Court turns to the legal sufficiency of Fincke's Counterclaims. First, Fincke argues that Access and the Investors are liable for breach of contract, under either standard contract or promissory estoppel theories, because they failed to execute an employment agreement. Under Massachusetts law, "the formation of a contract requires the manifestation of mutual assent by the parties to the agreement." Trifiro v. N. Y. Life Ins., Co., 845 F.2d 30, 31 (1st Cir. 1988). Such agreements may be enforced under traditional contract law or may be enforceable under the doctrine of promissory estoppel:

> An offspring of the intermarriage of tort and contract, this doctrine holds that a promise given without consideration is binding when the promissor should reasonably expect to induce action or forbearance if injustice can be avoided only by the enforcement of the promise.

Id.; see also Cellucci, 320 N.E.2d at 923.

Under either traditional contract or promissory estoppel theories, "the party bringing such an action must prove all the necessary elements of a contract . . . ." R. I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1179, 419 Mass. 841 (1995); see also Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197(1st Cir. 2004). "It is not required that all terms of [an] agreement be precisely specified," Neuhoff, 370 F.3d at 201 (quoting Situation Mgmt. Sys. v. Malouf, Inc., 724 N.E.2d 699, 703, 430 Mass. 875 (2000)), but there must be some evidence of agreement on essential terms.

The agreement between the parties here never rose beyond the level of a tenuous agreement that they would try to agree. No essential terms of an employment contract were ever discussed, much less agreed upon. Absent any specificity as to basic terms, the Court can not find that any enforceable agreement was reached or that there is a basis for Fincke's claim of promissory estoppel. See, e.g., Hall v. Horizon House Microwave, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987) (employee seeking stock options promised during compensation negotiations could not recover, "given the extended and persistently inconclusive nature of his negotiations").

But Fincke also says the failure to provide the employment agreement constituted a breach of both Access's and the Investors' fiduciary duties toward him. His argument is premised on the assertion that Access was a close corporation, which, under Massachusetts law, gives rise to enhanced fiduciary duties on the part of the shareholders.

158

Demoulas, 677 N.E.2d at 179 (citing Donahue, 328 N.E.2d 505; quoting Meinhard v. Salmon, 164 N.E. 545 (1928)).

Even if the Court were to find that Access was a close corporation, the Court still could not find that the Investors breached their fiduciary duties in this case.   Since Demoulas, the SJC has clarified that the duties attendant upon shareholders in a closely-held corporation should not be interpreted to "hamper legitimate corporate activity unduly." O'Brien, 868 N.E.2d at 125.

> Where the alleged wrongdoer can demonstrate a legitimate business purpose for his action, no liability will result unless the wronged shareholder succeeds in showing that the proffered legitimate objective could have been achieved through a less harmful, reasonably practicable, alternative mode of action.

Id. at 125 (quoting Zimmerman v. Bogoff, 524 N.E.2d 849, 402 Mass. 650 (1988)); see also Starr v. Fordham, 648 N.E.2d at 1266; Leader v. Hycor, Inc., 479 N.E.2d 173, 177, 395 Mass. 215 (1985).

In this case, the Court finds that the Board acted within legitimate bounds when it voted to remove Fincke as president and CEO of Access and to offer him instead the position of chief technology officer with no reduction in salary or benefits.   Quite apart from any alleged fraud or misrepresentation, the Board was justified in concluding that, because of Access's poor performance, Fincke was not an effective manager and president of the company.   And Fincke has not shown that the legitimate objective of finding someone new to fill that role could have been achieved through a less harmful, reasonably practicable alternative mode of action.   In fact, offering Fincke a continued high-level position at Access, with the same benefits and salary, was more than generous given Access's poor

159

performance.  Indeed, this Court cannot readily conjure a *less* harmful alternative to the Board's chosen action.

But it was Fincke, not the Board, that rejected this path.  The Board was more than patient throughout December as it waited to transition to new leadership at Access.  In light of Fincke's failure to accept the offered chief technology officer position and his apparent inaction and silence on the matter, the Court finds that the Investors and Access, acting through the Board, violated no fiduciary duties toward Fincke in deciding to terminate further employment and severance negotiations.

Finally, as previously discussed, the Court disagrees with Fincke regarding the retaliatory motives he attributes to the Investors as the basis for their refusal to continue negotiating either a severance or employment agreement.

### 2.    *Enforceability of the Stockholders Agreement*

The Court's analysis above applies with equal force to Fincke's assertion that the Stockholders Agreement should be declared unenforceable in equity because it was used in a retaliatory manner to repurchase Fincke's stock after his employment with Access was terminated.  The overwhelming consensus in Massachusetts case law compels the ruling that Access and its Board were within their rights to exercise the option to repurchase Fincke's stock at book value.  Fincke has raised no legally cognizable argument that would suggest a contrary ruling.

Fincke cannot argue that the Investors or Access were constrained by fiduciary obligations to refrain from exercising their rights pursuant to the Stockholders Agreement. In Massachusetts, when the "contested action falls entirely within the scope of a contract

between the director and the shareholders, it is not subject to question under fiduciary duty principles." Chokel v. Genzyme Corp., 867 N.E.2d 325, 331, 449 Mass. 272 (2007).  The repurchase of Fincke's stock upon termination of his employment falls squarely within the scope of the Stockholders Agreement.    Fincke has not attacked the validity or enforceability of the Stockholders Agreement *per se*, nor has he argued that the Board and Access failed to follow proper procedures for repurchase of stock under the agreement. He has asserted only the general argument that "equity" should render the agreement unenforceable.

But the Court has already found that the Board and Access were not driven by retaliatory motives when they sought to enforce the Stockholders Agreement.   They exercised their rights in good faith, as required under Massachusetts law, and the repurchase was therefore valid. See Donahue, 328 N.E.2d at 518; Brigham v. M & J Corp., 227 N.E.2d 915, 918, 352 Mass. 674 (1967); Winchell v. Plywood Corp., 85 N.E.2d 313, 317, 324 Mass. 171 (1949); Thompson v. Daluise (In re Wet-Jet International, Inc.), 235 B.R. 142, 149-50 (Bankr. D. Mass. 1999) ("Where there is no indication of any failure in the duty of good faith and fair dealing at the time that stockholder agreements are executed, issues of the breach of fiduciary duty do not arise when one party simply seeks to exercise its rights under those agreements"); Blank v. Chelmsford OB/GYN, 649 N.E.2d 1102, 1105, 420 Mass. 404 (1995); Vakil v. Anethesiology Associates of Taunton, Inc., 744 N.E.2d 651, 655 (Mass. App. 2001).

IV.    CONCLUSION

The Investors here, sophisticated businesspersons one and all, invested their monies in a startup venture, managed by Randall Fincke, to manufacture and distribute an AED in a competitive industry. The investments were substantial and the evidence has shown that the Investors actively followed Access's progress from their first dollar invested until the filing of this bankruptcy case and beyond.  The evidence has also shown that the Investors were informed, on a timely basis, of Access's struggles.  The Investors' claim to have been provided false or incomplete information, with the exception of the limited statement set forth below, is without merit.  Information given to the Investors, while always capable of further expansion or refinement, was reasonably sufficient to provide the Investors with the information needed to discern Access's ongoing fortunes.

Among the definitions of the term "risk" set forth in the Oxford English Dictionary is the following:

> The chance or hazard of commercial loss . . . . Also . . . the chance that is accepted in economic enterprise and considered the source of (an entrepreneur's) profit.

And the term "risk capital" is defined as "money that is put up for speculative business investment. Oxford English Dictionary, Oxford University Press (2d Ed. 1989).

Each Investor made his respective investments with his eyes wide open, and no material information was withheld then or thereafter.  Had the company succeeded, each Investor would have been vindicated in his initial investment decision and his willingness to take risks amply rewarded.  But the essence of risk capital is that sometimes the best-

laid plans do not have a positive outcome.  By their extensive and extraordinary effort here, the Investors seek to reduce their losses by casting about for someone to blame.  Their effort would be more productive were they to peer into a looking glass.  They are responsible for their losses by having made their investments.  No one else bears that responsibility.  With the limited exception set forth below, this Court finds that the Plaintiffs have not sustained their burden to demonstrate by a preponderance of the evidence that the actions of Fincke constituted actionable fraud, negligent misrepresentation, or violations of § 410(a)(2).  Nor, with the exception noted below, have the Plaintiffs sustained that burden with respect to their allegations that Fincke violated any standard of care or loyalty that he owed to them or to Access.

For his part, Fincke seeks to ameliorate his losses – of money, time, and energy – by employing the assistance of his Counterclaims.  But he too, and even more so than the Investors, made his investments and management decisions in an atmosphere where the risks were obvious and, to a large extent, totally within his control.  *He* drafted the initial Stockholders Agreement of which he now complains.  And *he* failed to timely and fairly pursue negotiations relative to an employment agreement which would have protected him in a manner far better than his Counterclaims will here.

This Court, by partial judgment of even date, will grant judgment to Fincke on the Plaintiffs' claims in chief, with the exception of its findings and rulings that Finke is liable 1) for fraud, negligent misrepresentation, and violation of §410(a)(2) on account of the false statement in the Business Plan that Access was advised by its patent counsel that its product did not infringe any patents known to him; and 2) for violating his duty of care and

163

loyalty to Access by causing the company to repay its loans from him at a time when Access was desperately in need of cash and without disclosure to and the consent of disinterested shareholders or the Board.  And with respect to Fincke's counterclaims, the Court will award judgment to the Plaintiffs.[127]

The Court's Partial Judgment issued simultaneously hereto will set a further pre-trial conference in order to set discovery deadlines and a trial date to liquidate the damages, if any, arising from the Plaintiffs' surviving claims.

_____

Dated: April 17, 2009                    Henry J. Boroff
                                         United States Bankruptcy Judge

---

[127]  Accordingly, Count VIII, the objection to allowance of Fincke's claims, is moot.

164