# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>Debtor | Chapter 11<br>Case No. 05-40809-HJB |
| ACCESS CARDIOSYSTEMS, INC., NORTH AMERICAN ENTERPRISES, INC., JOHN MORIARTY AND ASSOCIATES, JOHN J. MORIARTY, RICHARD F. CONNOLLY, JR., AND JOSEPH R. ZIMMEL,<br><br>Plaintiffs,<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ACCESS CARDIOSYSTEMS, INC.,<br><br>Plaintiffs-Intervenors,[1]<br><br>v.<br><br>RANDALL FINCKE,<br><br>Defendant | Adversary Proceeding<br>No. 05-4076-HJB |

---

[1] The Official Committee of Unsecured Creditors (the "Committee") was granted leave to intervene in the present case, but that intervention was predicated on its desire to protect the interests of unsecured creditors in the event of a settlement. As no settlement has yet been proposed, the Committee has remained largely inactive in this adversary proceeding and has raised no independent substantive issue.

## MEMORANDUM OF DECISION

Before the Court is a motion for summary judgment (the "Summary Judgment Motion") filed by Access Cardiosystems, Inc. ("Access"), four of its individual investors (the "Investors"), and the corporate entities through which several of those investments were made (together, the "Plaintiffs").[2]  Through their motion, the Plaintiffs seek an award of damages based on this Court's previous findings and rulings on liability with regard to their claims against Randall Fincke, former Access shareholder, officer, and director.  See Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 404 B.R. 593 (Bankr. D. Mass. 2009).  The issue now presented is whether, in light of the Court's ruling that Fincke violated Massachusetts General Laws ch. 110A, § 410(a)(2) ("§ 410(a)(2)")[3], the Investors are entitled to rescind their investment transactions as a matter of law.

---

[2] Those Investors are: (1) John J. Moriarty, who made some of his investments through John Moriarty & Associates (a company for which he serves as principal); (2) Richard F. Connolly; (3) James Radley, who made his investments through North American Enterprises, Inc. and Eastern Casualty Insurance (companies owned and controlled by Radley); and (4) Joseph Zimmel.

[3] Section 410(a)(2) creates civil liability for any person who:

> offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . .

Mass. Gen. Laws ch. 110A, § 410(a)(2).

I.   FACTS AND TRAVEL OF THE CASE[4]

Access Cardiosystems, Inc., was formed in 2000 by Randall Fincke (with the assistance of others) to develop, market, and sell a portable automated external defibrillator (the "Access AED"). From 2001 through the date of confirmation of its Chapter 11 plan,[5] Access's operations, including as debtor-in-possession in the underlying bankruptcy case, were substantially funded by its individual Investors through various loans and stock purchases.[6]

In April 2003, as a result of the conversion of much of the Investors' debt to equity and their purchase of additional Access stock, Fincke ceded his majority ownership of Access to the Investors (the "April 2003 Transaction"). Coincident with the April 2003 Transaction, a formal Board of Directors was established, comprised of Radley, Moriarty, Zimmel, and Fincke. Over the course of the ensuing months, tension and suspicions regarding Fincke's perceived misrepresentations and mismanagement of Access grew, and in November 2003, the Board voted to relieve Fincke of his executive and managerial

---

[4] The Court will not repeat all of the history of Access and the multifaceted dispute between the Plaintiffs and Fincke detailed in its previous memoranda, see Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 340 B.R. 127 (Bankr. D. Mass. 2006) ("Access I"); Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 404 B.R. 593 (Bankr. D. Mass. 2009) (Access II"), but will emphasize here those facts necessary to determine the summary judgment question now before the Court.

[5] Access's Second Amended Plan of Reorganization was confirmed on May 25, 2007. See Findings of Fact, Concl. of Law & Order Confirming Access Cardiosystems, Inc's 2d Am. Plan of Reorg., In re Access Cardiosystems, Inc., Case No. 05-40809-HJB (Bankr. D. Mass. May 25, 2007), ECF No. 466. The Court has not been presented with any information with respect to Access's operations or fortunes postconfirmation – nor would such information be relevant to the determinations made here.

[6] As the Court noted in Access II, the use of the term "investment" by the parties and the Court is a liberal one, and not necessarily intended to characterize the advance as debt or equity except where otherwise indicated. See Access II, 404 B.R. at 611 n.15.

3

positions. Fincke ultimately rejected the Board's offer to position him as Access's Chief Technology Officer and non-executive Chairman of the Board, and he left the company in January 2004. Shortly thereafter, Access exercised its rights under its stockholder agreement with Fincke, repurchasing all of Fincke's shares in Access for $1.00.

Disputes between the Plaintiffs and Fincke did not end there, however. In response to Fincke's assertion some months later that he owned the intellectual property related to the Access AED (the "Intellectual Property"), the Plaintiffs filed suit against Fincke in the Massachusetts Superior Court. In the Superior Court action, the Plaintiffs sought a declaratory judgment that Access, and not Fincke, owned the Intellectual Property and also asserted several claims against Fincke for his alleged breach of fiduciary duties, fraud, negligent misrepresentation, and securities fraud. Fincke counterclaimed, seeking declaratory determinations that he owned the Intellectual Property and that the purported repurchase of his Access stock was invalid. Fincke also sought damages on various breach of fiduciary duty, breach of contract, promissory estoppel, and wrongful discharge theories.

While that suit was pending, the struggling company suffered its final blow – the recall of substantially all of the Access AEDs. And, on February 8, 2005, Access filed for protection under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code"), 11 U.S.C. §§ 101 et seq. Fincke subsequently removed the pending Superior Court action to this Court. See Fed. R. Bankr. P. 9027.

On March 31, 2006, this Court issued a memorandum of opinion and partial judgment on the parties' cross-motions for summary judgment. See Access I, 340 B.R. 127. That judgment disposed of the contested ownership of the Intellectual Property. The

Court ruled that Access, and not Fincke, rightfully owned the Intellectual Property, and Fincke was ordered to assign any rights he held in the Intellectual Property to Access. Id.

Following the partial summary judgment ruling, the parties agreed to bifurcate the remaining claims – trying issues of liability first and then, to the extent necessary, trying issues related to damages. A lengthy trial on liability ensued, and on April 17, 2009, the Court issued a memorandum of opinion and partial judgment on the parties' remaining claims. See Access II, 404 B.R. 593. At the conclusion of trial, the Court found and ruled for the Investors and Access with regard to each of the Counterclaims. Id. at 699. The Court also ruled that Fincke had breached his fiduciary duties to Access in two respects: (1) by receiving reimbursements for personal expenses charged to his company credit cards, id. at 694, and (2) "by causing the company to repay its [debts to] him at a time when Access was desperately in need of cash and without disclosure to and the consent of disinterested shareholders or the Board." Id. at 699. As to the remainder of the Plaintiffs' claims, the Court found and ruled for Fincke on each, "with the exception of its findings and rulings that Fincke [wa]s liable . . . for fraud, negligent misrepresentation, and violation of § 410(a)(2) on account of the false statement in the Business Plan [dated October 2002] that Access was advised by its patent counsel that its product did not infringe any patents known to him . . . ." Id. at 698-99.

The Investors have now filed their Summary Judgment Motion on the issue of damages, to which Fincke objects. The issue to be decided is fairly narrow. The Plaintiffs have waived any claims for damages arising from Access's repayment of personal expenses charged on Fincke's credit cards. Hr'g Tr. 14:18-19, June 3, 2010. And Fincke has waived any objection to the entry of judgment for Access in the amount of $281,534.62

for Fincke's causing Access to repay his personal loans to the company in violation of his fiduciary duties. Hr'g Tr. 14:4-12. The sole remaining issue is whether the Investors are entitled to rescind all of their investment transactions and recover the total of their investments in Access on account of Fincke's violation of § 410(a)(2).[7]

## II.   POSITIONS OF THE PARTIES

### A.   The Investors

The Investors assert that the calculation of damages is simple, straightforward, and capable of summary determination. According to the Investors, because the Court has ruled that Fincke violated § 410(a)(2), the Investors are entitled to rescind their investment transactions and to recover the total of their prepetition investments, plus their debtor-in-possession financing, in addition to interest, attorneys' fees, and costs.[8] Citing the Massachusetts Supreme Judicial Court's (the "SJC") decision in Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1026 (Mass. 2004), the Investors say that "by making material misrepresentations in violation of Section 410(a)(2), Fincke became an insurer for Plaintiff investors' losses. . . . Accordingly, the risk shifted to Fincke that he would be liable for the full amount of Plaintiff investors' contributions under Section 410(a)(2)." Pl.'s Mem. in Supp. of Mot. for Summ. J. as to Damages, at 9-10, May 7, 2010.

---

[7] Although the Court also ruled that Fincke was liable for fraud and negligent misrepresentation for the misstatement contained in the Business Plan, the Investors have addressed their Summary Judgment Motion solely to the damages recoverable on account of Fincke's violation of § 410(a)(2).

[8] In the Summary Judgment Motion, the Investors assert that the total amount of prepetition investments is in excess of $20 million, although the total of their postpetition debtor-in-possession financing, attorneys' fees, and costs had not yet been calculated.

**B.    Fincke**

Fincke objects to the Summary Judgment Motion on two major grounds. First, Fincke argues that the Investors are not entitled to rescission under § 410(a)(2), because they did not timely offer to tender the securities and because rescission would be patently inequitable given the intervening time and changes in circumstance, including the Investors' long-standing control of Access. Second, Fincke says that even if rescission were an available remedy, the Investors may only recover for those sales of securities traceable to the material misstatement in the Business Plan. Since, according to Fincke, the question of which transactions are traceable to the misstatement is a disputed question of material fact, summary judgment should be denied.

III.    DISCUSSION

    **A.    Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c)(2), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, summary judgment should be granted where "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." If, under applicable law, a disputed fact is material to the outcome of the suit, the issue is "genuine," and summary judgment should be denied. See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).

B.    **Remedies under § 410(a)(2)**

Section 410(a)(2) creates "civil liability for sales [of securities] by means of fraud or misrepresentation," Marram, 809 N.E.2d at 1025 (quoting L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 410(a), at 147 (1976)), and provides a "'heightened deterrent against sellers [of securities] who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser,' regardless of the actual cause of the investor's loss." Id. at 1025 (citing Casella v. Webb, 883 F.2d 805, 809 (9th Cir. 1989) (interpreting § 12(2) of the Securities Act of 1933[9])). In Access II, this Court found and ruled that Fincke violated § 410(a)(2) when he made a material misstatement in the October 2002 Business Plan that Access had been advised by its patent counsel that its product did not infringe on any patents known to him. In fact, Fincke had neither sought nor received any such advice. See Access II, 404 B.R. at 666.

The remedy for a violation of § 410(a)(2) is provided for by subsection (a), which provides that any person found to have made a material misstatement under subsection (2),

---

[9] Decisions under the federal securities laws are relevant to the interpretation of § 410(a)(2). As the SJC has noted, since § 410(a)(2) "'is almost identical with § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2)'. . . , we look to Federal decisions under § 12(2), as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of [§ 410(a)(2)]." Marram, 809 N.E.2d at 1025; see also Access II, 404 B.R. at 641 n.64; Bergeron v. Ridgewood Sec. Corp., 610 F. Supp. 2d 113, 134 n.10 (D. Mass. 2009); Birch v. Choinski (In re Choinski), 214 B.R. 515, 523 (1st Cir. B.A.P. 1997), aff'd 187 F.3d 621 (1st Cir. 1997)); Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 684 n.9 (D. Mass. 1993) ("The Massachusetts securities laws ('the Blue Sky Laws') are substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well.") (citing Quincy Co-Op. Bank v. A.G. Edwards & Sons, Inc., 655 F. Supp. 78, 87 (D. Mass. 1986); Valley Stream Teachers Fed. Credit Union v. Comm'r of Banks, 384 N.E.2d 200, 208 (Mass. 1978)); Feldman v. Aspen Tech., Inc., 22 Mass. L. Rptr. 341, 2007 WL 1089220, *5 (Mass. Super. Ct. March 3, 2007); Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 15 Mass. L. Rptr. 542, 2002 WL 31875204, *31(Mass. Super. Ct. Dec. 16, 2002) (citing Cabot Corp. v. Baddour, 477 N.E.2d 399, 400-01 (Mass. 1985), superseded by statute, Mass. Gen. Laws ch. 93A, §§ 2, 9 (West 2006)).

> is liable to the person buying from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition.

Mass. Gen. Laws ch. 110A, § 410(a). Contract damages, punitive damages, and multiple damages are not recoverable. Marram, 809 N.E.2d at 1028 (citing Cabot, 477 N.E.2d at 401). Thus, a plaintiff who has proved a violation of § 410(a)(2) may recover in one of two ways: the plaintiff may tender the security and recover the consideration paid for the security (rescission), or the plaintiff may seek damages. See Adams v. Zimmerman, 73 F.3d 1164, 1173 (1st Cir. 1996) (plaintiffs were entitled to rescission or damages, but could not elect damages remedy while retaining the security as an off-set against uncollectible portion of damages).

In some cases, awarding rescission under § 410(a) is truly straightforward. And in those cases, a summary ruling on rescission may be appropriate when a violation of § 410(a) is established. See, e.g., Sampson v. Invest America, Inc., 754 F. Supp. 928, 934-35 (D. Mass. 1990). In other cases, however, complicated facts and unusual circumstances are not so easily reconciled with the statutory language. Here, for instance, although a violation of § 410(a)(2) has been established, the Court is nonetheless inclined to agree with Fincke that the remedy of rescission is no longer available to the Investors. This inclination rests on several factors, including: (1) the failure of the Investors to make an offer of tender or demand for rescission in their initial complaint or in any of the three

9

amended complaints filed in this action;[10] (2) the Investors' failure to seek rescission within a reasonable time after discovery of the facts forming the basis for the claims asserted in the complaint;[11] and (3) the Investors' continued exercise of control over Access, including their vigorous litigation regarding the validity of Access's repurchase of all of Fincke's stock and Access's ownership of the Intellectual Property.[12]

Regardless of whether the remedy of rescission under § 410(a)(2) could have been negated by the foregoing factors, however, rescission is not available to the Investors for a far simpler reason – they no longer own the securities underlying the § 410(a)(2) claim. This Court confirmed Access's Second Amended Plan of Reorganization (the "Plan") on

---

[10] See, e.g., Wigand v. Flo-Tek, Inc., 609 F.2d 1028, 1035 (2d Cir. 1979) (time for demanding rescission is when complaint is filed); Ong v. Sears, Roebuck & Co., 2005 WL 2284285, *16 (N.D. Ill. Sept. 14, 2005) (same); Metz v. United Counties Bancorp, 61 F. Supp. 2d 364, 379 (D.N.J. 1999) (collecting cases) ("[T]o make an offer to tender in a complaint which will satisfy Section 12, the plaintiff must make an explicit demand for rescission, an offer to tender, in the complaint."); Sweeney v. Keystone Provident Life Ins. Co., 578 F. Supp. 31, 33 (D. Mass. 1983) (time for electing rescission remedy is when complaint is filed).

[11] See, e.g.,Occidental Life Ins. Co. v. Pat Ryan & Assoc., Inc., 496 F.2d 1255, 1268 (4th Cir. 1974) (Where buyer of securities was aware of problems but did not request rescission until two and a half years after the discovery, buyer had not acted with reasonable diligence and right of rescission was lost) (citing Baumel v. Rosen, 412 F.2d 571, 574-75 (4th Cir. 1969)); Royal Air Prop., Inc. v. Smith, 312 F.2d 210, 213-14 (9th Cir. 1962) ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."); Gannett Co., Inc. v. Register Publ'g Co., 428 F. Supp. 818, 829 (D. Conn. 1977) ("Even when the magnitude of the fraud is grave, . . . the law has never allowed the defrauded party to experiment with the property or speculate on its value for as long as he likes within the statute of limitations and then force the wrongdoer to take back a changed item."); Chelsea Assoc. v. Rapanos, 376 F. Supp. 929, 943 (E.D. Mich. 1974) (Where investor became head of board of directors and had access to relevant company information, laches barred his claim for rescission under § 10(b) brought 17 months after the purchase of the stock).

[12] See, e.g., Gannett, 428 F. Supp. 818.

May 25, 2007.[13] Pursuant to Article V. § 5.2(g) of that Plan, the Access stock held by the Investors – i.e., the securities at the heart of the § 410(a)(2) claim – was "deemed cancelled, void, *surrendered* and of no further force and effect." (emphasis supplied).[14] By operation of law, pursuant to the language in the confirmed Plan, the Investors' securities have already been "disposed of," Mass. Gen. Laws ch. 110A, § 410(a); the Investors "no longer own the security." Id.[15] Accordingly, the Investors cannot rescind the transactions under § 410(a); their only available remedy is damages.

The consequence of this ruling, however, is minimal, since the calculation of damages under § 410(a) specifically relies on the "amount that would be recoverable upon a tender." Mass. Gen. Laws ch. 110A, § 410(a); see also Randall v. Loftsgaarden, 478 U.S. 647, 656 (1986) (even where the plaintiff's remedy is limited to damages, as opposed to rescission upon tender, "we may assume that a rescissory measure of damages will be employed; the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security.")

### C. Damages under § 410(a)

The Investors have argued that the measure of damages is simple – they are entitled to recover an amount equal to the total amounts invested in or loaned to Access,

---

[13] See Findings of Fact, Concl. of Law & Order Confirming Access Cardiosystems, Inc's 2d Am. Plan of Reorg., In re Access Cardiosystems, Inc., Case No. 05-40809-HJB (Bankr. D. Mass. May 25, 2007), ECF No. 466.

[14] See Access Cardiosystems, Inc.'s 2d Am.Plan of Reorg., at 12, In re Access Cardiosystems, Inc., Case No. 05-40809-HJB (Bankr. D. Mass. May 18, 2007), ECF No. 457 Ex.A.

[15] See also Peacock v. 21st Century Wireless Grp., 285 F.3d 1079, 1085-86 (8th Cir. 2002) (stock traded to company-seller in return for other securities was no longer in existence and could not be returned; thus, rescission – or return to status quo ante – was not possible and remedy would be damages measured as value of the consideration).

both pre- and postpetition. The Court disagrees. The plain language of § 410(a)(2) limits liability to instances where securities were sold "*by means of*" a material misstatement. Mass. Gen. Laws ch. 110A, § 410(a)(2). Indeed, this Court has already found that Fincke made a material misstatement, and understands that the Investors need not prove reliance on that statement or loss causation to recover for the § 410(a)(2) violation. But the statutory language nonetheless limits recovery to those transactions where the misstatement can be connected to the sale of securities. See Marram, 809 N.E.2d at 1025 (§ 410(a) is to be interpreted according to the plain language of the statute).

This "nexus" requirement has been long recognized under the federal securities laws, especially with regard to the "in connection with" requirement under § 10(b) of the Securities Exchange Act of 1934. As one commentator has noted, "[t]he 'in connection with' language serves to identify the outer limit of those misrepresentations and omissions which will be actionable [under § 10(b)] . . . . The 'by means of' language accomplishes the same function under Section 12(a)(2) of the 1933 Act [and] Section 410(a)(2) of the 1956 Uniform Act . . . .Therefore, absent case law discussing 'by means of,' it is proper to take guidance from those cases interpreting 'in connection with.'" Joseph C. Long, 12A Blue Sky Law § 9:117.45 (Westlaw 2010).

And case law interpreting the "in connection with" requirement is clear that the misstatement (or fraud) must relate to a *particular* securities transaction, even if the plaintiff need not prove reliance on the misstatement or prove that the misstatement caused the plaintiff's loss. See, e.g. Gandhi v. Sitara Capital Mgmt., LLC, 689 F. Supp. 2d 1004, 1011-12 (N.D. Ill. 2010) (Under § 10(b), "plaintiffs must somehow link the deceptive conduct . .

. to a relevant securities transaction."). As the Alabama Supreme Court explained in Buffo v. State:

> courts should be careful not to confuse the civil fraud concepts of reliance, privity, causation, and the purchaser-seller requirement with the connection or nexus requirement. When nexus is the issue to be determined, the essence of the question becomes whether the fraud has a sufficiently close relationship to the purchase or sale of the security to make it actionable.

415 So.2d 1158, 1164 (Ala. 1982) (discussing the meaning of "in connection with" under the Alabama Securities Act).[16]

Here, the Investors are not required to demonstrate reliance on Fincke's misstatement in the October 2002 Business Plan. Nor are they required to show the misstatement caused any loss. But, in order to recover damages on account of Fincke's misstatement, they must still show that one or more particular sales of securities were made "by means of" the misstatement. Because this indubitably material question of fact – i.e., which transaction or transactions, if any, involved the sale of securities to the Investors "by means of" Fincke's misstatement – remains in dispute, the request for summary judgment must be denied.

---

[16] See also Alley v. Miramon, 614 F.2d 1372, 1378 n.11 (5th Cir. 1980) ("The 'in connection with' requirement of Rule 10b-5 is flexibly applied to require that there be a nexus between the defendant's fraud and the plaintiff's sale of securities."); Gandhi, 689 F. Supp. 2d at 1012; Konstantinakos v. FDIC, 719 F. Supp. 35, 37-38 (D. Mass. 1989) (Under 10b-5, a misrepresentation or omission is actionable where there is a purchase or sale of a security connected with the challenged statement.) (citing Blue Chip Stamps v. Manor Drug Store, 421 U.S. 723, 737-38 (1975)); Utah v. Harry, 873 P.2d 1149, 1156 (Utah Ct. App. 1994) (quoting, citing Buffo) Arnold S. Jacobs, Disclosure and Remedies under the Securities Laws, § 9:3 (Westlaw 2010) ("[T]he 'in connection with' clause requires a nexus between the fraud and the purchase or sale. . . . This nexus should be distinguished from causation, reliance, and the test to determine what is misleading. Causation concerns the relationship between the fraud and plaintiff's loss. Reliance is a question of whether the plaintiff believed the statement to be true. . . . Whether the nexus is satisfied is a fact question measured by an objective standard . . . .").

Case 05-04076    Doc 293    Filed 10/14/10    Entered 10/14/10 10:46:27    Desc Main
            Document      Page 14 of 14

IV.     CONCLUSION

Although the Investors are not entitled to rescission under § 410(a)(2), they may be entitled to damages on account of Fincke's material misstatement contained in the Business Plan dated October 2002.  Because the question of which sale of securities was made "by means of" that material misstatement is a disputed question of material fact, the Investors' Motion for Summary Judgment will be DENIED.  An order in conformity with this memorandum shall issue forthwith.

Dated: October 14, 2010              _____
                                      Henry J. Boroff
                                      United States Bankruptcy Judge