# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 05-40809-HJB |
| ACCESS CARDIOSYSTEMS, INC., ) | |
| ) | |
| Debtor ) | |
| ) | |
| ACCESS CARDIOSYSTEMS, INC., ) | Adversary Proceeding |
| NORTH AMERICAN ENTERPRISES, ) | No. 05-4076 |
| INC., JOHN MORIARTY AND ) | |
| ASSOCIATES, JOHN J. MORIARTY, ) | |
| RICHARD F. CONNOLLY, JR., AND ) | |
| JOSEPH R. ZIMMEL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF ) | |
| ACCESS CARDIOSYSTEMS, INC., ) | |
| ) | |
| Plaintiffs-Intervenors,[1] ) | |
| ) | |
| v. ) | |
| ) | |
| RANDALL FINCKE, ) | |
| ) | |
| Defendant ) | |

---

[1] The Official Committee of Unsecured Creditors (the "Committee") was granted leave to intervene in the present case, but that intervention was predicated on its desire to protect the interests of unsecured creditors in the event of a settlement.  As no settlement has been proposed, the Committee has remained largely inactive in this adversary proceeding and has raised no independent substantive issue.

1

## MEMORANDUM OF DECISION

The matter at hand requires this Court to visit, once again, the protracted contest between Access Cardiosystems, Inc. ("Access"), together with certain of Access's individual investors (the "Investors"), and Access's founder and former shareholder, officer, and director, Randall Fincke.  Through their complaint, as amended (the "Complaint"), Access and the Investors sought damages for, *inter alia*, Fincke's alleged violation of Massachusetts securities law and breaches of his fiduciary duty owed to the Investors and to Access.  The Court has earlier ruled that Fincke did breach certain of his fiduciary duties to Access and, in one instance, violated Massachusetts General Laws ch. 110A, § 410(a)(2) ("§ 410(a)(2)").  Fincke has waived any further contest to the entry of judgment on account of the fiduciary duty breaches in an amount which the Court has earlier determined.  But the Court still must determine what, if any, damages are recoverable by the Investors on account of Fincke's violation of § 410(a)(2).

I.    FACTS AND TRAVEL OF THE CASE[2]

Access Cardiosystems, Inc., the debtor in the underlying Chapter 11 case, was formed in 2000 by Randall Fincke (with the assistance of others) to develop, market, and sell a portable automated external defibrillator (the "Access AED").  Initially, Access's start-up costs

---

[2] Given the extensive factual recitations contained in this Court's previous memoranda, see Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 340 B.R. 127 (Bankr. D. Mass. 2006) ("Access I") and Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 404 B.R. 593 (Bankr. D. Mass. 2009) ("Access II"), and partially summarized in Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 438 B.R. 16 (Bankr. D. Mass. 2010) ("Access III"), the Court has endeavored here to emphasize only those facts necessary to determine the limited issues presently before the Court.  The findings and rulings made in those earlier memoranda, however, are incorporated herein by reference.

were funded by advances made by Fincke and Gregory Baletsa,[3] but these early investments soon proved insufficient.  In the spring of  2001, Access received its first outside investment,[4] in the amount of $50,000, from John J. Moriarty, one of Fincke's close personal friends.  Moriarty then made two additional investments in 2001: $1,000,000 in July and $500,000 in December.[5]

Fincke also reached out to another personal acquaintance, Richard F. Connolly, Jr., who invested $500,000 in Access in November 2001.[6]  And in April 2002, both Moriarty and Connolly each invested $300,000 in Access,[7] followed by additional investments in May and June.[8]  In the spring of 2002, Connolly began discussing Access with his close friend, James Radley, who agreed to meet with Fincke regarding a potential investment.  Following that meeting, Radley invested $2 million in Access on June 14, 2002.[9]

---

[3] Baletsa was Access's first president.  He joined with Fincke to assist in forming Access's business framework and eventually left his position as president and discontinued his work with Access in April 2001.

[4] As the Court noted in <u>Access II</u>, the use of the term "investment" by the parties and the Court is a liberal one, and not necessarily intended to characterize the advance as debt or equity except where otherwise indicated.  <u>See</u> <u>Access II</u>, 404 B.R. at 611 n.15.

[5] Moriarty made these and subsequent investments through John Moriarty and Associates ("JMA").  Unless a distinction is required, Moriarty will be referred to as the "investor" regarding both his and JMA's loans.  According to a summary of outstanding promissory notes (the "Note Summary"), included in Pl.'s Ex. 110, both investments were documented by convertible promissory notes.

[6] The Note Summary characterizes this loan as documented by a convertible promissory note.

[7] These loans are also characterized as documented by convertible promissory notes in the Note Summary.

[8] These investments are characterized as non-convertible promissory notes in the amounts of $75,000 loaned by Connolly in May and $250,000 and $300,000 loaned by Moriarty in May and June, respectively.

[9] This loan is memorialized by a convertible promissory note in the amount of $2 million payable to Eastern Casualty Insurance ("Eastern Casualty").  Radley's investments were made through Eastern Casualty and North American Enterprises, Inc. ("North American Enterprises"), companies owned and

Despite these substantial investments made in late 2001 and early 2002, working capital constraints plagued Access, which continued to struggle with paying past-due vendor accounts and securing the raw materials necessary to manufacture the Access AED. With an eye toward obtaining additional investments in Access, Fincke, together with Access's management team and its corporate counsel, Michael Elefante, prepared an investor letter and a business plan dated October 2002 (the "Business Plan"). Each of the then extant investors – Connolly, Moriarty, and Radley – received a copy of the Business Plan.

Joseph Zimmel, a potential investor introduced to Access by a company manager, also received a copy of the Business Plan in the fall of 2002, when he met with Fincke to discuss a possible investment in Access. Following that meeting, Zimmel invested $2 million in Access in three tranches: a $1,000,000 stock purchase in October 2002, a $500,000 stock purchase in November 2002, and a $500,000 loan in December 2002. See Access Cardiosystems Loan/Equity Investment Summary, Def.'s Ex. 1.

But notwithstanding these new cash infusions, things were still not going well, and in March 2003, Moriarty invested an additional $250,000 in Access while Elefante and Fincke began negotiations with the Investors to secure additional financing for the company. In connection with these negotiations, the Investors received a new document titled "Access CardioSystems Company Overview" (the "Company Overview"). In a March 2003 email to the Investors, Fincke outlined several financing options (including financing from other sources), and the Investors responded with a proposal to invest an additional $2 million in Access, contingent upon changes in the company's governance and conversion of some of the Investors' outstanding debt to equity. Various email exchanges ensued between Elefante,

---

controlled by Radley. For simplicity, the Court will refer Radley as the "investor" in regard to these entities.

Fincke, and the Investors, as confusion arose regarding the terms of the additional financing. After some tense correspondence regarding the Investors' insistence on conversion of debt to equity and Fincke's initial reluctance to accept the Investors' proposed terms, a consensus was ultimately reached.

The additional financing from the Investors closed on April 25, 2003 (the "April 2003 Transaction"). Through the April 2003 Transaction, certain of the Investors' original notes were converted to stock and the Investors purchased additional stock as follows:

> Radley: $2 million previous investment plus interest converted to stock; $500,000 in new shares purchased;

> Moriarty: $250,000 in new shares purchased;

> Connolly: $875,000 previous investment plus interest converted to stock; $500,000 in new shares purchased;

> Zimmel: $500,000 previous investment converted to stock; $500,000 in new shares purchased.

See April 2003 Transaction Closing Documents, Pl.'s Ex. 110.

As a result of the conversion of much of the Investors' debt to equity and their purchase of additional Access stock, Fincke ceded his majority ownership of Access to the Investors. Coincident with the April 2003 Transaction, a formal Board of Directors (the "Board") was established, comprised of Radley, Moriarty, Zimmel, and Fincke. Following the establishment of the Board, the Investors began to suspect Fincke of various misrepresentations and mismanagement of Access. And in November 2003, the Board voted to relieve Fincke of his executive and managerial positions.[10]

---

[10] Fincke ultimately rejected the Board's offer to position him as Access's Chief Technology Officer and non-executive Chairman of the Board, and he left the company in January 2004. Shortly thereafter, Access, through the Board, exercised its rights under its stockholder agreement with Fincke, repurchasing all of Fincke's shares in Access for $1.00.

Some months later, on July 6, 2004, the Investors and Access (together, the "Plaintiffs") filed suit against Fincke in the Massachusetts Superior Court in response to Fincke's assertion that he owned the intellectual property related to the Access AED (the "Intellectual Property"). With regard to the Intellectual Property, the Plaintiffs sought a declaratory judgment that Access, and not Fincke, owned the Intellectual Property underlying the Access AED.  They also asserted several claims against Fincke for alleged breaches of fiduciary duty, fraud, negligent misrepresentations, and securities fraud.  Fincke counterclaimed, seeking declaratory determinations that he owned the Intellectual Property and that the purported repurchase of his Access stock was invalid.  Fincke also sought damages on various breach of fiduciary duty, breach of contract, promissory estoppel, and wrongful discharge theories.

While that suit was pending, Access filed for protection under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[11] on February 8, 2005.  Fincke subsequently removed the pending Superior Court action to this Court.  See Fed. R. Bankr. P. 9027.  Throughout the relevant time period, the Investors continued to fund Access's operations, including as debtor-in-possession in the Chapter 11 case. [12]  Between the closing of the April 2003 Transaction through June 30, 2005, Radley invested an additional $6,862,549 in Access, Moriarty invested an additional $1,050,000, Connolly invested an additional $2,100,000, and Zimmel invested an additional $1,630,000.  Through June 30, 2005, the Investors funded Access through various loans and stock purchases in the following total amounts:

---

[11] See 11 U.S.C. §§ 101 et seq.

[12] Access's Second Amended Plan of Reorganization was confirmed on May 25, 2007.  See Findings of Fact, Concl. of Law & Order Confirming Access Cardiosystems, Inc's 2d Am. Plan of Reorg., In re Access Cardiosystems, Inc., Case No. 05-40809-HJB (Bankr. D. Mass. May 25, 2007), ECF No. 466. The Court has not been presented with any information with respect to Access's operations or fortunes postconfirmation – nor would such information be relevant to the determinations made here.

Radley: $9,362,549

Moriarty: $3,900,000

Connolly: $3,400,000

Zimmel: $4,130,000

<u>See</u> Def.'s Ex. 1.

On March 31, 2006, this Court issued a Memorandum of Decision and Partial Judgment on the parties' cross-motions for summary judgment. <u>See</u> <u>Access I</u>, 340 B.R. 127. That judgment disposed of the contested ownership of the Intellectual Property. The Court ruled that Access, and not Fincke, rightfully owned the Intellectual Property, and Fincke was ordered to assign any rights he held in the Intellectual Property to Access. <u>Id.</u>

Following the partial summary judgment ruling, the parties agreed to bifurcate the remaining claims – trying issues of liability first and then, to the extent necessary, trying issues related to damages. A lengthy trial on liability ensued, and on April 17, 2009, the Court issued a Memorandum of Decision and Partial Judgment on the parties' remaining claims. <u>See</u> <u>Access II</u>, 404 B.R. 593. At the conclusion of trial, the Court found and ruled for the Plaintiffs with regard to each of Fincke's Counterclaims. <u>Id.</u> at 699. The Court also ruled that Fincke had breached his fiduciary duties to Access in two respects: (1) by receiving reimbursements for personal expenses charged to his company credit cards, <u>id.</u> at 694, and (2) "by causing the company to repay its [debts to] him at a time when Access was desperately in need of cash and without disclosure to and the consent of disinterested shareholders or the Board." <u>Id.</u> at 699. As to the remainder of the Plaintiffs' claims, the Court found and ruled for Fincke on each, "with the exception of its findings and rulings that Fincke [wa]s liable . . . for fraud, negligent misrepresentation, and violation of § 410(a)(2) on account of the false statement in

the Business Plan [dated October 2002] that Access was advised by its patent counsel that its product did not infringe any patents known to him . . . ." Id. at 698-99.[13]

Following this Court's findings and ruling on liability, the Plaintiffs waived any claims for damages arising from Access's repayment of personal expenses charged on Fincke's credit cards, Summ. J. Hr'g Tr. 14:18-19, June 3, 2010, and Fincke waived any objection to the entry of judgment for Access in the amount of $281,534.62 for Fincke's causing Access to repay his personal loans to the company in violation of his fiduciary duties, id. at 14:4-12. On the remaining narrow issue of damages on account of this Court's finding that the false statement in the Business Plan gave rise to liability under § 410(a)(2), the Plaintiffs filed a motion for summary judgment, to which Fincke objected. In that motion, the Investors addressed their arguments solely toward the damages recoverable on account of Fincke's violation of § 410(a)(2), arguing that they were entitled, as a matter of law, to rescind all of their investment transactions and recover the total of their investments in Access.

In its Memorandum of Decision and Order dated October 14, 2010, this Court ruled that: (1) rescission was not available to the Investors because they no longer owned the securities underlying the § 410(a)(2) claim, the stock having been terminated in the Debtor's confirmed plan of reorganization, Access III, 438 B.R. at 23; and (2) nonetheless, the Investors were entitled to damages calculated as the "amount that would be recoverable upon a tender," but

---

[13] Section 410(a)(2) creates civil liability for any person who:

> Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . .

Mass. Gen. Laws ch. 110A, § 410(a)(2).

only as to those sales of securities made "by means of" the misstatement in the Business Plan,
id. at 24-25.  Relying on the plain language of § 410(a)(2), the Court ruled:

> in order to recover damages on account of Fincke's misstatement, [the Investors]
> must still show that one or more particular sales of securities were made "by
> means of" the misstatement.  Because this indubitably material question of fact –
> i.e., which transaction or transactions, if any, involved the sale of securities to the
> Investors "by means of" Fincke's misstatement – remains in dispute, the request
> for summary judgment must be denied.

Id.

On April 15, 2011, this Court held an evidentiary hearing on the question of damages.

Five witnesses testified – each of the four Investors and Fincke.  Following the trial, the parties

were given an opportunity to file proposed findings of fact and conclusions of law, which each

have done.  In addition, Fincke has since filed a motion asking the Court to reconsider its

original finding and ruling that Fincke violated § 410(a)(2) by making a material misstatement

in the Business Plan (the "Motion to Reconsider").  The Investors, of course, have objected.

This Memorandum addresses both the Motion to Reconsider and the issue of damages – now

completing what is, hopefully, the final chapter in this years-long litigation between Access, its

Investors, and Randall Fincke.


II.    POSITIONS OF THE PARTIES

   **A.  The Motion to Reconsider**

Fincke asks this Court to reconsider its finding and ruling that Fincke violated § 410(a)

when he falsely stated in the Business Plan that Access had been advised by its patent

counsel that its product did not infringe any patents known to him – when in fact no such

advice was given.   Fincke's argument is premised on the Investors' testimony during the

damages trial to the effect that they did not understand from the Business Plan that the advice

was a "formal" opinion.   Accordingly, Fincke maintains, this Court's conclusion that the Business Plan contained a misstatement was based on the erroneous assumption that the Investors believed the Business Plan's language referred to a "formal" opinion by patent counsel.   According to Fincke's testimony at the damages trial, he *had* been personally told by patent counsel that the Intellectual Property did not infringe any other patents, and thus he concludes that the Investors were not misled by the Business Plan.

The Investors object to reconsideration on two grounds.   First, they say the request is untimely under relevant rules of bankruptcy and federal civil procedure.   Second, they disagree that the Court's ruling was based on any distinction between a "formal" and "informal" opinion. Rather, the Investors maintain that the reference in the Business Plan to Access having been "advised by" patent counsel was false in respect to either a formal or informal opinion of patent counsel.   The Investors argue instead that the Court's ruling was based on the finding that *no* such advice was given, formally or informally, and thus the statement was false.

### B. Damages

Relying on broad principles derived from interpretations of the "in connection with" requirement under § 10(b) of the Securities Exchange Act of 1934, the Investors say that their entitlement to the return of all of their post-October 2002 investments is nearly conclusively established by the simple fact that the investments were made after Fincke made the material misstatement in the Business Plan.   They base this argument on the statement in a leading treatise that: "if the misrepresentation or omission takes place before the sale, few cases have found a lack of the necessary nexus . . . It should be obvious that virtually all Sections 12(a)(2), 410(a)(2), and 509(b) cases will meet the test if the misrepresentations are made before the sale."   Pl.'s Proposed Findings of Fact and Conclusions of Law 7 ¶ 32 (quoting 12A Joseph C.

10

Long, Blue Sky Law, § 9:117.45), June 20, 2011, ECF No. 304.  The Investors further argue that their the pre-October 2002 investments are likewise recoverable because they refrained from calling their notes and eventually converted their loans to equity through purchase of Access stock in April 2003, *after* the dissemination of the Business Plan.

And to demonstrate a more concrete connection between the misstatement in the Business Plan and all subsequent investments, the Investors point to their testimony at the damages trial to the effect that they *relied* on the misstatement in making each and every investment in Access after October 2002.  The Investors characterize the "by means of" requirement under § 410(a)(2) as a "lower hurdle," and insist that they have met a "higher standard" by establishing their continuing reliance on the misstatement.  Id. at 6, ¶¶ 29, 30.

Fincke urges the Court to reject the Investors' "reliance" argument because, according to Fincke, the Investors' testimony was disingenuous.  Fincke maintains that the Investors' testimony "by rote" that "*every* investment they made, no matter how far in time removed (even three years later) . . . was based centrally on that one statement about patents made in the [Business Plan]" was too incredible to be believed.  Def.'s Mem. of Law in Supp. of Fincke's Mot. to Recons. and to Address the Damages Issue 2-3.

Fincke argues instead that the Investors failed to establish a nexus between the Business Plan and virtually all of their investments.  According to Fincke, the only investments possibly connected to the Business Plan were those made in late 2002, shortly after the distribution of the Business Plan.  Especially given the Investors' assumption of a majority interest in the company in April 2003 and the eventual filing of a patent infringement suit by Philips Electronics in late June 2003, says Fincke, the Investors cannot demonstrate a plausible connection between the false statement in the Business Plan and their later

investments.

III.   DISCUSSION

### A.  The Motion to Reconsider

Fincke has asked the Court to reconsider its finding and ruling that the statement in the October 2002 Business Plan that "Access has been advised by its patent counsel that its product does not infringe any patents known to him . . . ." was a material, false statement that renders Fincke liable under § 410(a)(2).  The Investors argue that reconsideration is foreclosed because the request is untimely.   But the Court need not consider the timeliness argument, because even if the Motion for Reconsideration was timely filed, it should be denied.

In Access II, the Court found that the statement in the Business Plan was a "clear representation of fact," and that:

> [n]either Pandiscio [Access's patent counsel] nor any other attorney had given a formal opinion related to the Access Intellectual Property.  Fincke testified at trial that he discussed the claims [made by Philips] and related his personal conclusion that the Access AED did not infringe any of Philip's patents. Trial Tr. day 3, 90-91.  But this is a far cry from receiving "advice" from counsel on the matter.  And his review, unlike the statement included in the Business Plan, was limited to Philip's patents, and not the universe of potential infringement in the AED field.  As a sophisticated inventor with knowledge of the patenting process and experience with handling intellectual property claims, Fincke knew, or at the very least, should have known, that no such opinion had been formally given.

Access II, 404 B.R. at 666.  Although the Court made reference to an opinion "formally given," the context makes clear that the Court found, based on the testimony at the liability trial, that Pandiscio had given *no* opinion, formal or otherwise, to the effect that Access's product infringed no patent known to him. Although Fincke insisted at the damages trial that he indeed *had* been so advised by Pandiscio, the Court is unable to sufficiently credit that testimony to overcome the conclusions it reached following the testimony of both Pandiscio and Fincke during the liability phase of trial.

To the extent the Investors' testimony during the damages trial regarding their understanding that such advice referred to an informal, rather than formal, opinion differs from their testimony adduced during the liability trial, any such discrepancy is irrelevant. The Court's ruling on liability under § 410(a)(2) was founded in an objective analysis of the truth and materiality of the statement, as the Massachusetts Supreme Judicial Court (the "SJC") has directed. See Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1030 (Mass. 2004). Viewed objectively, the Court found the statement to be false and also found that it would have been material to the average investor, since "[b]y affirmatively representing that a professional in the patent field has reviewed and preliminarily passed muster on the patent soundness of the intellectual property, the risk of those claims is, in the eye of a reasonable investor, greatly reduced." Access II, 404 B.R. at 666. Accordingly, Fincke's Motion for Reconsideration must be denied.

## B.    Damages

Section 410(a)(2) creates "civil liability for sales [of securities] by means of fraud or misrepresentation," Marram, 809 N.E.2d at 1025 (quoting L. Loss, Commentary on the Uniform Securities Act, draftsmen's commentary to § 410(a), at 147 (1976)), and provides a "'heightened deterrent against sellers [of securities] who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser,' regardless of the actual cause of the investor's loss." Id. (quoting Casella v. Webb, 883 F.2d 805, 809 (9th Cir. 1989)). A violation of § 410(a)(2) renders the seller liable to the buyer for:

> the consideration paid for the security together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition.

13

Mass. Gen. Laws ch. 110A, § 410(a)(2).  As just discussed, this Court has previously found and ruled that Fincke violated § 410(a)(2) when he made a material misstatement in the October 2002 Business Plan that Access had been advised by its patent counsel that its product did not infringe on any patents known to him.  In fact, Fincke had neither sought nor received any such advice.  See Access II, 404 B.R. at 666.

Remaining to be determined, therefore, is which, if any, sales of securities were made "by means of" that material misstatement.  See Access III, 438 B.R. at 24 ("The plain language of § 410(a)(2) limits liability to instances where securities were sold "*by means of*" a material misstatement."); Mass. Gen. Laws ch. 110A, § 410(a)(2).  There is little guidance in the case law interpreting the "by means of" language in § 410(a)(2).  But federal court decisions dealing with identical language in § 12(2) of the Securities Act of 1933 ("§ 12(2)")[14] and the analogous "in connection with" language in § 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)")[15]

---

[14] Section 12(2) provides:

  (a) Any person who –
  . . .
    (2) offers or sells a security . . . *by means of* a prospectus or oral communication, which contains an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

    shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l (emphasis supplied).

[15] Section 10(b) provides:

  It shall be unlawful for any person, directly or indirectly, . . .

provide a framework for understanding the "by means of" language in § 410(a)(2).[16]   The

Supreme Court of the United States has opined that the "in connection with" requirement under

§ 10(b) must be construed "not technically and restrictively, but flexibly to effectuate its

remedial purposes,"  <u>SEC v. Zanford</u>, 535 U.S. 813, 819 (2002), and has stated that the "in

connection with" requirement is met where the alleged fraud "coincides" with a securities

transaction, <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit</u>, 547 U.S. 71, 85 (2006), or

where the plaintiff's injury was incurred "as a result of deceptive practices touching [a] sale of

securities," <u>Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.</u>, 404 U.S. 6, 13 (1971).

However, what still remains wanting is a substantial body of case law "etch[ing] more

finely the contours of the 'in connection with' clause" under § 10(b), <u>Ketchum v. Green</u>, 557

F.2d 1022, 1026-27 (3d Cir. 1977), or fleshing out more distinctly the contours of the "by

means of" requirement under § 12(2) or § 410(a)(2).[17]   Notably, this determination does not

---

> (b) To use or employ, *in connection with* the purchase or sale of any security . . ., any
> manipulative or deceptive device or contrivance . . . .

15 U.S.C. § 78j (emphasis supplied).

[16] As this Court explained in <u>Access III</u>:

> This "nexus" requirement has been long recognized under the federal securities
> laws, especially with regard to the 'in connection with' requirement under § 10(b) of the
> Securities Exchange Act of 1934.  As one commentator has noted, "[t]he 'in connection
> with' language serves to identify the outer limit of those misrepresentations and
> omissions which will be actionable [under § 10(b)] . . . . The 'by means of' language
> accomplishes the same function under Section 12(a)(2) of the 1933 Act [and] Section
> 410(a)(2) of the 1956 Uniform Act . . . .   Joseph C. Long, 12A Blue Sky Law § 9:117.45
> (Westlaw 2010).

<u>Access II</u>, 438 B.R. at 24.  As the SJC has noted, "we look to Federal decisions under § 12(2), as well
as to the plain language of the statute and decisions of our appellate courts, for our interpretation of
[§ 410(a)(2)]." <u>Marram</u>, 809 N.E.2d at 1025.

[17] As the Third Circuit Court of Appeals noted in <u>Ketchum</u>, "a few judges have recognized that the
teachings of <u>Bankers Life</u> are hardly refined or capable of facile application."  557 F.2d at 1027.  This is,
perhaps, a natural consequence of idiosyncratic fact patterns and the need for flexibility in application.

require the Investors to prove either reliance or loss causation.  Marram, 809 N.E.2d at 1027.

But there must be "some causal relationship between the challenged communication and the

sale, even if not 'decisive.'"  Jackson v. Oppenheim, 533 F.2d 826, 830 & n.8 (2d Cir. 1976)

(discussing "by means of" provision in § 12(2)); see also Marram, 809 N.E.2d at 1030 n.24

(citing, quoting Jackson).   That is, while the Investors need not prove that the misleading

statement *caused* them to make their investments, they nonetheless must link a particular

securities transaction to the misleading statement; i.e., they must demonstrate that a particular

sale was made "by means of" the statement.  See Jackson, 533 F.2d at 829 ("While appellant

need not prove that the alleged "misleading nature" of [the challenged statement] 'caused' the

eventual purchase of . . . stock, he must still prove that the challenged sale was effected 'by

means of' the communication . . . ."); Gandhi v. Sitara Capital Mgmt., LLC, 689 F. Supp. 2d

1004, 1011-12 (N.D. Ill. 2010) (even if reliance is not required, "plaintiffs must somehow link

the deceptive conduct to the claimed harm and to a relevant securities transaction").

   During the damages trial, each of the Investors attempted to link the entirety of their

investment decisions to the misstatement contained in the Business Plan.  They testified that

they had considered, and relied upon, the misrepresentation in the Business Plan regarding

Access's Intellectual Property in making each and every one of their investments.  None of the

Investors' testimony on this point was credible.  In fact, their mechanistic, knee-jerk responses

to counsel's questioning gave the overall appearance that much of their testimony was wholly

---

But it emphasizes more clearly that, as Judge Wisdom noted In Smallwood v. Pearl Brewing Co., "it is
important that the standard be fleshed out by a cautious case-by-case approach." 489 F.2d 579 (5th
Cir. 1974); see also Pirate Investor, 580 F.3d at 245; Chem. Bank v. Arthur Andersen & Co., 726 F.2d
930 (2d Cir. 1984); Ketchum, 557 F.2d at 1027; In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.,
583 F. Supp. 1388, 1408 (E.D. Pa. 1984).  This Court agrees that, rather than becoming entangled in
the phraseology used to describe the "in connection with" or "by means of" requirement, it is incumbent
on the Court to reach a logical conclusion based on the particular facts of this case.

contrived. [18]

In addition, some of the Investors' direct testimony regarding the Business Plan was contradicted by later testimony on cross examination. For example, Zimmel initially testified that all of his investments in Access were made, in part, in reliance on the misstatement in the Business Plan relative to the Intellectual Property. [19] But Zimmel's response to being shown a

---

[18] Nor was Fincke's testimony in the least elucidating as to which investments were secured by means of the Business Plan. He continued to maintain that he *had* been advised by patent counsel that the Access AED infringed no patents known to him, see Trial Tr. 54:3-55:2; 61:20-62:22, April 15, 2011, essentially disputing the grounds on which the Court initially found him liable under § 410(a)(2). He denied ever having had a copy of the Business Plan that was given to the Investors, and further testified that it was it was not he, but Elefante, that had given the completed Business Plan to the Investors, id. at 56:15-57:19, implying that Elefante had inserted an "addendum" (presumably containing the offending language) after Fincke had drafted his portion and before it was given to the Investors. Id. at 58:14-19, 71:21-2; 72:6-73:23. During the earlier liability trial, however, Fincke was presented with a complete copy of the Business Plan and testified that he believed all the investors had received a copy of the document. Trial Tr. day 7, vol. 1, 7:14-24, Jan. 16, 2008.

[19] During the damages trial, Zimmel testified:

> Q.   And did Mr. Fincke provide you with his October 2nd, 2002 business plan?
> A.   Yes.
> Q.   All right. And did you review that plan prior to making the investment?
> A.   Yes.
> Q.   . . . In that plan, were you aware of the representation made regarding corporate counsel's patent opinion?
> A.   Yes, and it was very important to me.
> Q.   All right. And what role, if any, did that opinion in the investment and in the business plan play in making your investment?
> A.   Well, if it hadn't been in there as that, I wouldn't have done it. I mean, this is a technology investment.
>       . . .
> Q.   Now, again, did you make an equity investment on October 30th, 2002 in the amount of a million dollars?
> A.   Yes.
> Q.   And was that investment made in reliance on, at least in part, the representation regarding intellectual property?
> A.   Yes.
> Q.   Did you make a second investment on November 18th, 2002, --
> A.   Yes.
> Q.   -- in the amount of $500,000?
> A.   Yes.
> Q.   And did you also rely on the same disclosure in making that investment?
> A.   Yes.
> Q.   On April 25th , 2003, did you make a further investment --

copy of the Business Plan belied his earlier testimony that the document was central to all his

investment decisions.    Asked if the exhibit was a copy of the document he was given in

October 2002, Zimmel hesitated, stating:  "Well, this certainly looks like the document that – as

– as it would have been.  I don't specifically recollect whether it is the exact same one, or I saw

a draft, but this is an offering memorandum of the type I would have expected to have seen."

Trial Tr. 14:2-7, April 15, 2011.[20]

---

| | |
|---|---|
| A. | Yes. |
| Q. | -- of $500,000? |
| A. | Yes. . . . |
| Q. | All right.  Did you rely again on the representations that had been made to you? |
| A. | Yes. |
| Q. | And on that same date did you make a second investment of $500,000? |
| A. | Yes. |
| Q. | And did you again rely on the representations that had been made? |
| A. | Yes. |
| | . . . |
| Q. | On April 25th, 2003, did you also convert $500,000 from a note to equity? |
| A. | Yes. |
| | . . . |
| Q. | And was that conversion also made in reliance in part on the representations that had been made to you? |
| A. | Yes. |
| Q. | All right.  Did you subsequently  . . . make further advances to the company? |
| A. | Yes. |
| Q. | All right.  And when were those further advances made, sir? |
| A. | In the subsequent years as we continued to try to keep the company viable. |
| Q. | And would you have made those subsequent advances had you not been advised about the intellectual property? |
| A. | No. |
| | . . . |
| Q. | All right.  And were all of those loans and investments made in connection with your reliance on, at least in part, the representation regarding the intellectual property? |
| A. | Yes. |

Trial Tr. 7:13-12:13, April 15, 2011.

[20] During the earlier liability trial, Zimmel had similarly expressed hesitation when he testified to the identity of the Business Plan, at first testifying that "I don't have a specific recollection of seeing this exact letter, but this would be the sorts of things I'd be interested in knowing."  Trial Tr. day 9, vol. 1, 47:5-7, Feb. 4, 2008.  After being informed by his counsel that it was a copy of the investment letter and the Business Plan received by him and the other Investors, Zimmel testified that his memory was

Moriarty similarly testified that both his decision not to call his loans made prior to

October 2002 and each of his investments made after that time were in partial reliance on the

misstatement regarding Access's Intellectual Property.[21]   Like Zimmel, however, Moriarty's

---

"refreshed" and stated: "Yeah, this looks like the business plan I saw."  Id. at 47:8-18.  And when given
an opportunity to "tell the Court which aspects of a business plan such as this you would find material in
making a determination whether to invest and/or loan money  to a company such as Access
CardioSystems," id. at 47:20-23, Zimmel never referenced the Intellectual Property statement,
answering that:

> Well, I'm looking at the table of contents when you say material -- I would think
> everything, I mean, the business summary, the product, the market, the strategy, the
> competition, the technology, certainly regulatory status for medical product, the
> manufacturing, the management team, risk, and finan -- they're all essential.

Id. at 47:24-48:4.

[21] Moriarty testified at the damages trial, in relevant part:

| | |
|---|---|
| Q. | All right.  When, if ever, did you learn about the October 2nd, 2002 memoranda? |
| A. | I'm sure shortly thereafter because of the investment by Joe Zimmel. |
| Q. | Okay.  And were you provided a copy of that memorandum by Mr. Fincke? |
| A. | Yes. . . . It was for me a confirmation of how good things were. |
| Q. | All right.  And was one of the items in that that was a confirmation, the representation by Mr. Pandiscio corporate patent counsel, that there were no patent infringements? |
| A. | To his knowledge, correct. . . . |
| | . . . |
| Q. | Now, sir, on March 31st, 2003, did you loan an additional $250,000 to the company? |
| A. | I did. . . . |
| Q. | Okay.  Now, sir, at the time in April 2003, were you aware of the recapitalization that was going on with the company? |
| A. | Yes. |
| Q. | Okay.  And did you make any decision with regard to whether or not you would capitalize or call your loans? |
| A. | Because the loans were callable I didn't need to call them at that point in time.  I did invest additional money, as others did, on the same basis as others did going forward. |
| Q. | Was your decision at that time with regard not calling your loans in any way connected with the information provided you in that October memorandum? |
| A. | Indirectly, because there's loans that came ahead of the investors.  So I felt that I was in a very good position having this information, and didn't have any inkling of patent issues, and was concerned about the viability of the company, and I was in a good position of being -- you know, having a loan. |
| Q. | So one of the items that you were aware of and that factored into your decisions regarding your loans and investments in April of 2003 was the information |

confidence faltered during cross examination.  When he was handed a copy of the Business

Plan and asked if he recognized it, he stated "You know, I'm sure I – I'm sure I have seen this

before, but I – I can't testify with specificity exactly when or – I've seen everything in the book.

So can I tell you I got this on a timely basis?  I'm sorry, I can't."  Trial Tr. 25:10-14, April 15,

2011.  And when asked which document contained the representation he purportedly relied on

in connection with his loans, he testified that he could not remember which document it was.

Id. at 25:15-19.

Connolly's testimony also attempted to cast a broad net of reliance on the Business

Plan over all his subsequent investments.[22]  And Radley completed the testimony in the same

---

|     | contained in the offering memorandum regarding the patent. |
| --- | --- |
| A. | Right. |
| Q. | Now you made further advances to the company in 2003, is that correct? |
| A. | Yes. |
|     | . . . |
| Q. | . . . [Y]our loan balance as of 12/31/04 was $3,400,000, is that correct, sir? |
| A. | Yes. |
| Q. | All right.  And at the time you made those advances in 2004, was the representation regarding the patents something you considered in connection with advancing further money? |
| A. | Of course. |
| Q. | Now, sir, . . . directing your attention to the third page of the exhibit under the "Moriarty" column, does that refresh your recollection, sir, that your total invested in this company was $3,900,000? |
| A. | Yes, through that date. . . . Much more subsequently, but through that date. |
| Q. |  -- June 30 of '05. |
| A. | Correct. |
|     | . . . |
| Q. | And of that, 500,000 was equity, is that correct, sir? |
| A. | Yes, sir. |
| Q. | And the balance was loan. |
| A. | Correct. |
| Q. | And in making each and every one of those advances to the company after October 2002, one of the factors you considered in not calling the notes and advancing the equity was the patent opinion that you were advised of. |
| A. | Yes. |

Trial Tr. 20:5-24:9, April 15, 2011.

[22] Connolly's relevant testimony during the damages trial proceeded as follows:

Q.      . . . Mr. Connolly, . . . did you invest $500,000 in Access on or about November 2001?

A.      I did.

Q.      All right.  And did you invest a further $300,000 on or about April 2nd, 2002?

A.      I did.

Q.      And did you invest a further $75,000 on or about May 15th, 2002?

A.      Yes.

Q.      All right.  And were those investments loans at the time you made them?

A.      Yes.

Q.      All right.  And why did you make these loans to the company?

A.      I thought I was helping a friend, and I think I had the same attitude that -- that John Moriarty expressed.

Q.      All right.  And did there come a time when you converted those notes into equity?

A.      Yes.

Q.      And was that in April of 2003?

A.      Right.

Q.      Okay.  And at the time you converted those notes into equity, were you aware of the October 2nd, 2002 business plan?

A.      Yes.

Q.      Had you had any discussions with Mr. Fincke regarding that business plan?

A.      Yes.

Q.      And had you read that business plan?

A.      Yes.

Q.      All right.  And did you give any consideration in making the conversion from loan to equity of the representation in the business plan regarding the Access intellectual property?

A.      Yes.

Q.      All right.  And did that play a role in all of your subsequent decisions to advance money?

A.      Yes.
        . . .

Q.      Now directing your attention to 2004, did you continue to advance funds in 2004?

A.      Yes.

Q.      All right.  And were the advances of money you made in 2004 in part or in any way in connection with the representation regarding intellectual property?

A.      Yes.
        . . .

Q.      All right.  And as of June 23rd, 2005, had you advanced $3,400,000 --

A.      Yes.

Q.      -- to Access?

A.      Yes.

Q.      And were all of these funds advanced, at least in part, in connection with the representation regarding the intellectual property contained in the business plan of 2002?

A.      Yes.

Trial Tr. 28:7-31:8, April 15, 2011.

vein.[23]

---

[23] Radley's relevant damages trial testimony was as follows:

Q.   All right.  Directing your attention to October of 2002, did you receive a copy of the business plan from Mr. Fincke?

A.   Yes.

Q.   And did you have a chance to discuss it with Mr. Fincke?

A.   Yes.  I believe he actually presented it at a meeting with a group of us and -- and went through it bit by bit.

Q.   All right.  And do you recall the representation contained in the business plan regarding the status of the intellectual property?

A.   Yes.  My recollection was the business plan stated, and then further supported by Mr. Fincke, that he had -- actually had an opinion of counsel as to the fact that they were not violating any patents known to him -- "him" being the patent attorney.

Q.   All right.  And in April of 2003, you converted your demand note into equity, is that correct?

A.   Yes.

Q.   All right.  And was the representation contained in that October 2002 business plan regarding the intellectual property a factor you considered in connection with the conversion of your note to equity?

A.   Absolutely.

Q.   All right.  And continuing on in 2003, sir, in April did you also invest an additional $500,000 in equity in the company?

A.   Yes.

Q.   Okay.  And in September of 2003, did you invest additional funds in the company?
     . . .

A.   Yes.
     . . .

Q.   All right.  And were all of these investments you made in 2003, subsequent to April, in any way in connection with the representation made regarding the intellectual property?

A.   Yes.  It was a continuing belief that that . . . was still an accurate statement.

Q.   Okay.  Directing your attention now to 2004, in 2004 did you loan additional funds to the company?

A.   Yes.
     . . .

Q.   All right.  Were all of the advances you made in 2004 up through June made in connection with, in any way, your belief in the veracity of the statement regarding the intellectual property?

A.   Yes, they were.

Q.   Directing your attention to the balance of 2004 . . . All right.  And were all of those funds advanced, at least in part, in connection with your belief in the veracity of that representation?

A.   Yes, they were.
     . . .

Q.   Were the total loans and investments you made in Access as of June 23rd, 2005

Not only did the substance of the Investors' testimony and its delivery undermine their credibility with regard to *which* investments were related to the Business Plan, but their shifting focus from the allegations in the Complaint and testimony during the liability trial to the damages trial is telling.  Initially, in their Complaint, the Investors complained largely of alleged misrepresentations and omissions in the Company Overview given to the Investors in the spring of 2003 and in information subsequently given by Fincke to the Board.  During the liability trial, the testimony almost exclusively focused on those other allegations of fraud.  Now that the Court has rejected most of those claims, the Investors have changed their tune, resurrecting the earlier-drafted Business Plan as the operative document in all their investments.  Thus, instead of elucidating the issue of which investments truly were made in connection with the Business Plan, the Investors have done little more than cast doubt over the entirety of their testimony.

Because the Court finds the Investors' testimony of reliance on the Business Plan not credible, it is left only with an objective analysis of the relation of the investments to the dissemination of the Business Plan to determine which investments, if any, were procured "by means of" the material misstatement contained in that document.  This inquiry must ultimately focus, therefore, on the proximity between the misstatement and specific securities transactions in order to ascertain whether a real nexus exists or whether "the relationship between the fraud and the securities transaction is too attenuated."  Ketchum, 557 F.2d at

---

|      | a total of $9,362,549? |
| A.   | Yes, it is. |
| Q.   | And were these investments and loans, after the conversion, all of them made, at least in part, in connection with the representation regarding the intellectual property and the veracity of the same? |
| A.   | Yes, they were. |

Trial Tr. 34:10-40:12, April 15, 2011.

1028 (quoting Jacobs, The Role of the Sec. Exch. Act Rule 10b-5 in the Regulation of Corporate Mgmt., 59 Cornell L. Rev. 27, 43 (1973)).

The only sale of securities made shortly after the Business Plan was drafted and disseminated were Zimmel's purchase of $1,000,000 in Access shares in October and $500,000 in shares in November 2002.  Ironically, although the Court has not been persuaded by Zimmel's newly reinforced testimony that he read the Business Plan and relied on it, Fincke's own testimony and this Court's earlier findings compel the conclusion that the sale of Access stock to Zimmel in the fall of 2002 was made "by means of" the Business Plan and, consequently, the material misstatement contained in that document.  While Fincke attempted to shift the drafting of the false statement to Elefante, he admitted that the Business Plan was given to all Investors, including Zimmel, in October 2002.  See supra n.18; Access II, 404 B.R. at 615.   He is now estopped from saying otherwise.   And because Zimmel need not demonstrate actual reliance on the misstatement, the use of the Business Plan to solicit that sale of stock allows Zimmel to recover damages under § 410(a)(2) for that particular transaction.

Following those investments, however, no additional purchases of Access stock were made until April 2003.  The Court cannot conclude that the sales of stock in connection with the April 2003 Transaction were made "by means of" the misstatement in the Business Plan. Instead, those investments were made through the dissemination of a new company document – the Company Overview – and as the result of extensive negotiations between Fincke, Elefante, and the Investors in light of Access's dire financial situation, the need for additional working capital, and the desirability of a change in corporate structure. There was no evidence, apart from the Investors' self-serving and perfunctory testimony, that the Business Plan played

any role in the solicitation of those additional investments.  Thus, since the investments made during April 2003 were not as the result of a sale of securities "by means of" the material misrepresentation in the Business Plan, those investments are not recoverable pursuant to § 410(a)(2).

Following the April 2003 transaction, in addition to the dramatically changed circumstances and the Investors' new role in the government of Access,[24] there is simply no evidence that any of the Investors purchased additional Access stock.    Accordingly, the Investors may not recover their post-April 2003 investments pursuant to § 410(a)(2), because none of those investments involved the sale of securities.


IV.    CONCLUSION

The only sales of securities made "by means of" the material misstatement in the Business Plan were those purchases of Access stock made by Zimmel in October and November 2002.  Therefore, the Court will enter judgment against Fincke and in favor of Zimmel in the amount of $1,500,000 plus interest at six percent per year from May 25, 2007, the date of the of the disposition of the securities,[25] pursuant to § 410(a)(2), plus costs

---

[24] See, e.g., Horwitz v. Panhandle E. Pipe Line Co., 438 F.2d 53, 55 (10th Cir. 1971) (delivery of misleading information in connection with initial purchase of company stock had no connection to investor's later purchase of stock from company they had come to control); see also Shivers v. Amerco, 670 F.2d 826, 830, 832 (9th Cir. 1982).

[25] See Access III, 438 B.R. at 23 ("Pursuant to Article V. § 5.2(g) of [Access's Chapter 11] Plan, the Access stock held by the Investors – i.e., the securities at the heart of the § 410(a)(2) claim – was "deemed cancelled, void, surrendered and of no further force and effect.") (quoting Access Cardiosystems, Inc.'s 2d Am. Plan of Reorg., at 12, Case. No. 05-40809-HJB, May 18, 2007, ECF No. 457 Ex. A).  Access's Chapter 11 Plan was confirmed on May 25, 2007.  See Findings of Fact, Conl. Of Law & Order Confirming Access Cardiosystems, Inc.'s 2d Am. Plan of Reorg., Case. No. 05-40809-HJB, May 25, 2007, ECF No. 466.

pursuant to Bankruptcy Rule 7054(b).[26]  In addition, given Fincke's waiver of any objections to the entry of judgment in favor Access on account of his breaches of fiduciary duties, the Court will enter judgment against Fincke and in favor of Access in the amount of $281,534.62, plus interest at the rate of twelve percent from July 6, 2004, the time this action was commenced, pursuant to Mass. Gen. Laws ch. 231, § 6B,[27] plus costs pursuant to Bankruptcy Rule 7054(b). Postjudgment interest at the federal[28] rate established by 28 U.S.C. § 1961 will run on the entirety of both awards, including prejudgment interest and costs, from the date of judgment forward.  A judgment in conformity with this memorandum shall issue forthwith.

By the Court,

DATED: October 14, 2011

_____
Henry J. Boroff
United States Bankruptcy Judge

---

[26] Although the Complaint also included a request for attorneys' fees, no evidence relative to attorneys' fees was presented.  Accordingly, to the extent recoverable, the request for attorneys' fees has been waived.

[27] See Tobin v. Liberty Mutual Ins. Co., 553 F.3d 121, 145 (1st Cir. 2009) ("prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court"); Lattuca v. Robsham, 812 N.E.2d 877, 882 (Mass. 2004) (breach of fiduciary duty is "an action that sounds in tort" and prejudgment interest is calculated "under the statute governing tort actions," Mass. Gen. Laws ch. 231, § 6B); Mass. Gen. Laws ch. 231, § 6B (interest on order for judgment in tort action is "at the rate of twelve per cent per annum from the date of the commencement of the action").

[28] See Tobin, 553 F.3d at 145 (1st Cir. 2009) ("post-judgment interest, even on state-law claims, is governed by federal law").